# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

        *Plaintiff,*

        *v.*

LINDA YACCARINO,

        *Defendant*

Case No. 3:25-cv-1863

**DEMAND FOR JURY TRIAL**

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

# COMPLAINT FOR CONSTITUTIONAL VIOLATIONS, CONSPIRACY, AND

# DAMAGES

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**………………………………………………………………………..1

**INTRODUCTION** ...................................................................................3

**PARTIES** .................................................................................12

**JURISDICTION AND VENUE** .................................................................13

**FACTUAL BACKGROUND** ......................................................................16

- A. Incorporation by Reference ........................ 16
- B. Yaccarino's Individual Role in Constitutional Violations ... 17
- C. Consciousness of Guilt Through Strategic Resignation ... 22
- D. Specific Harm to Plaintiff Under Yaccarino's Authority ... 27
- E. Commercial Relationship and Consumer Protection Violations ... 27
- F. Evidence Destruction and Manipulation Pattern .....29
- G. Government Surveillance and Coordination Evidence …30

**CAUSES OF ACTION** ................................... 32

- COUNT I: Direct Constitutional Violation - First Amendment ... 32
- COUNT II: Conspiracy to Violate Constitutional Rights ... 34
- COUNT III: Texas Deceptive Trade Practices Act Violation ... 35
- COUNT IV: Fraudulent Misrepresentation ............. 37
- COUNT V: Civil RICO Violation ...................... 38
- COUNT VI: Corporate Officer Liability ............... 41
- COUNT VII: Breach of Contract ....................... 42
- COUNT VIII: Promissory Estoppel ....................43
- COUNT IX: Establishment Clause Violation ............45
- COUNT X: Religious Freedom Restoration Act Violation ... 46
- COUNT XI: Tortious Interference with Business Relations ...47
- COUNT XII: Obstruction of Justice ..................48

- COUNT XIII: Civil Conspiracy to Obstruct Justice ......49

- COUNT XIV: Intentional Interference with Prospective Business Relations ...49

**CONSCIOUSNESS OF GUILT** ............................50

**DAMAGES** .............................................50

**PRAYER FOR RELIEF** ................................. 55

**JURY DEMAND** ........................................57

**EXECUTIVE SUMMARY**

This case presents an unprecedented constitutional crisis where a corporate CEO implemented systematic religious discrimination under government entanglement, then fled legal accountability within hours of exposure. Defendant Linda Yaccarino, as CEO of X Corp. from June 2023 through July 2025, exercised executive authority over discriminatory "lawful but awful" content policies that systematically suppressed Mr. Richards' biblical religious expression while permitting more controversial secular and Catholic content to receive normal platform treatment. Her discriminatory implementation occurred during X Corp.'s unprecedented government entanglement through owner Elon Musk's simultaneous exercise of federal authority as official head of DOGE with continuing involvement even as the formal title ends, as stated by Musk and Trump, creating direct constitutional violations under color of federal law.

Most significantly, Defendant Yaccarino resigned from her CEO position within 10 hours of being identified as a participant in constitutional violations in the companion litigation--an unprecedented corporate departure occurring without succession planning, public explanation, or business justification. This extraordinary flight represents consciousness of guilt and demonstrates the culmination of a systematic pattern of coordinated obstruction, including strategic responses timed to legal challenges and systematic evidence destruction during active litigation. Her calculated silence regarding Pope Leo XIV's historic election as the first American pope, despite her documented Catholic devotion, further evidences strategic legal positioning due to consciousness that her Vatican coordination role created legal liability.

Plaintiff seeks $500 million in damages for systematic constitutional violations, fraudulent misrepresentation, and economic harm during Defendant's tenure, supported by established precedents including the Alex Jones verdict ($1.48 billion), Fox/Dominion settlement ($787.5

million), and E. Jean Carroll award ($83.3 million). The unprecedented nature of Defendant's strategic resignation--unparalleled in corporate history--combined with her role in coordinating constitutional violations under government entanglement, justifies substantial individual damages sufficient to deter future corporate executive participation in systematic suppression of religious expression in the digital public square.

## INTRODUCTION

1. This action seeks redress for Defendant Linda Yaccarino's individual participation in systematic constitutional violations during her tenure as Chief Executive Officer of X Corp. As detailed in the companion case *Richards v. X Corp. & Trump*, Case No. 3:25-cv-916 (N.D. Tex.), amended complaint filed July 8, 2025, X Corp. has engaged in unprecedented systematic suppression of Mr. Richards' biblical religious expression through government-platform coordination that violates the First Amendment.

2. Defendant Yaccarino, as CEO during the period of these violations, bears individual liability for: (a) implementing discriminatory "lawful but awful" suppression policies that systematically targeted biblical religious expression while permitting equally controversial secular or Catholic content to receive normal platform treatment; (b) personally overseeing and directing the systematic suppression of Plaintiff's religious expression; (c) conspiring with government actors to violate constitutional rights; and (d) attempting to evade legal accountability through strategic resignation.

3. **Most significantly, Defendant Yaccarino resigned from her position as CEO within 10 hours of being identified as a participant in these constitutional violations in the July 8, 2025 amended complaint in the companion case.** This unprecedented corporate

departure--occurring without succession planning, public explanation, or business justification--represents consciousness of guilt and an attempt to flee legal responsibility for systematic constitutional violations.

4. This case presents the unprecedented scenario expressed in the companion case in which a defendant has tight involvement with the federal government while implementing discriminatory content suppression policies. Upon information and belief, **Yaccarino's documented government coordination represents merely the tip of the iceberg and ties to X Corp.'s unprecedented government entanglement.** X Corp. operated under systematic government control through owner Musk's simultaneous exercise of federal authority as head of DOGE, $15.4 billion in government contracts, Top Secret security clearance, and ongoing federal coordination.

5. **Upon information and belief, Yaccarino was selected as CEO specifically due to deeper government coordination capabilities beyond her publicly documented appointments, making her the operational bridge for systematic constitutional violations under color of state law.** Discovery will reveal the full scope of coordination between Defendant's government network and X Corp.'s content suppression policies (explained in more detail in the companion case).

6. **As far as her observable ties,** she has been a part of the federal government in multiple openly known ways through bipartisan administrations. In 2018, President Donald Trump appointed Yaccarino to the President's Council on Sports, Fitness, and Nutrition for a two-year term.[1] As chair of the Ad Council from January 2021 to June 2022, Yaccarino

---

[1] https://x.com/Adweek/status/992512981585063937 May 4, 2018 5:15pm @Adweek

partnered with the Biden administration to create a COVID-19 vaccination campaign that featured Pope Francis Adweek (https://www.adcouncil.org/press-releases/the-ad-council-and-covid-collaborative-reveal-its-up-to-you-campaigns-to-educate-millions-of-americans-about-covid-19-vaccines).

7. Yaccarino's government entanglement exceeds the threshold established in *Brentwood Academy* through multiple vectors: (1) **Direct Presidential Appointments** across administrations demonstrating ongoing government coordination; (2) **Operational Government Partnerships** including the Biden administration COVID campaign featuring Pope Francis; (3) **Catholic-Government Nexus** where her religious devotion aligns with government preferences for Catholic institutional protection; (4) **Continuing Pattern** rather than isolated appointment, with deeper connections that discovery will demonstrate.

8. Courts apply the entwinement test broadly when government coordination creates constitutional violations. In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982), the Supreme Court found state action where private actors "acted together with or obtained significant aid from state officials." Upon information and belief, Yaccarino's systematic coordination with both Trump and Biden administrations, combined with her documented Catholic institutional loyalty and platform decisions favoring Catholic over biblical viewpoints, and tight coordination with Musk and X to advance government interests, establishes the requisite coordination with government actors necessary for state action.

---

Trump names NBCU's Linda Yaccarino to the President's Council on Sports, Fitness and Nutrition: http://adweek.it/2KyTmNI; https://www.adweek.com/convergent-tv/trump-names-nbcus-linda-yaccarino-to-the-presidents-council-on-sports-fitness-and-nutrition/).

9. **Critically, Yaccarino's government entanglement operates through COORDINATION rather than formal authority** - she serves as the operational bridge between government policy and platform implementation, making her role more integral to the constitutional violation than traditional government employees who lack platform control.

10. Rather than falsely promising content neutrality like X itself and Musk, Yaccarino publicly advocated for systematic suppression of what she termed "lawful but awful" content. In CNBC interviews, she explicitly stated: "if you're going to post something that is lawful, but it's awful, you get labeled. You get labeled, you get deamplified, which means it cannot be shared. And it is certainly demonetized".[2] "If it is lawful but it's awful, it's extraordinarily difficult for you to see it."[3] She further clarified: "If it's lawful but awful, it's extraordinarily difficult for you to see it."[4]

11. **The constitutional violation arises from Yaccarino's discriminatory application of this "lawful but awful" standard**: while systematically suppressing Mr. Richards' biblical religious expression, she simultaneously allowed and even boosted "awful" secular content including accounts promoting violence and extremist rhetoric. This

---

[2] *X Has Never Been Safer—But Major Brands Are Pulling Advertising After Posts Reportedly Appeared Beside Pro-Nazi Content*, FORTUNE (Aug. 17, 2023), https://fortune.com/2023/08/17/twitter-x-ads-pro-nazi-account-right-wing-hate-groups/.

[3] *X CEO Linda Yaccarino: "Lawful But Awful" Content To Be Hidden*, MEDIA STEADY, RUMBLE (Aug. 10, 2023), https://rumble.com/v3a04bl-x-ceo-linda-yaccarino-lawful-but-awful-content-to-be-hidden....html; *Twitter/X CEO Claims That '99.9%' of Site's Content Is 'Healthy'*, DAILY BEAST (Aug. 10, 2023), https://www.thedailybeast.com/twitter-or-x-ceo-linda-yaccarino-claims-that-999-of-sites-content-is-healthy.

[4] *X CEO Linda Yaccarino: "Lawful But Awful" Content To Be Hidden*, RECLAIM THE NET (Aug. 10, 2023), https://reclaimthenet.org/x-ceo-linda-yaccarino-lawful-but-awful; https://x.com/SpeechUnion/status/1690018254142533632.

demonstrates clear religious viewpoint discrimination under color of state law through X's and her personal, extensive government entanglement.

12. Yaccarino's discrimination operates through **coded language and selective classification** rather than explicit anti-biblical statements. As a "devoted Catholic"[5] she employs the traditional Catholic strategy of superficial biblical references while systematically undermining biblical authority through institutional preference. Her classification of Mr. Richards' biblical criticism of Catholic institutions as "awful" content warranting suppression, (a conclusion logically drawn from the fact that he is completely shadowbanned, with X causing his posts to be viewed by only a fraction of his follower count) while permitting secular criticism of other institutions, reveals denominational bias disguised as religious neutrality.

13. **Discriminatory Application Evidenced by Disparate Treatment**: The constitutional violation is demonstrated through systematic disparate impact rather than explicit anti-biblical statements. While Yaccarino's "lawful but awful" policy systematically suppressed Mr. Richards' biblical religious expression, more controversial secular accounts -- including Alex Jones (@RealAlexJones, 4.4M followers) calling for "war" against political enemies, Jackson Hinkle (@jacksonhinklle, 2.9M followers) calling for "targeted strikes," Catturd (@catturd2, 3.6M followers) spreading conspiracy theories, and Ian Miles Cheong (@stillgray, 1.2M followers) promoting extremist rhetoric -- received algorithmic boosting rather than suppression. This disparate treatment reveals

---

[5] *Who is Linda Yaccarino, really? Former colleagues reveal the tough "Long Island lady" Elon Musk has chosen to run Twitter*, FORTUNE (May 14, 2023, 8:01 AM), https://fortune.com/2023/05/14/new-twitter-ceo-linda-yaccarino-ad-industry-skills-but-challenge-elon-musk-leash/.

denominational bias disguised as content neutrality through her **mealy-mouthed advertising executive double-speak**, with Yaccarino's Catholic devotion and government entanglement motivating preferential treatment for secular over biblical content.

14. **Mr. Richards' Biblical Ministry and Cross-Platform Suppression:** For 28 years, Thomas Richards has maintained a biblical religious ministry exposing institutional corruption and antichrist deceptions within organized religion, beginning 25 years ago with SpirituallySmart.com and including 16 years on X/Twitter platform (@tlthe5th) where he built approximately 3,400 followers through over 71,500 posts of biblical content, despite extreme censorship across the entire internet.

15. **Mr. Richards' calling began in early childhood.** After experiencing a vision of Ἰησοῦς Χριστός (Iēsous Christos - Jesus the Christ) at 3 years old and expressing his desire to learn about Θεός (Theos - God), he was sent to the Catholic church. He then grew up in that faith, being formally confirmed at around age 13. However, Mr. Richards experienced a profound born-again conversion in March 1997 through a powerful supernatural and unexpected encounter with Θεός (Theos - God) through Ἰησοῦς Χριστός (Iēsous Christos - Jesus the Christ); this ultimately lead him to expose the unbiblical practices and institutional corruption within the Catholic church hierarchy. His transformative spiritual experience compels him to speak biblical truth against institutional corruption, including the Vatican's documented connections to Nazi escape networks, systematic cover-ups of child sex abuse scandals, and the antichrist practice of claiming unscriptural priestly authority (infant baptism, sovereign immunity, papal infallibility) exceeding that of Θεός (Theos - God) claimed through Ἰησοῦς Χριστός

(Iēsous Christos - Jesus the Christ) who even allowed (autos - himself) to be wrongly put to death.

16. In February 2025, Mr. Richards launched #OvertPsyops, a multifaceted educational initiative including published research, a book, artwork, and AI development work drawing on biblical wisdom and contemporary analysis to promote transparency about psychological influence operations in the digital age. His current AI projects include tlthe5th.ai (featuring a chatbot based on his biblical work where users can ask theological questions), lwrbot.ai (providing information about his constitutional lawsuits), and his recent blog posts at https://spirituallysmart.blogspot.com/. Due to systematic corruption embedded in third-party AI/LLM products, Mr. Richards is developing his own AI system from scratch along with independent computer and internet infrastructure to ensure biblical truth can be shared without institutional interference. All of this work is provided for free to everyone.

17. Mr. Richards' systematic suppression extends far beyond X Corp. to encompass coordinated cross-platform censorship designed to silence his biblical revelations from Θεός (Theos - God) through Ἰησοῦς Χριστός (Iēsous Christos - Jesus Christ). YouTube has restricted his documentary content exposing Vatican-Nazi connections and has blocked his channel (https://www.youtube.com/spirituallysmart) numerous times while simultaneously permitting unauthorized duplicates on other channels, demonstrating targeted rather than policy-based restrictions. This coordination is evidenced by YouTube's unprecedented decision to grant the Vatican exclusive partnership status at the time of its launch - the only religious institution in Google's 20-year history to receive such preferential treatment - combined with Google executive Eric Schmidt's explicit

promise to Pope Francis "We will make it happen" regarding suppression of Vatican-critical content.[6]

18. This suppression intensified after mainstream media attention, a 2009 article in *The Independent* that specifically mentioned his work as the second result when searching "Vatican" on YouTube, stating "Now the Vatican has the means to fight back."[7] The coordinated nature of this suppression - spanning Google, YouTube, Facebook, and X Corp., coupled with the universal recognition of the Pope/Vatican by each of these companies[8] - demonstrates institutional coordination between tech platforms and Vatican interests to systematically silence biblical criticism that could protect children and families from institutional deception.

19. Defendant Yaccarino's discriminatory application of "lawful but awful" policies represents the operational mechanism through which this broader Catholic-government-tech coordination suppresses biblical religious expression in the digital public square.

20. **The Vatican-Government-Tech Coordination Framework:** This constitutional violation operates within a comprehensive institutional framework where the Vatican has positioned itself as global authority over AI development through the "Rome Call for AI Ethics," with major technology companies including Microsoft, IBM, and Cisco formally

[6] Rome Reports, "Pope Francis meets with Google executive Eric Schmidt," January 15, 2016, available at https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

[7] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

[8] On July 2, 2022, after an uncharacteristic nine-day Twitter silence, Elon Musk tweeted "Honored to meet @Pontifex yesterday" with a photo of himself meeting Pope Francis. Elon Musk (@elonmusk), X (July 1, 2022, 9:54 PM), https://twitter.com/elonmusk/status/1543050489050402816.; David McCabe, *Mark Zuckerberg meets with Pope Francis*, THE HILL (Aug. 29, 2016, 11:02 AM), https://thehill.com/policy/technology/293656-mark-zuckerberg-meets-with-pope-francis-during-italy-visit/.

submitting to papal guidance. Yaccarino - a "devoted Catholic"[9] appointed by Trump to government councils and who partnered with Biden administration on Vatican COVID campaigns[10] serves as the operational bridge between government policy and platform implementation. While more "awful" secular accounts like Alex Jones (@RealAlexJones, 4.4M followers) calling for "war" against political enemies and Jackson Hinkle (@jacksonhinklle, 2.9M followers) calling for "targeted strikes" receive algorithmic boosting, Richards' biblical criticism of Catholic institutions faces systematic suppression under Yaccarino's discriminatory "lawful but awful" framework.

21. **Unprecedented Constitutional Crisis and Evidence of Coordination**: This case exposes how corporate executives with government entanglement coordinate to suppress religious expression while evading accountability. Yaccarino implemented discriminatory suppression while X Corp. operated under unprecedented government entanglement through owner Musk's simultaneous exercise of federal authority as head of DOGE, $15.4 billion in government contracts, and systematic deployment of AI systems across federal agencies. Yaccarino's systematic coordination with both Trump and Biden administrations, combined with her role as operational bridge between government policy and platform implementation, enabled discriminatory suppression of biblical criticism under color of state law. Three strategic responses prove systematic coordination: (1) March 31, 2025 demand letter to X Corp. → immediate reports of Musk leaving DOGE;

[9] *Who is Linda Yaccarino, really? Former colleagues reveal the tough "Long Island lady" Elon Musk has chosen to run Twitter*, FORTUNE (May 14, 2023, 8:01 AM), https://fortune.com/2023/05/14/new-twitter-ceo-linda-yaccarino-ad-industry-skills-but-challenge-elon-musk-leash/.
[10] CBS News, *Who is Linda Yaccarino, the new Twitter CEO replacing Elon Musk?*, CBS NEWS, https://www.cbsnews.com/news/linda-yaccarino-nbc-new-twitter-ceo-elon-musk/. *Who is Linda Yaccarino, Elon Musk's pick for new Twitter CEO?*, WASH. POST (May 12, 2023), https://www.washingtonpost.com/technology/2023/05/12/new-twitter-ceo-linda-yaccarino-elon-musk/.

(2) June 2, 2025 private attorney-client email about adding Trump as defendant → June 5 staged 'feud' on the exact specified date; (3) July 8, 2025 Yaccarino named in amended complaint → CEO resignation within 10 hours without succession planning. Systematic evidence destruction includes deletion of 61,600+ posts representing 16 years of religious expression, removal of 5,974 media files immediately following legal demands, and multiple content purges timed to legal communications. The mathematical impossibility of these timing correlations, combined with Yaccarino's conspicuous silence regarding Pope Leo XIV's historic election as the first American pope despite her documented Catholic devotion, demonstrates consciousness of guilt and systematic coordination to evade legal accountability while suppressing biblical religious expression under government entanglement.

## PARTIES

22. Plaintiff Thomas Richards is a natural person and resident of Virginia who has maintained a biblical religious ministry on X Corp.'s platform for 16 years, amassing approximately 3,400 followers through over 71,500 posts of compliant religious content.

23. Defendant Linda Yaccarino is a natural person and resident of New York. She served as Chief Executive Officer of X Corp. from June 6, 2023 through July 9, 2025, during which time she exercised executive authority over content moderation policies and public communications that systematically violated Mr. Richards' constitutional rights and breached X's user agreement, among other violations.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), and 28 U.S.C. § 1367 (supplemental jurisdiction).

25. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant directed conduct at this District through her executive control over X Corp., a Nevada corporation with its principal place of business in Bastrop, Texas.

26. This Court has personal jurisdiction over Defendant Yaccarino because she purposefully directed her conduct at Texas through her executive control over X Corp.'s Texas-based operations. As CEO of X Corp. from June 6, 2023 through July 9, 2025, Defendant exercised executive authority over content moderation policies from X Corp.'s principal place of business in Bastrop, Texas. Defendant's content moderation decisions were implemented through X Corp.'s Texas-based servers and infrastructure, directly affecting Texas users including Plaintiff's followers in Texas. Defendant's systematic suppression of Plaintiff's content was directed at and had its primary effect in Texas, where X Corp. conducts its business operations and maintains its technological infrastructure.

27. **Related Case and Consolidation**: This action is directly related to *Richards v. X Corp. & Trump*, Case No. 3:25-cv-916, currently pending in this District, which involves the same plaintiff, the same core constitutional violations, and the same systematic suppression of religious expression. Defendant Yaccarino, as CEO of X Corp. during the relevant period, was the individual corporate officer responsible for implementing the violations alleged against X Corp. in the related case. The systematic constitutional and contractual violations described herein are comprehensively documented in the companion case, including: detailed evidence of government-platform entanglement through Musk's dual

roles; statistical analysis of systematic religious content suppression; documentation of coordinated responses to legal challenges; evidence of Vatican-government-tech coordination; and extensive proof of constitutional violations spanning multiple years. Complex legal theories -- such as the Common Carrier framework for social media platforms recommended by Justice Thomas -- also receive thorough treatment in that complaint. Mr. Richards incorporates by reference all factual allegations, exhibits, and evidentiary materials from the companion case to establish the full scope of Defendant Yaccarino's individual participation in these systematic violations.

28. **Joinder Necessity and Consolidation**: X Corp.'s mandatory venue clause in its Terms of Service requires all disputes to be litigated in the Northern District of Texas, making it fundamentally unfair and contrary to judicial efficiency to require Plaintiff to litigate against X Corp. in Texas while forcing separate litigation against its CEO in another jurisdiction, when both defendants engaged in the same coordinated conduct targeting Mr. Richards' constitutional rights. **This separate litigation against Defendant Yaccarino became necessary solely because of her strategic resignation within 10 hours of being named in the companion case--a transparent attempt to evade legal accountability that should not be rewarded by forcing Mr. Richards to bear the additional burden and expense of pursuing her in a separate jurisdiction.** The systematic suppression was implemented through Defendant Yaccarino's executive authority over X Corp.'s Texas-based operations, making Texas the appropriate venue for claims against both the corporation and its controlling executive. The Defendant's coordination with the Defendants in the companion case, Richards v X , Corp. & Trump, in systematic religious suppression operated through complementary deception: while

Musk publicly denied shadowbanning to maintain platform credibility, Yaccarino implemented discriminatory "lawful but awful" policies that provided operational cover for the same suppression. All Defendants served Catholic-government coordination interests - Musk through his Vatican deference and government entanglement, Yaccarino through her documented Catholic devotion and government appointments. This coordinated approach enabled systematic biblical viewpoint discrimination while maintaining false narratives of content neutrality.

29. **It would be particularly unjust to allow Defendant's consciousness of guilt--evidenced by her unprecedented immediate resignation--to create additional procedural obstacles for Plaintiff while potentially allowing her to escape accountability entirely.** Discovery and evidence from both cases will be inherently intertwined, and splitting these cases would create risk of inconsistent judgments, duplicative discovery, and additional burden on Mr. Richards while undermining the policy behind X Corp.'s own venue selection. Judicial efficiency and the interests of justice strongly favor consolidation of these related matters.

## FACTUAL BACKGROUND

### A. Incorporation by Reference

30. Plaintiff incorporates by reference the factual allegations set forth in *Richards v. X Corp. & Trump*, Case No. 3:25-cv-916 (N.D. Tex.), where X Corp has been on the docket since April 2025 receiving all filings through ECF,[11] including but not limited to:

---

[11] The original complaint in 3:25-cv-916 was filed April 13, 2025 in draft form to quickly file the emergency TRO and Motion for Preliminary injunction. Therefore, as was noted in that litigation and also noted by Hon. Judge Brantley Starr, who is presiding over that case, the original complaint was not served upon X, Corp. Rather X,

- Plaintiff's 16-year history of biblical religious expression on X Corp.'s platform

- Systematic suppression through shadowbanning, content deletion, and algorithmic throttling

- Government-platform entanglement through Elon Musk's dual roles

- Evidence of coordinated constitutional violations and surveillance

- Vatican-government-tech coordination targeting biblical religious expression

31. **Documentary Evidence and Judicial Notice**: True and correct copies of key filings from Case No. 3:25-cv-916 are attached as exhibits: (Exhibit A) Amended Complaint filed July 8, 2025; (Exhibit B) Second Amended Emergency TRO Motion; and (Exhibit C) Emergency Supplemental Brief documenting Defendant's resignation timing. The full procedural history and all filings in Case No. 3:25-cv-916 provide essential context for Defendant's strategic resignation, including the pattern of coordinated responses to legal challenges documented therein. Mr. Richards respectfully requests this Court take judicial notice of the complete docket pursuant to Fed. R. Evid. 201.

## B. Yaccarino's Individual Role in Constitutional Violations

32. **Executive Authority During Suppression Period**: As CEO from June 6, 2023 through July 9, 2025, Defendant Yaccarino held executive authority over X Corp.'s content moderation policies and their discriminatory application against Mr. Richards' biblical religious expression.

---

Corp. was served the TRO and X Corp. then made appearances by counsel and received all filings by ECF after that point. The amended complaint was then formally served upon X, Corp. July 10, 2025.

33. **Discriminatory Application of "Lawful But Awful" Standard**: Unlike X Corp.'s owner Musk who publicly denied shadowbanning, Defendant Yaccarino explicitly advocated for systematic content suppression. During her tenure, she publicly stated: "if you're going to post something that is lawful, but it's awful, you get labeled. You get labeled, you get deamplified, which means it cannot be shared. And it is certainly demonetized."[12]

34. **The constitutional violation stems from discriminatory enforcement**: While Yaccarino's standard systematically targeted Mr. Richards' biblical religious expression as "awful," she simultaneously permitted and boosted equally "awful" secular content including accounts promoting violence, extremist rhetoric, and conspiracy theories. As a "devoted Catholic and staunch Republican"[13] with extensive government ties, her application of the "awful" standard reflected religious and political bias rather than neutral content criteria.

35. **False Public Statements**: Throughout her tenure, Defendant Yaccarino made categorical public statements claiming X Corp. protected free speech -- while knowing her company systematically suppressed religious viewpoints -- including:

---

[12] *X CEO Yaccarino: "Lawful But Awful" Content To Be Hidden*, MEDIA STEADY, RUMBLE (Aug. 10, 2023), https://rumble.com/v3a04bl-x-ceo-linda-yaccarino-lawful-but-awful-content-to-be-hidden....html; Daily Wire News, *X CEO Linda Yaccarino On 'Hate Speech' Policy At X: We 'Deamplify' Posts That Are 'Lawful But Awful'*, DAILY WIRE (Aug. 10, 2023), https://www.dailywire.com/news/x-ceo-linda-yaccarino-on-hate-speech-policy-at-x-we-deamplify-posts-that-are-lawful-but-awful.
[13] *Who is Linda Yaccarino, really? Former colleagues reveal the tough "Long Island lady" Elon Musk has chosen to run Twitter*, FORTUNE (May 14, 2023), https://fortune.com/2023/05/14/new-twitter-ceo-linda-yaccarino-ad-industry-skills-but-challenge-elon-musk-leash/.

- "@lindayaX: Protecting free speech is more important than ever. The people have woken up and they are the media now." (Nov. 20, 2024)[14]

- "@lindayaX: Free Speech. Today. Tomorrow. Always. X." (Oct. 8, 2024)[15]

- Promises of equal treatment for all users while implementing differential standards targeting biblical viewpoints[16]

- Public statements claiming platform neutrality[17] while privately coordinating denominational preferences favoring Catholic over biblical religious expression

36. **Direct Participation in Suppression Decisions**: Upon information and belief, Defendant Yaccarino participated in and approved content moderation policies that systematically targeted biblical religious expression, including:

- The March 19, 2025 mass deletion of Plaintiff's 61,600+ historical posts (see exhibits imported from Richards v X Corp & Trump)

- The April 5, 2025 removal of 5,974 media files following Mr. Richards' demand letter (see exhibits imported from Richards v X Corp & Trump)

- Ongoing algorithmic suppression reducing Plaintiff's engagement by 98%

---

[14] Linda Yaccarino (@lindayaX), X (Nov. 20, 2024, 12:07 PM), https://x.com/lindayaX/status/1859282552638317004; ("Protecting free speech is more important than ever. The people have woken up and they are the media now.")
[15] Linda Yaccarino (@lindayaX), X (Oct. 8, 2024, 1:35 PM), https://x.com/lindayaX/status/1843706908353626223 ("Free Speech. Today. Tomorrow. Always. X.")
[16] *Twitter CEO Linda Yaccarino Parrots Elon Musk's 'Global Town Square' Talking Points in First Memo to Staffers*, VARIETY (June 12, 2023), https://variety.com/2023/digital/news/twitter-ceo-linda-yaccarino-parrots-elon-musk-global-town-square-1235641232/.
[17] *With 600 million monthly active users, X's Linda Yaccarino doubles down on dismissing journalism*, DIGIDAY (May 1, 2025), https://digiday.com/marketing/with-600-million-users-xs-linda-yaccarino-doubles-down-on-dismissing-journalism/.

37. **Coordination with Government Actors**: Defendant Yaccarino's tenure coincided with unprecedented government-platform entanglement through Musk's role in the Department of Government Efficiency (DOGE), creating her individual liability for constitutional violations under color of state law.

38. This entanglement did not end with the culmination of Musk's official role at DOGE. As explained in Richards v X Corp & Trump: Musk cemented X's involvement with DOGE and the Federal government in several ways, including:

- Simultaneous roles as X's controlling owner and federal official with Top Secret clearance,

- Ongoing unofficial DOGE authority with continuing access and control over the DOGE team. President Trump stated "Elon is really not leaving" called DOGE "his baby", stating Musk would continue his involvement even after the official term ended. Musk concurred, stating, "this is not the end of Doge but really the beginning", adding he will continue to visit the White House as a "friend and adviser" to the president.[18]

- Musk placing over 700 former Tesla engineers, including Thomas Shedd, into prominent government roles.

- Musk also has unprecedented access to intelligence agencies. Altogether this creates direct federal action when X Corp. -- which Musk controls -- suppresses religious speech. Unlike *Brentwood Academy*'s diffuse governmental connections,

---

[18] *See* Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

here the same individual exercises both private platform control and federal authority, making X Corp.'s constitutional violations direct state action rather than merely private conduct.

39. **Executive Oversight of AI-Powered Religious Discrimination**: During Defendant's tenure, X Corp. systematically deployed Grok AI systems with documented anti-biblical bias while simultaneously implementing those same AI systems across federal agencies under government coordination. Defendant oversaw the integration of AI technology that dismissed biblical authority while promoting government submission theology, creating a direct pipeline between government-directed AI policy and private platform religious suppression.

40. **Vatican-Tech Coordination Framework**: Also during Defendant's tenure, X Corp. operated within a comprehensive Vatican-directed technology framework that began no later than 2017. This multi-year campaign included the "Child Dignity in the Digital World" initiative (2019), "The Common Good in the Digital Age" conference (2019), the "Rome Call for AI Ethics" (2020), the establishment of the RenAIssance Foundation (2021), and the multi-religious expansion in Hiroshima, Japan (July 2024) where eleven world religions and sixteen new signatories joined the framework under the Vatican-culminating with major technology companies including Microsoft, IBM, and Cisco formally submitting to papal guidance on artificial intelligence. Pope Leo XIV's election in 2025 as the first American pope intensified this coordination, as he explicitly chose his papal name to honor Pope Leo XIII, who addressed the Industrial Revolution, and has positioned himself as the global authority over artificial intelligence development, stating that "The Church offers to everyone the treasury of her social teaching, in response to

another industrial revolution and to developments in the field of artificial intelligence."
This systematic Vatican-tech coordination created the exact infrastructure for
denominational preference that Plaintiff's biblical ministry challenged, explaining the
systematic targeting of his religious expression under Defendant's executive authority.

41. Yaccarino's tenure as CEO fits within the broader pattern of Vatican-government-tech
coordination that characterizes this constitutional violation. Her documented partnership
with the Biden administration to create a COVID-19 vaccination campaign featuring
Pope Francis[19] demonstrates direct operational coordination between her role in a non-
profit that often works with governemnt (Ad Council chair), Catholic institutional
interests (Pope Francis), and technology implementation. This coordination extended to
Trump's administration through her appointment to the President's Council on Sports,
Fitness, and Nutrition[20] creating a continuous pattern of government-Catholic-tech
coordination regardless of partisan changes. Her systematic classification of Mr.
Richards' biblical criticism of Catholic institutions as "awful" content warranting
suppression, while permitting secular content critical of other institutions, demonstrates
how this coordination operates to protect Catholic institutional interests through platform
control under government entanglement.

C. **Consciousness of Guilt Through Strategic Resignation**

42. **Immediate Flight Following Legal Exposure**: On July 9, 2025--within 10 hours of the
filing of the amended complaint in Case No. 3:25-cv-916 on July 8, 2025 identifying her

---

[19] https://www.adweek.com/agencies/nbcuniversals-linda-yaccarino-named-ad-council-board-chair/
[20] https://twitter.com/Adweek/status/992512981585063937

specific role in constitutional violations--Defendant Yaccarino abruptly resigned as CEO of X Corp. without explanation, with no successor named, effective immediately.

43. While the initial complaint had never been served on X Corp, X Corp's counsel had made an appearance in the case in April 2025 and was receiving all filings through ECF.  (The initial complaint had not been served to allow for amending one time as a matter of right, pursuant to FRCP 4(m) and 15(a), but the emergency TRO was served on defendant X Corp in April 2025).

44. X Corp's lawyers therefore would have immediately notified Defendant when the amended complaint specifically documenting her role was filed.

45. Defendant's resignation within 10 hours demonstrates immediate corporate coordination to address her legal exposure.

46. **Unprecedented Corporate Departure**: This resignation is unprecedented in corporate history--no CEO of any major corporation has ever resigned, effective immediately with no succession planning. And here, this occurred within 10 hours of being named in litigation, abandoning her post with no public explanation to stakeholders, and no interim leadership structure. Even CEOs facing criminal charges, hostile takeovers, or catastrophic scandals provide orderly transitions. Defendant's immediate abandonment of corporate duties represents the most extreme form of executive flight from legal accountability ever documented.

47. **Pattern of Strategic Evasion**: Yaccarino's resignation represents the third documented "coincidence" following legal developments in the companion case:

- March 31, 2025: Demand letter sent → Reports of Musk leaving DOGE

- June 2, 2025: Private attorney-client email → June 5 staged "feud"

- July 8, 2025: Amended complaint filed naming Yaccarino → July 9 CEO resignation

48. **Strategic Vatican Distancing**: Defendant's consciousness of guilt is further evidenced by her complete silence regarding the May 2025 election of Pope Leo XIV, the first American pope in history. This silence is stark given her documented Catholic devotion.[21] She partnered with Biden's White House to create a COVID-19 vaccine campaign featuring Pope Francis.  2) she publicly honored him upon death, stating, "Mourning the loss of Pope Francis. Rest in eternal peace Holy Father."[22]  She even stated "love this" regarding a meeting with Pope Leo XIV's brother and wife with Trump and Vance[23] and "So wonderful" (with prayer hand emoji) regarding a meeting with Senator Marco Rubio and JD Vance with attending the inaugural mass for Pope Leo XIV.[24] Yet conspicuously she made not a single tweet (or comment anywhere) directly speaking of the inauguration of the new (and first American) Pope.

49. **Calculated Legal Strategy Through Selective Papal Silence**: Yaccarino's complete avoidance of any direct statement congratulating, celebrating, or even acknowledging the historic Catholic milestone of Pope Leo XIV's election is unprecedented for a Catholic media executive. Yet, his election occurred *after* litigation had begun in Richards v X

[21] Who is Linda Yaccarino, really? Former colleagues reveal the tough "Long Island lady" Elon Musk has chosen to run Twitter, May 14, 2023, (https://fortune.com/2023/05/14/new-twitter-ceo-linda-yaccarino-ad-industry-skills-but-challenge-elon-musk-leash/.)

[22] Linda Yaccarino (@lindayaX), X (Apr. 21, 2025, 8:26 AM), https://x.com/lindayaX/status/1914294681124426205.

[23] Linda Yaccarino (@lindayaX), X (May 20, 2025, 8:52 PM), https://x.com/lindayaX/status/1924991683533709736.

[24] Linda Yaccarino (@lindayaX), X (May 16, 2025, 8:14 PM), https://x.com/lindayaX/status/1923532515387556084.

Corp. This calculated pattern is further evidenced by her prior Catholic posting, including promoting Pope Francis' funeral ("As people around the world gather for the Funeral Mass for Pope Francis, you can virtually attend this historic moment on X...May he rest in eternal peace"[25]), celebrating her grandson's Catholic baptism ("A Beautiful Saturday for the Baptism of our Grandson!"[26]), and engaging with comments declaring "Catholicism is beautiful and true!" as her top pinned response. Yet she completely avoided any direct acknowledgment of the first American pope while actively posting about all other Catholic matters. This selective silence--posting about Catholic topics generally, honoring Pope Francis directly, acknowledging Pope Leo XIV indirectly through others' meetings, yet refusing to directly celebrate the first American pope--is impossible to explain innocently and demonstrates strategic legal positioning due to consciousness that litigation was underway in Richards v X Corp and her Vatican coordination role would become central to legal liability in that case.

50. **Yaccarino's Advertising Executive Background and Contradictory Public Messaging**: Yaccarino's 35-year career in advertising and public relations trained her as a mealy-mouthed executive, skilled in saying contradictory things to different audiences - a skill that enabled her coordinated deception regarding X Corp.'s content policies. As an advertising executive, her profession involves crafting messages designed to influence rather than inform. Her contradictory statements about free speech demonstrate this professional deception: she simultaneously promotes "free speech" in general terms (even

---

[25] Linda Yaccarino (@lindayaX), X (Apr. 25, 2025, 7:55 PM), https://x.com/lindayaX/status/1915917731964096717.
[26] Linda Yaccarino (@lindayaX), X (July 20, 2024, 1:50 PM), https://x.com/lindayaX/status/1814719618331656222.

saying that free speech needs to be available for people's views that you don't agree with[27]) while explicitly advocating for systematic suppression of content she deems "awful." This is classic advertising technique - using aspirational language ("free speech") while implementing opposite practices ("lawful but awful" suppression). **True free speech cannot exist when content is, as Defendant promised, systematically hidden "so it's extraordinarily difficult for you to see" - that is the definition of censorship, not free speech**.

51. Yaccarino's professional background in paid persuasion (advertising) explains her ability to maintain these contradictory positions: advertising executives are trained to say whatever serves their client's interests regardless of truth or consistency. Here, her "client" was the Catholic-government coordination that benefited from suppressing biblical criticism while maintaining false claims of supporting free speech. This mealy-mouthed approach enabled Defendant to claim support for "free speech" while implementing the exact opposite -- systematic suppression that serves her Catholic-government coordination clients.

52. This selective silence becomes even more significant given Pope Leo XIV's explicit positioning as the global authority over artificial intelligence development - the exact technology through which Defendant, through X Corp, oversaw systematic suppression of biblical religious expression on X Corp.'s platform. Her silence regarding a pope focused specifically on AI control, while she simultaneously oversaw X Corp's AI-

---

[27] *X CEO Linda Yaccarino: "Lawful But Awful" Content To Be Hidden*, MEDIA STEADY, RUMBLE (Aug. 10, 2023), https://rumble.com/v3a04bl-x-ceo-linda-yaccarino-lawful-but-awful-content-to-be-hidden....html;

powered biblical religious discrimination,[28] demonstrates consciousness that acknowledging this papal authority would expose her coordination role in systematic constitutional violations.

## D. Specific Harm to Plaintiff Under Yaccarino's Authority

53. During Defendant's tenure as CEO, Plaintiff suffered systematic constitutional violations including:

- 98% reduction in content visibility despite 3,400+ followers

- Mass deletion of 16 years of biblical religious expression

- Discriminatory API restrictions despite $200 monthly payments

- Systematic suppression escalating after legal challenges

54. These violations occurred under Defendant's executive authority and with her knowledge, as evidenced by her public statements claiming the opposite of X Corp.'s actual practices.

## E. Commercial Relationship and Consumer Protection Violations

55. **Consumer Status Under Texas Law**: Plaintiff qualifies as a "consumer" under Texas Deceptive Trade Practices Act § 17.45(4) through his purchase of API access ($200 monthly) and Premium services from X Corp. during Defendant's tenure as CEO.

56. **Industry Standard Performance Metrics**: Content creators with comparable follower counts (3,400+) typically achieve engagement rates of 2-5% on social media platforms.

---

[28] This is one example among many. Exhibit D demonstrates Grok amplifying Pope Leo XIV's post while stating that the Bible is false (that indeed there is no "rulebook" for getting to heaven), and specifically amplifying the post of an unknown user who refutes the bible, while silencing Mr. Richards' bible-based comment.

Industry metrics confirm such creators generate approximately $1.65 per follower annually through platform monetization opportunities. Plaintiff's documented systematic reduction in content visibility despite X Corp.'s explicit promise that followers would see all posts from accounts they follow, while Yaccarino's "lawful but awful" policy provided the framework for this discriminatory suppression. This represents systematic commercial fraud, as X collected $200 monthly for API services while deliberately throttling the very content those services were designed to distribute.

57. **Systematic Deceptive Practices Under Yaccarino's Authority**: During her tenure as CEO, Defendant directed and oversaw systematic deceptive practices prohibited by DTPA § 17.46(a), including: (a) False Service Characteristics (§ 17.46(b)(5)): Promising "free speech" and neutral moderation while implementing systematic religious discrimination against biblical content; (b) Misrepresented Service Quality (§ 17.46(b)(7)): Claiming equal treatment while applying discriminatory standards to religious content; (c) False Rights Representations (§ 17.46(b)(12)): Promising transparency and appeals processes that were never provided; (d) Material Omissions (§ 17.46(b)(24)): Concealing differential moderation targeting religious viewpoints.

58. **Contractual Violations Under Executive Authority**: Defendant's leadership directly caused multiple contractual breaches including: (a) Violation of X's explicit promises that "When you follow someone, every time they post a new message, it will appear on your X Home timeline";[29] (b) Breach of Premium Service guarantees promising prioritized visibility while simultaneously suppressing Plaintiff's Premium content; (c) API Service

---

[29] X Help Center, New user FAQ - https://help.x.com/en/resources/new-user-faq

violations through discriminatory throttling while continuing to charge $200 monthly fees.

59. **Establishment Clause Coordination**: Defendant's systematic accommodation of Catholic perspectives while suppressing biblical viewpoints violated the Establishment Clause's prohibition on denominational preferences. Her calculated silence regarding Pope Leo XIV's historic election--despite her documented Catholic devotion and prior papal statements--demonstrates consciousness that her Vatican coordination role created legal liability in the active litigation of Richards v X , Corp.

60. **Religious Exercise Burden**: Defendant's content policies substantially burdened Plaintiff's religious exercise protected under the Religious Freedom Restoration Act by effectively silencing his digital biblical ministry through systematic suppression.

61. **Common Carrier Violations**: Under Defendant's leadership, X Corp. functioned as a common carrier of digital speech but violated fundamental common carrier duties by discriminating against religious speech and applying differential standards based on denominational viewpoint.

## F. Evidence Destruction and Manipulation Pattern

62. **Systematic Evidence Destruction During Litigation**: Defendant oversaw a documented pattern of evidence destruction directly correlated with legal challenges: (a) March 19, 2025: Mass deletion of 61,600+ historical posts; (b) March 31, 2025: Demand letter sent; (c) April 5, 2025: Removal of 5,974 media files within days of demand letter; (d) April 6, 2025: Further post deletions following counsel's follow-up letter; (e) July 3, 2025: Additional content removal following litigation developments.

63. **Systematic Performance Suppression Documentation**: During Defendant's tenure implementing "lawful but awful" suppression policies, Plaintiff's religious content experienced systematic reduction in visibility compared to X's explicit promise that followers see posts from accounts they follow,[30] while secular "awful" content received normal or boosted algorithmic treatment. During Defendant's leadership, identical religious content posted under identical conditions achieved only 10-50 views, representing a mathematically impossible degradation absent systematic algorithmic intervention. This suppression occurred despite Plaintiff's Premium subscription specifically promising "prioritized visibility" and his $200 monthly API payments guaranteeing content distribution services.

64. **Algorithmic Manipulation to Create False Evidence**: Under Defendant's authority, X selectively amplified exactly one of Plaintiff's posts[31] (reaching nearly 8,000 views compared to typical 10-50 views) shortly after receiving the demand letter. Notably, the only post X chose to amplify involved Plaintiff's Bible-based AI development--a field directly related to Musk's primary business interests through Grok, its AI This manipulation demonstrates both X's complete algorithmic control and Defendant's deliberate attempt to create false evidence of content neutrality for litigation purposes.

## G. Government Surveillance and Coordination Evidence

65. **Pattern of Strategic Responses Under CEO Authority**: During Defendant's tenure as CEO, X Corp. demonstrated a documented pattern of immediate strategic responses to

---

[30] *Id.*

[31] Tommy Richards (@tlthe5th), X (Apr. 12, 2025, 2:06 PM), https://x.com/tlthe5th/status/1911088636155617393.

legal challenges: (a) March 31, 2025: Demand letter sent → Reports of Musk leaving DOGE; (b) June 2-5, 2025: Private attorney-client communication about litigation strategy → Immediate public "feud" on the exact specified date; (c) July 8, 2025: Amended complaint naming Yaccarino → CEO resignation within 10 hours with no succession planned. The mathematical improbability of these timing correlations raises substantial questions about coordination capabilities that, upon information and belief, operated under or with the knowledge of Defendant's executive authority.

66. **Executive Responsibility for Corporate Coordination**: As CEO, Defendant bore responsibility for understanding and controlling X Corp.'s operational capabilities and external coordination. Whether through direct participation, willful blindness, or failure of executive oversight, Defendant's leadership during this period of systematic strategic responses establishes her individual liability for constitutional violations. The precise timing correlations, while requiring discovery to establish the full scope and mechanisms, demonstrate coordination patterns that either involved Defendant's direct knowledge or occurred due to her failure to exercise proper executive oversight of corporate activities affecting active litigation.

67. **Necessity for Enhanced Security Measures**: The pattern of coordinated responses to private attorney-client communications compelled both Mr. Richards and counsel to obtain new encrypted email addresses due to reasonable concerns about ongoing surveillance of their legal strategy. The mathematical improbability of the June 2-5, 2025 coordination, combined with the sophisticated nature of the coordinated responses, created legitimate security concerns requiring enhanced protective measures for attorney-client communications. This extraordinary step--necessitated by Defendant's participation

in systematic coordination--further demonstrates the scope and sophistication of the surveillance capabilities operating during Defendant's tenure as CEO.

## CAUSES OF ACTION

## COUNT I: DIRECT CONSTITUTIONAL VIOLATION - FIRST AMENDMENT

68. Plaintiff incorporates by reference all preceding paragraphs.

69. **Individual Liability for Constitutional Violations**: Defendant Yaccarino, acting in her individual capacity as CEO of X Corp., violated the First Amendment by depriving Plaintiff of rights secured by the Constitution under color of law. Defendant acted under color of law because her role as CEO of X Corp. -- which became a government entity through unprecedented government entanglement via owner Elon Musk's simultaneous exercise of federal authority -- made her a government actor whose content moderation decisions constitute direct government action subject to constitutional constraints.

70. **Federal Action Through Government Entanglement**: Defendant's actions constitute federal action because X Corp. operated under unprecedented government entanglement through owner Elon Musk's simultaneous exercise of federal authority as head of DOGE, his $15.4 billion in government contracts, systematic deployment of AI systems performing governmental functions, and continuing federal authority under DOGE (despite claims that his role had ended) as stated by President Trump and Musk.[32]

---

[32] President Trump stated "Elon is really not leaving" called DOGE "his baby", stating Musk would continue his involvement even after the official term ended. Musk concurred, stating, "this is not the end of Doge but really the beginning", adding he will continue to visit the White House

71. **Alternatively, even if after discovery, Defendant's individual government ties are deemed insufficient, her CEO role at X Corp. during unprecedented government entanglement through owner Musk's federal authority makes her actions state action under color of law.** Defendant implemented discriminatory policies while X Corp. operated as a government entity, making her individual participation in constitutional violations direct government action regardless of her personal government status.

72. **Personal Participation**: Defendant personally participated in the constitutional violations by:

    - Exercising executive authority over discriminatory content policies

    - Making false public statements to conceal systematic suppression

    - Directing corporate resources toward viewpoint-based religious discrimination

    - Coordinating with government actors in violation of constitutional rights

73. **Alternative Theory - Joint Action**: Even if X Corp. is not deemed a government entity, Defendant's systematic coordination with government actors in suppressing Plaintiff's religious expression constitutes joint action sufficient to establish federal action under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

---

as a "friend and adviser" to the president.- *See* Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

74. **Systematic Religious Viewpoint Discrimination**: Under Defendant's leadership, X Corp. systematically suppressed Plaintiff's biblical religious expression while accommodating Catholic and secular viewpoints, violating both Free Speech and Establishment Clause protections.

75. As a direct result of Defendant's constitutional violations, Plaintiff has suffered irreparable harm to his First Amendment rights and quantifiable damages exceeding $500 million.

## COUNT II: CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS

76. Plaintiff incorporates by reference all preceding paragraphs.

77. **Conspiracy Under Color of Law**: Defendant Yaccarino conspired with X Corp. owner Elon Musk, President Trump, and other government actors to systematically deprive Plaintiff of constitutional rights through coordinated suppression of bible-based religious expression.

78. **Overt Acts in Furtherance**: The conspiracy included multiple overt acts:

- False public statements claiming content neutrality while implementing discrimination

- Mass deletion of religious content following legal challenges

- Strategic coordination with government actors under DOGE framework

- Evidence destruction through systematic content removal

79. **Meeting of Minds**: The conspiracy is evidenced by coordinated responses to legal challenges, including Defendant's strategic resignation within 10 hours of legal exposure, demonstrating awareness of wrongdoing and coordination to evade accountability.

80. Plaintiff has suffered substantial damages exceeding $500 million as a direct result of this conspiracy.

## COUNT III: TEXAS DECEPTIVE TRADE PRACTICES ACT VIOLATION

81. Plaintiff incorporates by reference all preceding paragraphs.

82. **Consumer Status**: Plaintiff qualifies as a "consumer" under DTPA § 17.45(4) through his purchase of API access ($200 monthly) and Premium services from X Corp. during Defendant's tenure as CEO.

83. **Systematic Deceptive Practices**: Under Defendant's executive authority, X Corp. engaged in false, misleading, and deceptive acts prohibited by DTPA § 17.46(a): (a) False Service Characteristics (§ 17.46(b)(5)): Promising "free speech" and neutral moderation while implementing systematic religious discrimination; (b) Misrepresented Service Quality (§ 17.46(b)(7)): Claiming equal treatment while applying discriminatory standards to religious content; (c) False Rights Representations (§ 17.46(b)(12)): Promising transparency and appeals processes that were never provided; while X Corp.'s published policies and Musk's statements promised such processes (https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice),[33] Defendant as CEO failed to ensure these promised appeals processes were actually

---

[33] Elon Musk (@elonmusk), Twitter is Working on a Software Update That Will Show Your True Account Status, So You Know Clearly if You've Been Shadowbanned, the Reason Why and How to Appeal, TWITTER (Dec. 8, 2022, 9:32 PM), https://x.com/elonmusk/status/1601042125130371072.

provided to users experiencing suppression under her "lawful but awful" framework; (d) Material Omissions (§ 17.46(b)(24)): Concealing differential moderation targeting religious viewpoints.

84. **CEO-Level Fraudulent Inducement**: Defendant, as CEO, knowingly induced Plaintiff's continued platform investment through false promises of content neutrality and free speech protection, preventing migration to alternative platforms and causing substantial financial harm.

85. **Knowing and Intentional Violations**: The statistical impossibility of Plaintiff's 98% engagement reduction from what X's terms promise, coupled with deliberate technical intervention, demonstrates intentional deception designed to maintain revenue while providing fraudulent services.

86. **Specific Service Performance Failures**: During Defendant's tenure as CEO, X explicitly promised that "When you follow someone, every time they post a new message, it will appear on your X Home timeline"[34] while simultaneously suppressing Plaintiff's content from followers' feeds. X collected Premium subscription fees promising "prioritized visibility" while implementing systematic algorithmic suppression. These contradictory practices constitute knowing deception under DTPA § 17.46(b)(5) (false service characteristics) and § 17.46(b)(24) (material omissions regarding actual service delivery)

87. **Damages and Enhanced Relief**: Plaintiff suffered economic damages of $4.2 million annually during Defendant's tenure plus mental anguish from systematic suppression of

---

[34] X Help Center, New user FAQ - https://help.x.com/en/resources/new-user-faq

religious expression. Due to knowing and intentional violations, Plaintiff seeks treble damages under DTPA § 17.50(b)(1) and attorney's fees under § 17.50(d).

**COUNT IV: FRAUDULENT MISREPRESENTATION**

88. Plaintiff incorporates by reference all preceding paragraphs.

89. **Discriminatory Religious Targeting Under "Lawful But Awful" Framework**: Defendant's constitutional violation stems from discriminatory application of her explicitly stated "lawful but awful" suppression policy. As a documented "devoted Catholic" with extensive government entanglement, Defendant systematically classified Mr. Richards' biblical criticism of Catholic institutions as "awful" warranting suppression, while permitting equally controversial secular content to receive normal platform treatment.

90. **Knowledge of Falsity**: Defendant knew these statements were false based on her executive authority over content moderation policies that systematically suppressed religious viewpoints.

91. **Intent to Deceive**: Defendant intended to deceive users, advertisers, and the public about X Corp.'s true content moderation practices to maintain platform credibility while engaging in discriminatory suppression.

92. **Justifiable Reliance**: Mr. Richards reasonably relied on these representations by continuing to invest time, resources, and content creation on the platform rather than investing that time on work for alternative platforms.

93. **Damages**: Plaintiff suffered substantial economic and reputational harm exceeding $500 million as a direct result of Defendant's fraudulent misrepresentations.

94. **Loss of Section 230 Immunity**: Defendant's systematic religious discrimination through selective application of "lawful but awful" standards, combined with her extensive government entanglement, removes Section 230 protection. The statute only protects actions "voluntarily taken in good faith," and Defendant's discriminatory targeting of biblical viewpoints while accommodating secular content demonstrates religious bias rather than good faith content moderation.

## COUNT V: CIVIL RICO VIOLATION (18 U.S.C. § 1962)

95. Plaintiff incorporates by reference all preceding paragraphs. This count parallels and coordinates with Count IX in the companion case *Richards v. X Corp. & Trump*, as Defendant Yaccarino served as the operational bridge for the same RICO enterprise during her tenure as CEO.

96. **Enterprise Existence**: Defendant participated in an enterprise consisting of X Corp., President Trump, government actors, and coordinated entities engaged in systematic suppression of religious expression while maintaining false public representations. This enterprise operated through: (a) Musk's $300 million investment in Trump's campaign; (b) Trump's creation of DOGE specifically for Musk; (c) Defendant's role as CEO implementing discriminatory policies during unprecedented government entanglement; (d) Vatican-government-tech coordination framework; (e) strategic timing of coordinated responses to legal challenges.

97. **Pattern of Racketeering Activity**: Defendant engaged in a pattern of racketeering activity through documented predicate acts during her tenure as CEO:

**a. Wire Fraud (18 U.S.C. § 1343):**

- Systematic transmission via electronic communications of false promises that X provides neutral content moderation while implementing "lawful but awful" religious discrimination

- Electronic transmission of Defendant's false public statements claiming "Free Speech. Today. Tomorrow. Always. X." while overseeing systematic biblical suppression

- Each transmission of suppressed religious content to Plaintiff's followers while concealing Defendant's discriminatory classification constitutes a separate wire fraud predicate act

- Electronic coordination of strategic responses following legal challenges

**b. Mail Fraud (18 U.S.C. § 1341):**

- Transmission of false API service agreements and Premium subscription promises through electronic systems while providing discriminatory service under Defendant's executive authority

- Deceptive service agreements and terms promising equal treatment while implementing denominational preferences

**c. Extortion (18 U.S.C. § 1951 - Hobbs Act):**

- Systematic suppression escalating after each legal demand during Defendant's tenure

- Retaliation through mass deletion of 61,600+ posts and 5,974 media files under Defendant's executive oversight

- Creating coercive pressure to abandon constitutional claims through escalating platform restrictions

**98. Continuity and Relationship**: The predicate acts demonstrate both continuity (systematic suppression spanning Defendant's entire tenure as CEO, 2023-2025) and relationship (all acts served the common purpose of suppressing biblical criticism while maintaining false neutrality under Defendant's "lawful but awful" framework).

**99. Interstate Commerce Impact**: The enterprise affects interstate commerce through X's national platform operations, API services involving interstate transactions, and suppression of religious content affecting followers nationwide under Defendant's executive authority.

**100. Specific RICO Violations During CEO Tenure**:

- **§ 1962(a)**: Using income from racketeering (fraudulent Premium/API fees collected during discriminatory service delivery) to maintain enterprise operations

- **§ 1962(c)**: Conducting enterprise affairs through pattern of racketeering activity via Defendant's executive implementation of discriminatory policies

- **§ 1962(d)**: Conspiring to violate RICO through coordinated suppression scheme evidenced by strategic resignation following legal exposure

**101.** As a direct result of Defendant's RICO violations during her tenure as CEO, Plaintiff has suffered damages exceeding $500 million and seeks treble damages under 18 U.S.C. § 1964(c), plus attorney's fees and costs.

**COUNT VI: CORPORATE OFFICER LIABILITY**

98.  Plaintiff incorporates by reference all preceding paragraphs.

99.  **Individual Liability Doctrine**: Under established corporate officer liability doctrine, Defendant bears personal responsibility for constitutional violations committed by X Corp. under her executive authority.

100. Direct Constitutional Liability: Corporate officers bear personal responsibility for constitutional violations committed under their executive authority when they personally participate in or direct the unconstitutional conduct. This liability exists independently of statutory frameworks and derives directly from the constitutional violation itself.

101. Direct Personal Conduct: Defendant's personal liability stems from her direct participation in constitutional violations, including: (a) publicly articulating the "lawful but awful" suppression framework that enabled systematic religious discrimination; (b) making false statements about platform neutrality while knowing of discriminatory practices; (c) exercising executive authority over content moderation policies during systematic religious suppression; (d) coordinating strategic responses to legal challenges while maintaining false public representations.

102. **Personal Participation**: Defendant personally participated in and directed the constitutional violations rather than merely serving in a passive corporate role.

103. **Executive Authority**: As CEO, Defendant possessed authority to prevent the constitutional violations but chose to perpetuate and conceal them through false public statements.

104. **Government Entanglement Liability**: When private entities become government actors through unprecedented entanglement, their corporate officers bear individual liability for constitutional violations under the same principles that would apply to government officials. Defendant's executive role during X Corp.'s government entanglement through Musk's federal authority creates direct individual liability for First Amendment violations.

105. Defendant's individual liability requires compensation for all damages caused by the systematic constitutional violations under her leadership.

106. **No Section 230 Protection for Contractual Breaches**: Defendant's systematic breach of X Corp.'s explicit contractual promises cannot claim Section 230 immunity, as the statute does not protect platforms from liability for their own contractual commitments to users.

107. **Common Carrier Obligations**: Under Defendant's leadership, X Corp. functioned as a common carrier of digital speech by holding itself out as a neutral conduit and generating hundreds of millions of algorithmic feeds. As a common carrier, X Corp. owed fundamental duties of non-discrimination and reasonable accommodation that Defendant systematically violated through religious viewpoint discrimination and differential treatment based on denominational preferences. (See companion complaint in Richards v Corp, incorporated by reference for further treatment on the Common Carrier Framework).

## COUNT VII: BREACH OF CONTRACT

108. Plaintiff incorporates by reference all preceding paragraphs.

109. **Enhanced Contractual Relationship**: During Defendant's tenure as CEO, Plaintiff's relationship with X Corp. included enhanced contractual obligations through his $200 monthly API payments and Premium subscription.

110. **Breach Through Discriminatory "Lawful But Awful" Implementation**: Defendant breached X Corp.'s explicit promises by implementing "lawful but awful" suppression in a religiously discriminatory manner: (a) While X Corp. promised "When you follow someone, every time they post a new message, it will appear on your X Home timeline" (https://help.x.com/en/resources/new-user-faq), Defendant's systematic classification of Mr. Richards' biblical content as "awful" prevented his followers from seeing his posts as promised";[35] (b) Breach of X's "Free Speech Commitment" and Defendant's personal CEO statements that X protects free speech; (c) Premium Service Fraud: X promised Premium subscribers would receive "prioritized visibility" while simultaneously suppressing Plaintiff's Premium content under Defendant's leadership; (d) API Service Breach: Throttling compliant bots while continuing to charge $200 monthly fees.

111. **CEO Personal Responsibility**: Defendant, as CEO, bore executive responsibility for ensuring contractual compliance and made personal public guarantees about platform neutrality that created individual liability for contractual breaches.

112. Plaintiff's reasonable reliance on these contractual promises during Defendant's tenure resulted in continued platform investment, Premium payments, API fees, and foregone opportunities on alternative platforms.

## COUNT VIII: PROMISSORY ESTOPPEL

---

[35] X Help Center, New user FAQ - https://help.x.com/en/resources/new-user-faq

113. **Specific Executive Promises Creating Reasonable Reliance**: Defendant made specific, unambiguous promises as CEO that created reasonable expectations of neutral platform treatment:

  **(a) Categorical Free Speech Guarantees**: "Free Speech. Today. Tomorrow. Always. X." (Oct. 8, 2024) - an unqualified commitment to free speech protection

  **(b) Promise of Equal Treatment**: Public statements that X would protect free speech "for people's views that you don't agree with" - creating expectation of viewpoint neutrality

  **(c) "Lawful but Awful" Standard**: While Defendant explicitly promised to suppress "awful" content, she represented this would be applied through neutral criteria rather than religious discrimination

114. **Reasonable Reliance Despite Advertising Background**: Although Defendant's advertising executive background involves "mealy-mouthed" contradictory messaging, Plaintiff's reliance was reasonable because:

  **(a) CEO-Level Authority**: These promises came from the Chief Executive Officer, not merely marketing materials, creating heightened credibility and legal significance

  **(b) Specific Operational Commitments**: The "lawful but awful" framework provided seemingly objective criteria that appeared religiously neutral

  **(c) Industry Standard Expectations**: Users reasonably expect neutral application of stated policies regardless of executive communication style

**(d) Legal Framework Reliance**: Plaintiff relied on constitutional and contractual protections that should prevent discriminatory application even by contradictory executives

115. **Detrimental Reliance on Neutral Implementation**: Plaintiff reasonably relied on neutral implementation of Defendant's stated policies by continuing to invest time, resources, and content creation on the platform during Defendant's tenure rather than spending that time on alternative platforms, despite growing evidence of discriminatory application.

116. **Injustice Requires Enforcement**: Defendant's discriminatory implementation of her own stated framework, combined with her strategic resignation to evade accountability, creates injustice that can only be avoided by enforcing the neutral application that users reasonably expected.

## COUNT IX: ESTABLISHMENT CLAUSE VIOLATION

117. Plaintiff incorporates by reference all preceding paragraphs.

118. **Denominational Preference Under Executive Authority**: Under Defendant's leadership, X Corp. systematically established Catholic religious perspectives over biblical viewpoints through coordinated platform action, violating the Establishment Clause's prohibition on denominational preferences.

119. **Personal Vatican Coordination**: Defendant's documented Catholic devotion, combined with her calculated silence regarding Pope Leo XIV's historic election while posting about other Catholic matters, demonstrates consciousness of her role in coordinating platform censorship with Vatican interests.

120. **Systematic Religious Discrimination**: During Defendant's tenure, Plaintiff's biblical critique of Catholic institutional corruption faced systematic suppression while Catholic perspectives received normal algorithmic treatment, creating governmental endorsement of Catholic over biblical religious authority under Defendant's executive control.

121. **Catholic Institutional Deception Through Biblical References**: While Yaccarino occasionally references biblical concepts, this follows the antichrist pattern Mr. Richards exposes in his ministry. The Catholic institution regularly invokes Ἰησοῦς Χριστός (Iēsous Christos - Jesus Christ) while implementing practices that contradict biblical authority - such as claiming priests can place αὐτός (autos - Him) into a wafer, making the priest more powerful than Θεός (Theos - God), and constantly displaying αὐτός (autos - Him) in pain on the cross despite scripture teaching He 'despised the shame' (Hebrews 12:2), among many others. This mirrors Satan's temptation strategy of quoting scripture while twisting its meaning. Yaccarino's superficial biblical references while systematically suppressing biblical criticism of Catholic institutional corruption demonstrates this same antichrist deception that Mr. Richards' ministry exposes.

122. This denominational preference under Defendant's leadership caused substantial harm to Plaintiff's biblical religious expression and ministry.

## COUNT X: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION

123. Plaintiff incorporates by reference all preceding paragraphs.

124. **RFRA Application Through Government Entanglement**: During Defendant's tenure, X Corp.'s unprecedented government entanglement through owner Musk's federal

authority created government action sufficient to trigger RFRA protections when content policies suppressed religious expression under Defendant's executive oversight.

125. **Substantial Burden Under Executive Authority**: Defendant's systematic suppression of Plaintiff's biblically-guided content substantially burdened his religious exercise by effectively silencing his digital ministry.

126. **No Compelling Interest**: Defendant cannot demonstrate that suppressing Plaintiff's religious expression under her executive authority furthered any compelling governmental interest or used the least restrictive means.

## COUNT XI: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

127. Plaintiff incorporates by reference all preceding paragraphs.

128. **Executive Interference with Business Relationships**: During Defendant's tenure as CEO, she systematically interfered with Plaintiff's reasonable expectation of business relationships including Creator Revenue Sharing, speaking engagements, and potential subscription offerings.

129. **Willful Interference Under Executive Authority**: Defendant's systematic interference occurred through: (a) The systematic reduction in Plaintiff's engagement metrics through Defendant's discriminatory "lawful but awful" implementation, compared to industry expectations that followers see posts from accounts they follow and compared to the treatment received by secular accounts posting equally controversial content; (b) Mass deletion of 16 years of content during her tenure; (c) Artificial suppression during critical periods when religious content gains attention.

130. **Industry-Standard Damage Calculations**: Industry metrics confirm content creators with comparable follower counts generate $1.65 per follower annually, indicating Defendant's interference caused lost revenue of $4.2 million annually during her tenure.

## COUNT XII: OBSTRUCTION OF JUSTICE

131. Plaintiff incorporates by reference all preceding paragraphs.

132. **Systematic Evidence Destruction**: Defendant engaged in systematic obstruction of justice by: (a) Overseeing mass deletion of 61,600+ posts during active litigation; (b) Directing removal of 5,974 media files immediately following legal demands; (c) Implementing algorithmic manipulation to create false evidence of platform neutrality; (d) Coordinating strategic departures to evade legal accountability.

133. **Intent to Impair Judicial Proceedings**: The timing of evidence destruction directly following legal communications demonstrates Defendant's intent to impair this Court's ability to fairly adjudicate Plaintiff's claims by eliminating critical evidence.

134. **Pattern of Coordinated Obstruction**: Defendant's resignation within 10 hours of being named in litigation represents the culmination of a systematic pattern of obstruction designed to evade accountability rather than defend the merits of constitutional violations.

## COUNT XIII: CIVIL CONSPIRACY TO OBSTRUCT JUSTICE

135. Plaintiff incorporates by reference all preceding paragraphs.

136. **Conspiracy to Impair Legal Proceedings**: Defendant conspired with X Corp.'s owner and President Trump to systematically obstruct justice through: (a) Coordinated evidence destruction; (b) Strategic departures timed to legal challenges; (c) Surveillance of

attorney-client communications; (d) Manipulation of corporate structure to evade accountability.

137. **Overt Acts in Furtherance**: The conspiracy included multiple overt acts designed to impair legal proceedings: (a) Real-time surveillance evidenced by June 2-5 timeline; (b) Systematic content deletion following legal demands; (c) Strategic resignation to avoid testimony and document production; (d) Algorithmic manipulation to create false evidence.

## COUNT XIV: INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

138. Plaintiff incorporates by reference all preceding paragraphs.

139. **Systematic Interference with Business Opportunities**: During Defendant's tenure as CEO, she systematically interfered with Plaintiff's reasonable expectation of business relationships and economic opportunities including: (a) Creator Revenue Sharing programs on X platform; (b) Speaking engagements and ministry opportunities dependent on social media reach; (c) Potential subscription-based religious content offerings; (d) Book sales and publication opportunities linked to platform visibility.

140. **Willful and Intentional Interference**: Defendant's interference was willful and intentional, demonstrated through: (a) 98% reduction in content visibility from what is promised - under her executive authority; (b) Mass deletion of 16 years of content establishing plaintiff's religious authority and credibility; (c) Systematic suppression during critical periods when religious content typically gains broader attention; (d)

Continued collection of Premium and API fees while deliberately undermining the services those payments were intended to secure.

141. **Industry-Standard Damage Calculations**: Industry metrics confirm that content creators with comparable follower counts (3,400+) generate $1.65 per follower annually through platform monetization. Defendant's systematic interference caused lost revenue of approximately $5,610 annually during her tenure, with additional losses from prevented growth and business development opportunities exceeding $100,000 annually.

## CONSCIOUSNESS OF GUILT

142. **Strategic Flight as Evidence**: Defendant's unprecedented resignation within 10 hours of legal exposure, without succession planning or explanation, constitutes powerful evidence of consciousness of guilt admissible under Federal Rule of Evidence 404(b) and relevant state law.

143. **Pattern Recognition**: The timing correlation with two previous strategic evasion events establishes a pattern of coordinated obstruction rather than coincidental corporate decisions.

144. **Inference of Liability**: The extraordinary nature of Defendant's departure-- unprecedented in corporate history for the CEO of a major corporation--permits the inference that she knew her conduct violated federal law and could not be defended on the merits.

## DAMAGES

145. **Quantifiable Economic Harm**: Plaintiff has suffered economic damages during Defendant's tenure calculated at $4.2 million annually, based on systematic suppression of platform engagement that prevented monetization opportunities including creator revenue sharing, speaking engagements, and business relationships.

146. **Constitutional Violation Multiplier**: Courts have recognized substantial damages for constitutional violations even without demonstrable economic harm. The systematic suppression of religious expression under government entanglement warrants enhanced compensation reflecting the severity of First Amendment violations.

147. **Suppression-Affected Damages Calculation:** Courts recognize that when wrongful conduct prevents establishing financial track records, damages should reflect comparable creators' earnings without suppression rather than artificially depressed historical earnings. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Defendant's systematic suppression through "lawful but awful" discrimination artificially depressed Mr. Richards' historical performance metrics, requiring damages calculation based on industry standards for unsuppressed religious content creators rather than Defendant's deliberately throttled engagement rates.

148. **Government Entanglement Enhancement:** The unprecedented government-private entanglement during Defendant's tenure justifies enhanced damages reflecting heightened constitutional concerns when government-coordinated actors suppress religious speech under executive authority.

149. **Individual Deterrence Necessity:** Given Defendant's personal executive authority during systematic constitutional violations and her strategic flight to evade accountability,

substantial individual damages are necessary to deter future corporate executive participation in constitutional violations.

150. **Executive Responsibility Enhancement**: Defendant's CEO-level authority during the constitutional violations justifies enhanced damages reflecting the higher standard of care and greater culpability associated with executive positions.

151. **Fraudulent Misrepresentation Damages**: Defendant's false public statements while knowing the truth about systematic suppression caused additional harm through fraudulent inducement to continue platform investment rather than seeking alternatives.

152. **Punitive Damages**: Defendant's systematic deception combined with strategic flight demonstrates willful misconduct warranting substantial punitive damages sufficient to deter similar conduct by other corporate executives.

**153. Precedential Damage Framework:** The $500 million damages demand is justified by established precedents for comparable constitutional harms:

- Alex Jones defamation verdict: $1.48 billion

- Fox/Dominion settlement: $787.5 million

- Jean Carroll v. Trump: $83.3 million

- Doe v. Fullstory, Inc.: $148 million

154. **Constitutional Violation Multipliers**: Courts permit substantial multipliers when defendants intentionally harm fundamental rights:

- *BMW v. Gore*, 517 U.S. 559: Permits multipliers exceeding single digits for intentional constitutional violations

- *State Farm v. Campbell*, 538 U.S. 408: 40× multiplier justified for malicious conduct

- *Carey v. Piphus*, 435 U.S. 247, 254 (1978): Damages should "compensate persons for injuries caused by the deprivation of constitutional rights

155. **Government Entanglement Enhancement:** The unprecedented government-private entanglement during Defendant's tenure justifies enhanced damages reflecting heightened constitutional concerns when government-coordinated actors suppress religious speech under executive authority.

156. **Total Damages:** The $500 million figure represents a conservative calculation considering: (a) systematic constitutional violations under Defendant's executive authority; (b) 16+ years of religious expression suppression; (c) economic harm calculated at $4.2 million annually during Defendant's tenure; (d) consciousness of guilt evidenced by strategic resignation; (e) established precedents for speech-related constitutional violations; and (f) deterrent requirements for corporate executives coordinating constitutional violations under government entanglement.

157. **Flight Penalty**: Defendant's unprecedented resignation to evade legal accountability warrants additional punitive enhancement reflecting the extraordinary nature of her attempt to obstruct justice.

158. **Obstruction of Justice Enhancement:** Defendant's systematic obstruction of justice through evidence destruction and strategic departure warrants enhanced punitive damages reflecting the extraordinary attempt to subvert judicial proceedings.

159. **Pattern-Based Damage Multiplier:** The three consecutive strategic responses demonstrate a level of coordinated misconduct that warrants substantial punitive enhancement. The mathematical impossibility of coincidental timing establishes systematic planning designed to evade legal accountability.

160. **Total Damages**: Based on the systematic nature of constitutional violations, executive responsibility, DTPA violations with treble damages, fraudulent misrepresentation, breach of contract, promissory estoppel, RFRA violations, tortious interference, common carrier violations, and consciousness of guilt evidenced by strategic flight, Plaintiff seeks damages of $500 million from Defendant individually, plus treble damages under applicable Texas law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

**A. INJUNCTIVE RELIEF**

1. Issue immediate injunctive relief requiring Defendant to:

   o Provide complete testimony regarding her knowledge of and participation in systematic religious discrimination

   o Produce all documents and communications related to content moderation decisions affecting religious expression

- o Produce all communications between defendant and others regarding Mr. Richards or his content, all individual account targeting decisions and manual moderation actions affecting Mr. Richards' account, including any "free-text notes" or individual targeting flags as described by former Twitter Head of Trust and Safety Yoel Roth, who confirmed that Twitter maintained systems where moderators could attach individual targeting instructions to specific accounts[36]

- o Disclose all coordination with government actors, including Vatican officials. regarding platform censorship

## B. DECLARATORY RELIEF 2. Declare that:

- Defendant's conduct violated Plaintiff's First Amendment rights

- Defendant's strategic resignation constitutes consciousness of guilt

- Corporate executives bear individual liability for systematic constitutional violations under their authority

## C. DAMAGES 3. Award Plaintiff:

- **$500 million in compensatory damages** for systematic constitutional violations, fraudulent misrepresentation, and economic harm during Defendant's tenure as CEO

- **Treble damages under RICO** for systematic racketeering activity

- **Punitive damages** sufficient to deter future corporate executive participation in constitutional violations

---

[36] https://techcrunch.com/2023/08/17/musk-says-x-will-address-shadowbanning-soon-but-former-trust-safety-exec-explains-why-that-will-be-difficult/

- **Enhanced damages** reflecting consciousness of guilt evidenced by strategic flight

**D. ADDITIONAL RELIEF** 4. Award Plaintiff:

- Reasonable attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law

- Pre- and post-judgment interest

- Such other relief as the Court deems just and proper

**E. OBSTRUCTION OF JUSTICE RELIEF**

- **Order immediate preservation of all evidence** related to Defendant's departure, including: (a) All communications regarding the resignation decision; (b) All transition documents and succession planning materials; (c) All severance or departure agreements; (d) All documents related to evidence destruction during Defendant's tenure.

- **Authorize expedited discovery** including: (a) Immediate deposition of Defendant before complete corporate separation; (b) Forensic examination of all electronic communications and document destruction logs; (c) Production of all surveillance capabilities and data sharing agreements; **(d) Discovery of all surveillance technologies and monitoring capabilities that may have intercepted attorney-client communications, including email monitoring systems and cross-platform data sharing protocols.**

- **Enhanced damages for obstruction of justice** including: (a) Punitive damages for systematic evidence destruction; (b) Additional compensation for fraud upon the court; (c) Enhanced punitive awards reflecting the mathematical impossibility of coincidental timing and sophisticated coordination to evade accountability.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

**DATED:** July 16, 2025

**Respectfully submitted,**

/s/ Lisa Weingarten Richards
Lisa Weingarten Richards
LWR Law Offices
3060 Williams Dr
Ste 300 #510
Fairfax, VA 22031
*Tel.:* (202) 981-2059
lwr@lwrlawoffices.com
VA BAR # 96671
NY BAR #4932570
*Counsel for Plaintiff*