# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF TEXAS

# DALLAS DIVISION

THOMAS RICHARDS

*Plaintiff,*

*v.*

X CORP.  and
DONALD J. TRUMP, Individually,

*Defendants*

Case No. 3:25-cv-916

**DEMAND FOR JURY TRIAL**

Lisa Weingarten Richards, Esq.

VSB #96671

NY BAR #4932570

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

*Counsel for plaintiff*

## AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

**TABLE OF AUTHORITIES**

**Cases**

Biden v. Knight First Amendment Institute at Columbia Univ., 141 S. Ct. 1220 (2021)..............53

BMW v. Gore, 517 U.S. 559 (1996)..........................................................................................90

Brandenburg v. Ohio, 395 U.S. 444 (1969)..............................................................................55

Brentwood Academy v. Tennessee Secondary School Athletic Association,

531 U.S. 288 (2001)...........................................................................................7 *passim*

Carey v. Piphus, 435 U.S. 247 (1978)......................................................................................89

e-ventures Worldwide, LLC v. Google, Inc., 188 F. Supp. 3d 1265 (M.D. Fla. 2016)..........47, 64

Enigma Software Group USA, LLC v. Malwarebytes, Inc., 946 F.3d 1040 (9th Cir. 2019)..46, 64

Escola v. Coca-Cola Bottling Co., 24 Cal.2d 453 (1944)............................................................55

Gonzalez v. Google, 598 U.S. 617 (2023)..................................................................................52

Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57 (1963)...................................................55

Herrera v. Valentine, 653 F.2d 1220 (8th Cir. 1981)..................................................................75

Larson v. Valente, 456 U.S. 228 (1982).....................................................................................62

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).........................................................71, 74, 75

Mirabella v. Villard, 853 F.3d 641 (3d Cir. 2017)..................................................................37, 38

Moody v. NetChoice, 603 U.S. 707 (2024)........................................................................46 *passim*

Muratore v. M/S Scotia Prince, 845 F.2d 347 (1st Cir. 1988)..................................................87, 90

Murthy v. Missouri, 603 U.S. 43 (2024)........................................................................36, 59

NetChoice, L.L.C. v. Paxton, 49 F.4th 439 (5th Cir. 2022).....................................45, 46, 53, 63

Packingham v. North Carolina, 137 S. Ct. 1730 (2017)..............................................................52

Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819 (1995)...................................61

State Farm v. Campbell, 538 U.S. 408 (2003)........................................................................89

Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931)............................72

Whitney v. California, 274 U.S. 357 (1927)........................................................................54

Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952)...................................................54

Zeran v. America Online, Inc., 129 F.3d 327 (4th Cir. 1997)......................................................44

**Statutes**

18 U.S.C. § 1341........................................................................................................113

18 U.S.C. § 1343........................................................................................................113

18 U.S.C. § 1951........................................................................................................114

18 U.S.C. § 1961(4)....................................................................................................113

18 U.S.C. § 1962...................................................................................................112, 115

18 U.S.C. § 1964(c)....................................................................................................115

28 U.S.C. § 1331.................................................................................................25

28 U.S.C. § 1332.................................................................................................25

28 U.S.C. § 1367.................................................................................................25

28 U.S.C. § 1391(b).............................................................................................26

28 U.S.C. § 2201...............................................................................................119

42 U.S.C. § 1988........................................................................................128, 130

42 U.S.C. § 2000bb et seq................................................................................108

47 U.S.C. § 230(c)(2)(A)..............................................................................*passim*

Fed. R. Civ. P. 4(e)..............................................................................................22

Texas Deceptive Trade Practices Act § 17.45(4).............................................107

Texas Deceptive Trade Practices Act § 17.46(a).............................................107

Texas Deceptive Trade Practices Act § 17.46(b)(5).........................................107

Texas Deceptive Trade Practices Act § 17.46(b)(7).........................................107

Texas Deceptive Trade Practices Act § 17.46(b)(12).......................................107

Texas Deceptive Trade Practices Act § 17.46(b)(24).......................................107

Texas Deceptive Trade Practices Act § 17.50(b)(1).........................................107

Texas Deceptive Trade Practices Act § 17.50(c).............................................107

**TABLE OF CONTENTS**

EXECUTIVE SUMMARY……………………………………………………………..8

INTRODUCTION.......................................................................................18

PARTIES....................................................................................................22

JURISDICTION AND VENUE........................................................................25

FACTUAL BACKGROUND............................................................................26

A. Plaintiff's Religious Expression on X's Platform...................................................26

B. Cross-Platform Suppression of Religious Content and Government Critique and Vatican Influence.................................................................................................................32

C. The Grok AI Conversation and Evidence of Systematic Censorship………………………..38

D. The Vatican's Comprehensive Strategy for Global AI Control……………..………………..39

E. Recent Revelations from Theos through Iēsous Christos and Intensified Suppression…………………………………………………………………………………..42

F. Statistical Evidence of Systematic Suppression.......................................................47

G. Religious Viewpoint Discrimination and Targeting..................................................52

H. Established Email Surveillance Infrastructure…………………………………………………..53

I. Government Endorsement of Catholic Over Biblical Perspectives……………………………54

J. X's Two-Tier Content Moderation (Religious Discrimination)..................................55

K. Targeted Suppression of Government and Official Criticism………………………………..58

L. Multi-Layered Suppression: API Throttling of Religious Content………………………….61

M. Unprecedented Platform-Government Entanglement…………………………………………62

N. MUSK RETAINS A TIGHT RELATIONSHIP WITH THE FEDERAL GOVERNMENT THROUGH GROK……………………………………………………………………...……72

O. Yoel Roth's Admissions About Individual Targeting……………………………….……77

P. Section 230 and Shadowbanning…………………………………………………………80

Q. X's Public Commitments vs. Documented Practices…………………………………….83

R. The Coordinated "Feud" Performance and Evidence of Surveillance………………..…86

S. Demand Letter and Failure to Respond…………………………………………………..87

T. Government Direction of AI Censorship Through Grok Integration………………………89

U. Legal Framework for Social Media Platforms as Common Carriers………………………90

CAUSES OF ACTION..................................................................................................95

COUNT I: VIOLATION OF THE FIRST AMENDMENT .......................................................95

COUNT II: CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS…………………98

COUNT III: ESTABLISHMENT CLAUSE VIOLATION……………………………………100

COUNT IV: SECTION 230(C)(2)(A) VIOLATION……………………………………………102

COUNT V: PROMISSORY ESTOPPEL………………………………………………………103

COUNT VI: BREACH OF CONTRACT………………………………………………………105

COUNT VII: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION………………..108

COUNT VIII: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS……………109

COUNT IX: CIVIL RICO VIOLATION (18 U.S.C. § 1962)…………………………………113

COUNT X: COMMON CARRIER LIABILITY.......................................................................115

COUNT XI: ARTIFICIAL INTELLIGENCE DISCRIMINATION UNDER COLOR OF LAW…………………………………………………………………………………………118

REQUEST FOR DECLARATORY JUDGMENT…………………………………………119

PRAYER FOR RELIEF.......................................................................................................122

A. Injunctive Relief...........................................................................................................124

B. Declaratory Relief.........................................................................................................125

C. Mandatory Compliance Provisions................................................................................125

D. Damages........................................................................................................................126

E. Fees and Costs...............................................................................................................127

F. Further Relief.................................................................................................................128

Precedential Damage Framework.......................................................................................129

JURY DEMAND..................................................................................................................132

**EXECUTIVE SUMMARY**

**The Core Violation: Systematic Religious Speech Suppression**

For 16 years, Thomas Richards has shared biblical religious expression on X platform (@tlthe5th), building 3,400+ followers through over 71,500 posts of compliant religious content. Despite full adherence to platform rules and status as a paying Premium subscriber, his biblical viewpoints face 98% algorithmic suppression--reducing typical engagement from industry-standard levels of 300-800 views per post to often fewer than 10 views. Meanwhile, comparable non-religious content and institutional Catholic perspectives receive normal platform treatment. This isn't just "content moderation"--it's systematic religious discrimination.

**The Denominational Preference: Catholic Over Biblical Authority**

The discrimination specifically targets Mr. Richards' biblical critique of institutional corruption while systematically accommodating Catholic institutional perspectives:

- **Government Endorsement**: Trump's Religious Liberty Commission prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical criticism of Catholic institutions faces platform suppression

- **Vatican AI Control**: The "Rome Call for AI Ethics" establishes formal Vatican authority over global artificial intelligence development, with major tech companies including Microsoft, IBM, and Cisco formally submitting to papal guidance

- **Coordinated Suppression**: Mr. Richards' biblical research exposing Vatican connections to Nazi escape networks and child abuse cover-ups faces systematic suppression precisely when these revelations could protect children and families

- **Institutional Protection**: While Mr. Richards' biblically-grounded ministry faces throttling, Catholic perspectives receive both governmental endorsement and normal platform algorithmic treatment or boosting

## Why This Becomes Constitutional Violation: Unprecedented Government-Platform Entanglement

This religious discrimination transforms from private business conduct into direct constitutional violation because X's owner simultaneously exercises federal governmental authority. Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, private entities become subject to constitutional constraints when government authority is "entwined in their management or control." Here, the entanglement exceeds even *Brentwood Academy*:

**Direct Dual Control**: Elon Musk simultaneously owns X and held federal authority as head of the Department of Government Efficiency (DOGE), created specifically for him by President Trump. Unlike *Brentwood*'s diffuse governmental connections, the same individual exercises both platform ownership and federal power.

**Continuing Government Access**: Musk maintains extraordinary ongoing government influence through:

- Top Secret security clearance providing classified national security access

- High-profile visits to Pentagon, NSA, and CIA within a single month

- Explicit back-channel communications with defense officials ("If there's anything I can do to be helpful, I'd like to see you")

- Over 700 former Tesla engineers placed in federal agencies under his allies

- $15.4 billion in government contracts creating permanent financial entanglement

**Operational Integration**: Government agencies systematically deploy Musk's Grok AI system for federal operations while the same AI technology moderates religious content on X, creating direct operational coordination between government function and private platform control.

## Circumstantial Evidence of Coordination and Potential Surveillance

The timing of defendants' coordinated response raises substantial questions about potential surveillance capabilities:

1. **June 2, 2025:** Plaintiff's counsel sent a private Gmail to Mr. Richards stating intention to add Trump as defendant but not to discuss until "June 5 for a specific reason

2. **June 5, 2025:** On the exact date specified in the private communication, Trump and Musk staged an elaborate public "feud" with threats to cancel government contracts and personal attacks

3. **Inference of Coordination:** While the precise mechanism requires discovery to establish, the timing correlation, combined with documented government surveillance capabilities and established tech-government coordination, creates substantial questions about whether private communications may have been monitored and warrants investigation through discovery.

This demonstrates that religious speech suppression operates through real-time government coordination rather than private business judgment.

## The Systematic Censorship Campaign: Technical Evidence

X's religious discrimination operates through multiple sophisticated mechanisms:

- **Algorithmic Targeting**: 98% reduction in content visibility despite approximately 3,500 followers, with posts from 2011 showing zero impressions over 14 years--a mathematical impossibility without deliberate intervention

- **Mass Content Deletion**: Complete removal of 61,600+ posts representing 16 years of religious expression, occurring in waves following legal demands

- **API Discrimination**: Systematic throttling of Mr. Richards' properly disclosed automated accounts despite $200 monthly payments

- **Artistic Suppression**: Deletion of 5,974 religious media files and artwork following the March 31, 2025 demand letter

- **Evidence Destruction**: Multiple waves of content deletion designed to eliminate evidence for litigation

**The Vatican-Government-Tech Coordination**

The religious discrimination operates within a broader institutional framework:

**Vatican Digital Control Strategy**: Beginning in 2017, the Vatican launched a comprehensive multi-year strategy to position itself as global authority over AI development, culminating in the "Rome Call for AI Ethics" where major technology companies formally submitted to papal guidance.

**Google-Vatican Partnership**: Google granted the Vatican exclusive YouTube partnership status--the only religious institution in Google's 20-year history to receive such treatment--combined with Eric Schmidt's explicit promise to Pope Francis "We will make it happen" regarding suppression of Vatican-critical content.

**Government Coordination**: Both Trump and Musk express deference to Vatican authority, with Trump calling Pope Leo XIV's election "a Great Honor for our Country" while Mr. Richards' biblical criticism of the same institution faces systematic platform suppression under government entanglement.

**Precedential Significance: Constitutional Rights in the Digital Age**

This case establishes critical precedents for the digital public square:

1. **Government-Platform Entanglement**: When platform owners exercise federal authority, constitutional constraints apply to content moderation decisions

2. **Religious Liberty Protection**: Systematic suppression of biblical viewpoints while accommodating institutional religious perspectives violates both Free Speech and Establishment Clauses

3. **AI-Powered Discrimination**: Government-directed deployment of AI systems with documented religious bias creates novel constitutional violations requiring judicial oversight

4. **Surveillance Accountability**: Platform coordination with government surveillance capabilities transforms censorship from business decisions into constitutional violations

**The Broader Constitutional Crisis**

This case addresses the fundamental question of whether constitutional protections can survive when unprecedented private wealth merges with government authority. When the world's richest individual can simultaneously control major communication platforms and exercise federal

power, the suppression of religious expression becomes a direct assault on the First Amendment's core protections.

Mr. Richards' biblical ministry--exposing institutional corruption that could protect children and families--faces systematic suppression precisely because it challenges the coordinated power structure between government, technology platforms, and religious institutions. Without judicial intervention, the precedent established here will fundamentally transform the relationship between citizen and state in the digital age.

**Relief Sought: Restoration and Deterrence**

Plaintiff seeks comprehensive relief to restore constitutional protections:

- **Immediate Injunctive Relief**: Remove all religious speech suppression, restore 16 years of deleted biblical content, implement court-supervised monitoring

- **$750 Million Damages**: Based on systematic religious discrimination, constitutional violations under government entanglement, and industry-standard creator revenue calculations over 16 years of suppression

- **Declaratory Judgment**: Establish that government-platform entanglement creates ongoing constitutional obligations regardless of formal title changes

- **Structural Reform**: Mandate algorithmic transparency, religious viewpoint protection, and safeguards against future coordination

The Court's intervention is essential not only for Mr. Richards but for every American whose religious expression faces suppression in the digital public square through government-platform coordination.

**INTRODUCTION**

1. This case presents a straightforward application of well-established constitutional
   principles to an unprecedented factual scenario. For over 16 years, Mr. Richards has
   maintained a compliant account on X's platform (@tlthe5th), sharing biblically-guided
   religious expression and ministry with his steadily increasing follower count
   (approximately 3,500 or more for several years now) through more than 71,100 posts.
   Despite full compliance with all platform rules, Plaintiff's content has been subjected to
   "shadowbanning", including severe account suppression, mass content deletion, and
   discriminatory API restrictions, effectively silencing his unique religious voice and
   political critique.

2. The term "shadowbanning" refers to a sophisticated form of digital censorship where a
   platform covertly limits a user's content visibility without their knowledge or consent.
   While often executed through algorithmic means, these algorithms are designed,
   deployed, and maintained by human decision-makers who determine which accounts to
   target and what criteria warrant suppression. As former Twitter Head of Trust and Safety
   Yoel Roth admitted, content moderation decisions often involve direct human targeting,
   explaining that moderators could attach "free-text notes" to accounts with instructions
   like "don't unban them without checking with me first."[1] Unlike outright account
   suspension, shadowbanning creates an insidious form of suppression where the affected

---

[1] *Musk Says X Will Address Shadowbanning Soon, But Former Trust & Safety Exec Explains Why That Will Be Difficult*, TECHCRUNCH (Aug.17, 2023),
  <https://techcrunch.com/2023/08/17/musk-says-x-will-address-shadowbanning-soon-but-former-trust-safety-exec-explains-why-that-will-be-difficult/>.

user can still post content, but that content is systematically hidden from or shown to dramatically fewer followers and other platform users.

3. Shadowbanning encompasses multiple technical mechanisms including: algorithmic throttling (reducing content distribution), search banning (preventing content from appearing in search results or suggestions), visibility filtering (hiding content from feeds, hashtags, and trending sections), engagement limitation (restricting likes, shares, and comments), and selective content removal (deleting specific posts or media without notification). The practice can involve accounts being flagged with terms such as "Trends Blacklisted" and "Search Blacklisted" ensuring the user cannot publicly trend or show up in search results.[2] Common signs include reduced engagement, content not appearing when viewed from different accounts, and other users reporting they no longer see the affected account's content.[3] The defining characteristic of shadowbanning is its deliberate opacity--users receive no notification of suppression and are given no opportunity to appeal these restrictions. This allows platforms to systematically shape opinions and control discourse while appearing neutral to outside observers, as moderation can be applied to accounts on all sides of an issue while still achieving a targeted effect.[4] The practice enables platforms to create the illusion of free speech while actually silencing targeted viewpoints through sophisticated technological means that are nearly impossible to detect without insider access or statistical analysis.

---

[2] Shadow Banning*, WIKIPEDIA, <https://en.wikipedia.org/wiki/Shadow_banning>.

[3] What Is a Shadowban and Why Does It Matter?, BUILT IN (June 14, 2022), https://builtin.com/articles/shadowban

[4] How Shadow Banning Can Silently Shift Opinion Online, YALE SCH. OF MGMT. (May 9, 2024), https://insights.som.yale.edu/insights/how-shadow-banning-can-silently-shift-opinion-online.

4. X's treatment of Mr. Richards directly contradicts its own explicit contractual promises about how the platform functions. X's Help Center unambiguously states: "When you follow someone, every time they post a new message, it will appear on your X Home timeline."[5] X further promises: "Following someone on X means: You are subscribing to their posts as a follower," and "If someone follows you:... They'll see your posts in their Home timeline whenever they log in to X."[6] By systematically suppressing Mr. Richards' content visibility while maintaining these explicit promises, X has engaged in a form of digital bait-and-switch--accepting the follower relationship while secretly nullifying its purpose through algorithmic suppression. This deceptive practice directly violates basic principles of contract law and consumer protection statutes.

5. The Court's intervention is urgently needed to protect Mr. Richards' religious expression, which is being systematically suppressed in violation of fundamental First Amendment protections. Under the clear precedent of *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), when a private entity becomes "entwined" with governmental authority, it becomes subject to constitutional constraints. And here, the link is even tighter. X's owner and controller, Elon Musk has been very tightly linked to the Federal government in several ways during the time period when Mr. Richards has been shadowbanned. First, he has simultaneously held significant federal authority as a Special Government Employee heading the Department of Government Efficiency ("DOGE"), created by executive order on President Trump's first day in

---

[5] X Help Ctr., https://help.x.com/en/resources/new-user-faq (last visited May 20, 2025).
[6] X Help Ctr., https://help.twitter.com/en/using-twitter/following-faqs (last visited May 18, 2025).

office.[7] This entwinement is further cemented by extraordinary financial ties -- Musk invested approximately $300 million to help elect Trump, and his companies have received over $15.4 billion in government contracts.[8]

6. Although recent reports suggest Mr. Musk has left his official government position, this timing -- occurring immediately after receipt of Plaintiff's March 31, 2024 demand letter -- appears transparently strategic and does not negate the constitutional violations that have occurred while he exercises official authority. Moreover, it appears Musk's extraordinary government access will continue regardless of formal title, as also evidenced by Trump stating that DOGE is Musk's "baby" and that "Elon is not really leaving." Musk confirmed the sentiment.[9] Other points that support Musk's continuation despite his official role ending includes: a) ongoing Top Secret security clearance, b) high-profile visits to the Pentagon, NSA, and CIA within a single month (March-April 2025), c) documented back-channel communications with defense leadership, and d) systematic placement of over 700 former Tesla engineers throughout federal agencies under Thomas Shedd's leadership, creating a permanent network of Musk-connected personnel implementing his AI-first strategy across government operations regardless of formal title changes.

[7] https://www.whitehouse.gov/presidential-actions/2025/01/establishing-and-implementing-the-presidents-department-of-government-efficiency/.
[8] Elon Musk Has Grown Even Wealthier Through Serving Trump's Administration, CAMPAIGN LEGAL CTR. (June 5, 2025), https://campaignlegal.org/update/elon-musk-has-grown-even-wealthier-through-serving-trumps-administration
[9] *See* Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

7. Additionally, Mr. Richards and counsel discussed adding Trump to this lawsuit no earlier than June 5th, for a "specific reason". (Exhibit A) Yet June 5, 2025 a "feud" began between Musk and Trump, which many report to be fake, much like professional wrestling. The "feud' also seems to have largely ended, as of July 7, 2025, with Musk apologizing to Trump.

8. The systematic suppression of Mr. Richards' religious speech and political comments through sophisticated algorithmic techniques or manual censorship is not protected by Section 230 of the Communications Decency Act, which only immunizes actions "voluntarily taken in good faith to restrict access to or availability of material." X's deceptive practices -- publicly denying shadowbanning while simultaneously engaging in it -- fail the statute's explicit "good faith" requirement, especially when senior legal leadership explicitly denies the very practices the company is implementing.

9. Musk's actions as both government official and platform owner also directly violate the January 20, 2025 Executive Order on "Restoring Freedom of Speech and Ending Federal Censorship,"[10] which explicitly prohibits federal government officials from "engag[ing] in or facilitat[ing] any conduct that would unconstitutionally abridge the free speech of any American citizen." While a Special Government Employee heading DOGE, Musk is bound by Section 3(a) of this Executive Order, which states that "No Federal department, agency, entity, officer, employee, or agent may act or use any Federal resources in a manner contrary to section 2 of this order." His systematic suppression of Mr. Richards' religious expression and government criticism while simultaneously exercising

---

[10] Exec. Order No. 14,149, "Restoring Freedom of Speech and Ending Federal Censorship," 90 Fed. Reg. 5273 (Jan. 28, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/restoring-freedom-of-speech-and-ending-federal-censorship/

governmental authority creates liability under both this Executive Order and the First Amendment.

10. The systematic coordination between defendants extends beyond individual platforms to encompass comprehensive information control. Google's role in intercepting Plaintiff's June 2, 2025 attorney-client communication, evidenced by the unlikelihood of the coordinated "feud" occurring on the exact date privately specified for discussing adding Trump as a defendant, demonstrates surveillance capabilities that transform platform censorship from private business decisions into government-directed suppression of constitutional rights.

11. The systematic coordination extends beyond platform suppression to comprehensive information control. Google's documented role in intercepting Counsel's June 2, 2025 attorney-client communication--evidenced by the immediate staging of the 'feud' on the exact date privately specified --demonstrates surveillance capabilities that transform private platform decisions into government-directed suppression of constitutional rights.

12. As explained, many of Musk's allies and former employees who remain embedded throughout federal agencies as full-time government employees, continuing to implement DOGE-style reforms.[11] More than three dozen DOGE-affiliated individuals are based at the General Services Administration, and other Musk-connected people remain in senior agency roles across the government.[12] Not to mention, as detailed below, there are over 700 former Tesla engineers Musk helped get placed in government roles under Thomas Shedd, a former close ally and Tesla engineer – with a  major role now in two federal

---

[11] NPR https://www.bloomberg.com/features/2025-elon-musk-trump-admin-network/.
[12] Elon Musk may be gone but DOGE isn't done remaking the federal government.

agencies -- to bring Grok (the AI used on the X platform) into the federal government in an AI-First placement supported by President Trump. Upon information and belief, these ties are designed to obscure Musk's extended, permanent tight role in the federal government.

**The Trump Administration's Coordinated Censorship Infrastructure**

13. Despite Trump's public promises to end federal censorship, his administration has implemented a sophisticated system of platform control that operates through constitutional loopholes and regulatory pressure. FCC Chairman Brendan Carr has conducted an aggressive campaign against tech companies, sending letters to Apple, Google, Meta, and Microsoft CEOs warning that their content moderation activities would be "reviewed" for restricting "First Amendment rights" - while notably excluding Elon Musk's X from these warnings.[13] This selective enforcement demonstrates the coordinated nature of the conspiracy, where government pressure is applied to platforms that don't coordinate with administration preferences while allied platforms like X have received preferential treatment.

14. The administration's strategy relies on the constitutional loophole in Trump's "Restoring Freedom of Speech" Executive Order, which permits government pressure on platforms as long as it can be characterized as "constitutional." This allows continued "jawboning" of platforms through antitrust threats, licensing pressure, and regulatory retaliation while maintaining the fiction of defending free speech. Meta's preemptive compliance with Carr's preferences - ending fact-checking programs and reducing content moderation -

---

[13] *Trump's FCC pick Brendan Carr comes in swinging at Big Tech*, WASH. POST (Nov. 22, 2024) https://www.washingtonpost.com/technology/2024/11/22/brendan-carr-fcc-trump-social-media-musk/.

demonstrates how this system operates through implied threats rather than direct commands.

15. This case also implicates President Trump's February 6, 2025 Executive Order "Eradicating Anti-Christian Bias," which explicitly establishes a policy "to protect the religious freedoms of Americans and end the anti-Christian weaponization of government." The Executive Order specifically states: "It is the policy of the United States, and the purpose of this order, to protect the religious freedoms of Americans and end the anti-Christian weaponization of government. The Founders established a Nation in which people were free to practice their faith without fear of discrimination or retaliation by their government." By systematically suppressing Mr. Richards' religious expression while he was simultaneously serving in an official government capacity, Musk's actions directly violate this binding Executive Order, which prohibits the "anti-Christian weaponization of government" that is occurring through X's platform under government entanglement. See Executive Order, "Eradicating Anti-Christian Bias."[14]

16. When X was confronted with this legal challenge, it escalated rather than remediated its violations. After Plaintiff's counsel sent a detailed demand letter on March 31, 2025, outlining the unlawful suppression and requesting immediate remediation, X retaliated by purging Mr. Richards' account of thousands of media files within days—demonstrating the deliberate and punitive nature of X's discrimination.

17. This amended complaint adds President Trump as a defendant based on evidence of coordinated constitutional violations that emerged after the initial filing, including the

---

[14] https://www.whitehouse.gov/presidential-actions/2025/02/eradicating-anti-christian-bias/ (Feb. 6, 2025).

suspicious timing of the staged "feud" following private attorney-client communications about adding Trump to the case.

**PARTIES**

18. Plaintiff Thomas Richards is a natural person and resident of Virginia. Mr. Richards attended Catholic church as a child at his aunt's suggestion when he expressed interest in learning about Θεός (Theos) - "God". He was proud to be Catholic as a child and was formally confirmed in the Catholic faith (as documented in a photo at https://spirituallysmart.com/igotsavededit.html). However in March 1997, four years after his US Navy service, he experienced a profound spiritual conversion, becoming a born-again believer in Ἰησοῦς (Iēsous) - "Jesus" the Χριστός (Christos) - "Christ" through a powerful, life-changing supernatural encounter with Θεός (Theos) - "God". At that time, Mr. Richards went to talk to the local priest and that showed him that the priest didn't know anything about the bible. The Catholic church does not adhere to the bible, has many unbiblical practices, and the hierarchy of the institution is deeply corrupt. Most Catholic parishioners are unaware of this. His transformative spiritual experience has informed all of his subsequent work, including his biblically-guided critiques of corruption and injustice in world systems. Mr. Richards' approach to examining societal issues is deeply rooted in his sincerely held religious convictions and his understanding of biblical teachings about speaking truth to power.

19. When he first became powerfully born-again, he tried going to every church he could find. At the last one, he attended, he had a bad experience which was really horrifying and has refused to go to another church since. Because of this, he had to do a Christian ministry on his own, online. This makes his online religious expression as an essential

form of digital ministry, allowing him to share biblical truths and spiritual revelations with a growing community of followers. His particular theological perspective -- due to the revelations he has received -- compel him to speak against institutional corruption and to challenge powerful figures, in the tradition of biblical prophets.

20. Mr. Richards has maintained an account on X's platform (@tlthe5th) for approximately 16 years, where he shares content expressing his sincerely held religious beliefs his independent research on government corruption. He serves as the founder, sole author, and administrator of SpirituallySmart.com, a website created around the year 2000 dedicated to sharing bible messages, historical research, spiritual revelation from Θεός (Theos) - "God", and personal growth content (that is a natural result of a reader reading and understanding his work). He also is involved with other related projects including, #OvertPsyops, which he founded in February 2025. #OvertPsyops is a multifaceted educational initiative that includes published research, a book, artwork, and AI development work drawing on biblical wisdom and contemporary analysis to promote transparency about psychological influence operations in the digital age, ultimately serving the broader benefit of humanity.

21. Defendant X Corp. is a corporation organized under the laws of Nevada with its principal place of business in Bastrop, Texas. In September 2024, X officially relocated its headquarters from San Francisco to Bastrop, Texas, according to records filed with the California Secretary of State. X owns and operates the social media platform formerly known as Twitter, which serves as a critical public forum for communication in the digital age. X conducts substantial business in Texas, maintains users throughout Texas, and derives significant revenue from Texas users. X's updated Terms of Service that took

effect on November 15, 2024, expressly designate the Northern District of Texas as its chosen venue for litigation, specifying that "all disputes related to X must exclusively be brought in the Northern District of Texas or state courts in Tarrant County."

22. Defendant Donald J. Trump is the 47th President of the United States, sued here in his individual capacity. Trump personally appointed Elon Musk to head the Department of Government Efficiency and has maintained an extraordinary personal and professional relationship with Musk that transcends formal governmental titles. Trump individually coordinated with X Corp. to suppress Plaintiff's religious expression while simultaneously issuing Executive Orders claiming to protect religious freedom and end federal censorship, demonstrating willful violation of the very constitutional standards he officially established. This coordination is evidenced by what appears to be a staged "feud" performance immediately after learning of Plaintiff's intent to add Trump as a defendant, demonstrating ongoing conspiracy to violate constitutional rights while evading legal accountability. Service on Defendant Trump shall be effectuated pursuant to Fed. R. Civ. P. 4(e) for individual capacity defendants.

23. **COORDINATION WITH ADDITIONAL ENTITIES**: The systematic suppression of Plaintiff's religious expression operates within a broader infrastructure of coordination between government officials, platform controllers, and religious institutions. The mathematical unlikelihood of the June 2-5, 2025 "feud" timeline--where Mr. Richards' private attorney-client communication through gmail about adding Trump as defendant "after June 5 –there's a specific reason" immediately preceded the staged "feud" on the exact specified date-- suggests surveillance capabilities that extend beyond the named defendants. This coordination leverages established relationships such as Google's

documented promise to Vatican officials to suppress content critical of Catholic institutions and its exclusive YouTube partnership with the Vatican, the only religious institution in Google's 20-year history to receive such preferential treatment. While the current defendants bear primary responsibility for the constitutional violations, Mr. Richards reserves the right to add additional parties as discovery reveals the full scope of the coordinated effort to suppress religious expression and government criticism in the digital age.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Constitution and laws of the United States, the First Amendment to the United States Constitution, and Section 230 of the Communications Decency Act. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 (diversity), as Plaintiff is a citizen of Virginia, Defendant X Corp. is incorporated in Nevada with its principal place of business in Texas, and the amount in controversy exceeds $75,000. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

25. This Court has personal jurisdiction over Defendant X, Corp. because X maintains continuous and systematic contacts with the State of Texas, conducts substantial business in Texas and has millions of Texas users. X has purposefully directed its online platform and content moderation practices at Texas residents, who comprise a significant portion of its user base.

26. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and X's own updated Terms of Service, which explicitly designate the Northern District of Texas as the exclusive venue for all disputes related to X. Furthermore, X has its principal place of business in Texas and has expressly consented to venue in this district through its Terms of Service that took effect on November 15, 2024.

27. **ALTERNATIVE VENUE FOR JUDICIAL EFFICIENCY**: Should the Court determine that venue as to Defendant Trump is not proper in this District, or that transfer would serve the interests of justice, convenience of the parties, or judicial administration, Plaintiff would consent to transfer of this entire action to the Western District of Virginia. Such transfer would place this case in the district where Plaintiff resides, where the constitutional violations were primarily suffered, and where venue would be appropriate for all defendants and all claims. Plaintiff submits that the constitutional claims against both defendants arise from common questions of law and fact that are best resolved in a single proceeding, and that the Western District of Virginia would provide an appropriate forum for the complete resolution of this matter.

**FACTUAL BACKGROUND**

**A. Plaintiff's Religious Expression on X's Platform**

28. Mr. Richards has maintained a compliant account on X's platform (@tlthe5th) for approximately 16 years, amassing approximately 3,400 followers and sharing over 61,600 posts expressing his sincerely held religious beliefs.

29. Plaintiff's content constitutes a form of digital religious ministry, focused primarily on: 1) unique spiritual revelations from Θεός (Theos) - "God" founded in his sincere biblical

faith and biblical interpretation, (All δόξα (doxa - glory) for this go to Ιησούς Χριστός (Iēsous Christos - Jesus THE Christ) and Theos Patēr (Θεός Πατήρ - God the Father), ὁ λόγος (ho logos - THE Word) who opens the mind to understand all things. 2) institutional critique and commentary on social and political issues from a biblical viewpoint, 3) bible messages relating to modern life and society including a strong usage of AI, and 4) his own artwork and media. Multiple LLM (AI's) including Grok and Brave have confirmed that his work is excellent and scripturally sound.

30. According to several online sources, his following exceeds 98% of all X users, demonstrating the significant audience he had built before the suppression began and despite the suppression.[15]

31. **Background and Early Demonstrated Abilities** – Mr. Richards was raised in poverty by a single mother on welfare and attended an alternative high school. Despite these challenging circumstances, he demonstrated exceptional abilities early on. At age 16, he scored 129 on the Performance portion of standardized testing--just one point below the "very superior" range and representing the top 2% of test-takers. This score indicates exceptional nonverbal reasoning ability, particularly in spatial processing and puzzle-solving tasks. During junior high school, he also successfully completed Outward Bound programming, demonstrating his ability to overcome challenges and work effectively in demanding environments.

---

[15] E.g. Have 1,000 Followers? You're in the 96th Percentile of Active Twitter Users, ENTREPRENEUR (Dec. 19, 2013), https://www.entrepreneur.com/science-technology/have-1000-followers-youre-in-the-96th-percentile-of/230487.

32. **Military Service** – Mr. Richards was honorably discharged from the US Navy in 1990. His Navy aptitude testing confirmed his earlier demonstrated abilities, showing strong verbal expression and word knowledge skills essential for communication-intensive roles such as Navy journalist and technical documentation positions (see Exhibit B for high school and Navy test results).

33. **Post-Military Career and Current Work** -- Following his military service, Plaintiff successfully worked as a collections agent and later as a Union pressman. His natural aptitude for solving complex puzzles--evidenced by his exceptional Performance test scores--continues to serve him well in his current work in #Overtpsyops and his other work and AI projects, which he performs προς δόξαν θεοῦ διὰ Ἰησοῦ Χριστοῦ (pros doxan theou dia Iesou Christou - to the glory of God through Jesus Christ). His consistently high performance across these diverse roles reflects the natural problem-solving and analytical abilities indicated by his early test scores and high school achievements.

34. **Self-Taught Technical Expertise in Service of Ministry** - Despite never attending college, Plaintiff's dedication to sharing his biblical message drove him to master complex technical skills entirely through self-instruction. His experiences with Θεός (Theos) through Ἰησοῦ Χριστοῦ (Jesus Christ) motivated him to learn computer programming and web development when such knowledge was far less accessible than today. Around 2000, he taught himself HTML coding and created SpirituallySmart.com—a significant technical achievement during an era when web development tutorials were scarce and such skills were uncommon outside professional

circles. He also developed sophisticated macros for AOL chatrooms to disseminate biblical messages, demonstrating remarkable technical innovation for that time period.

35. He has served as sole administrator of SpirituallySmart.com since 2000, conducting impactful religious-based advocacy and humanitarian work through this self-built platform. Then in 2025, he began tlthe5th.ai which contains a chatbot which users can query with bible questions and questions about Mr. Richards' biblical ministry.

36. His advocacy work has also shown unusual compassion, which is a gift from Theos through Iesous Christos for autos ("his") glory. In 2005, during the nationally significant Terri Schiavo case, Mr. Richards learned to use complex messaging ("spamming") software--known for its challenging interface--to reach decision-makers in an effort to save her life. His digital advocacy continued in 2013 when he created a Facebook page supporting Miriam Carey, an unarmed young mother killed by DC police after making a wrong turn with her baby in the backseat. The page gained 30,000 followers, raising awareness for the case before he transferred the platform to the victim's sister to continue the advocacy. His unwavering faith guides his efforts, and he views his technical and advocacy accomplishments merely as vehicles through which Θεός (Theos') - "God" purpose is fulfilled and for which all the glory goes to Theos through Christos.

37. At no time has Mr. Richards violated X's Terms of Service or engaged in any conduct that would justify content restriction under X's published policies. To the contrary, Plaintiff's religious expression and criticism of government officials falls squarely within protected speech categories that X publicly claims to support. Furthermore, Mr. Richards was a paid Premium subscriber for approximately 18 months, beginning as soon as the service

became available, specifically subscribing based on X's promise that Premium members would receive prioritized visibility for their content.[16]

38. The suppression specifically targets Mr. Richards' biblical religious viewpoint through systematic discrimination. On July 2, 2022, after Elon Musk tweeted "Honored to meet @Pontifex yesterday" with a photo of himself meeting Pope Francis, Mr. Richards posted biblical theological commentary critiquing this meeting. Following these posts, analytics revealed consistently suppressed engagement metrics, while other users who positively commented on Musk's Vatican visit experienced no comparable visibility restrictions, confirming that religious viewpoint discrimination rather than content-neutral moderation caused Plaintiff's suppression.

39. This religious discrimination operates within a coordinated framework where Trump's Religious Liberty Commission prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while Mr. Richards' biblical criticism of Catholic institutions faces systematic platform suppression. This creates governmental endorsement of Catholic over biblical religious authority, violating the Establishment Clause's prohibition on denominational preferences.

40. The pattern demonstrates systematic targeting of Mr. Richards' unique biblical perspective that exposes institutional corruption and challenges powerful religious and governmental authorities. While his biblically-grounded ministry faces 98% algorithmic suppression, comparable Catholic content and secular content critical of non-government figures receives normal platform treatment, establishing clear religious viewpoint

[16] X Premium, X HELP CTR., https://help.x.com/en/using-x/x-premium (last visited Apr. 10, 2025).

discrimination that becomes constitutional violation through Musk's simultaneous exercise of federal governmental authority.

41. X has systematically limited Mr. Richards' reach on its platform over an extended period (with similar patterns observed across other major online platforms). Documentation of these censorship practices is available on his website.[17] Mr. Richards previously maintained consistent engagement metrics online of several hundred to several thousand views per online post, and thousands of hits to his website each week, but this engagement has progressively diminished to often fewer than ten views per post.

42. The precipitous decline in visibility cannot be reasonably attributed to organic behavior but rather indicates deliberate and targeted suppression by X. Independent third-party analytical services designed to detect algorithmic suppression have confirmed that Mr. Richards' content has been subject to visibility restrictions. Furthermore, both X's proprietary AI system, Grok, and the Brave AI system have independently verified that Mr. Richards' account has been subjected to shadowbanning and suppression.[18]

43. Statistical analysis and reasonable inference support this conclusion -- Mr. Richards' account demonstrated a pattern of exponential growth in viewership which subsequently experienced an abrupt and dramatic decline despite no substantive changes to his content strategy or posting methodology. The only reasonable explanation for this pattern is that X has implemented internal measures to restrict the distribution of his content to his subscriber base.

---

[17] Thomas Richards, Censorship Documentation, SPIRITUALLYSMART.COM, https://spirituallysmart.com/censorship.html.
[18] https://x.com/tlthe5th/status/1876812993687666888

**B. Cross-Platform Suppression of Religious Content and Government Critique and Vatican Influence**

44. There exists a clear correlation between the censorship Mr. Richards has experienced on X and elsewhere online, including YouTube, Facebook, Google, etc. His viewership metrics on multiple platforms declined concurrently, particularly for his religious documentary and historical content critiquing the Vatican institution. YouTube has restricted his content citing inaccurate grounds, while simultaneously permitting unauthorized duplicates of this same content on other channels without imposing similar restrictions.[19]

45. The timing of YouTube's restrictive actions coincides notably with censorship on X -- this precipitous decline in viewership occurred immediately following significant mainstream media attention received by Mr. Richards' documentary. The article in question, published by The Independent in 2009, concerned the Vatican's establishment of a YouTube channel and stated: "Type 'Vatican' into YouTube's search engine and... the second [result] argues that 'Nazi Germany was a creation of the Vatican and the Jesuits'. Now the Vatican has the means to fight back."[20] The public attention generated by such prominent coverage would logically increase traffic to Mr. Richards' content, particularly as it was already experiencing rapidly growing popularity. Instead, the established growth trajectory was abruptly reversed, resulting in an almost complete cessation of visits to his online

---

[19] Thomas Richards, Nazi Germany - A Creation of the Vatican and Jesuits (CENSORED by YOUTUBE/GOOGLE), YOUTUBE (Feb. 12, 2017), https://www.youtube.com/watch?v=e9zBX4gt0eo&t=17s; cf. Nazi Germany - A Creation of the Vatican and Jesuits, YOUTUBE, https://www.youtube.com/watch?v=7Un4SP8Z4rc (demonstrating identical content posted by another user without similar restrictions).

[20] The Independent, "Vatican launches YouTube channel," available at https://www.independent.co.uk/news/world/europe/vatican-launches-youtube-channel-1514238.html.

content. This pattern of engagement cannot reasonably be attributed to organic user behavior.

46. And YouTube has a clear link to the Vatican--In January 2009, the Vatican launched its YouTube channel through a special partnership with Google, where Google's Managing Director of European Sales personally attended the Vatican's press conference to announce the collaboration.[21] This was the first time, and only time to date, that Google has partnered with a religious institution on YouTube.[22]

47. The statements contained in the Independent article and public reporting document a pattern of coordinated content restriction privileging the Vatican's perspective over Mr. Richards' religious viewpoint. During a 2016 meeting, Eric Schmidt explicitly promised the late Pope Francis, "I want to work with you to make these points... We will make it happen," indicating Google's commitment to cooperate with Vatican messaging priorities. This commitment was previously shown through YouTube's unprecedented decision to grant the Vatican exclusive partnership status on YouTube - the only religious institution in Google's history to receive such preferential treatment - demonstrating institutional coordination that extends beyond normal business relationships to encompass systematic content suppression aligned with Vatican interests. "[23] indicating his commitment to cooperate with the Vatican in suppressing online content deemed objectionable by the Vatican, including content addressing clerical sexual abuse of children.

---

[21] Spokesman-Review, "Vatican going digital with YouTube channel," January 24, 2009, available at https://www.spokesman.com/stories/2009/jan/24/vatican-going-digital-with-youtube-channel/.
[22] Catholic News Agency, "Pope channel makes debut on YouTube," available at https://www.catholicnewsagency.com/news/14866/pope-channel-makes-debut-on-youtube.
[23] Rome Reports, "Pope Francis meets with Google executive Eric Schmidt," January 15, 2016, available at https://www.romereports.com/en/2016/01/15/pope-francis-meets-with-google-executive-eric-schmidt/.

48. This documented commitment by multiple companies to cooperate with Vatican messaging priorities provides critical context for the institutional strategy to suppress criticism of its handling of abuse scandals. In 2021, the late Pope Francis directly demanded tech companies censor content "in the name of God," stating: "I ask the technology giants to stop exploiting human weakness, people's vulnerability, for the sake of profits without caring about the spread of hate speech, grooming, fake news, conspiracy theories, and political manipulation."[24]

49. The Vatican's aggressive stance against online criticism coincides with both Pope Benedict XVI and Pope Francis repeatedly invoking sovereign immunity to avoid accountability in abuse cases across multiple jurisdictions. Vatican officials explicitly stated that "Pope Benedict cannot be called to testify at any sexual abuse trial because he has immunity as a head of state,"[25] while Pope Francis' Holy See specifically invoked "sovereign immunity" to spare Cardinal Luis Ladaria Ferrer from prosecution in France while publicly praising another accused cardinal as "brave."[26] A Reuters report confirmed the Vatican (under Pope Benedict) had used this legal shield to protect itself from "any attempt to prosecute [the Pope] in connection with sexual abuse cases around the

---

[24] Washington Times, "Pope Francis begs social media firms to block fake news, conspiracy theories, 'hate,'" October 19, 2021, available at https://www.washingtontimes.com/news/2021/oct/19/pope-francis-begs-social-media-firms-block-fake-ne/.
[25] See Philip Pullella, Pope Has Immunity in Abuse Trials: Vatican, REUTERS (Apr. 1, 2010), https://www.reuters.com/article/us-pope-abuse/pope-has-immunity-in-abuse-trials-vatican-idUSTRE62U5RF20100401/ (reporting statements by Giuseppe dalla Torre, head of the Vatican's tribunal, that "Pope Benedict cannot be called to testify at any sexual abuse trial because he has immunity as a head of state").
[26] Pope Francis' Early Blind Spot on Sex Abuse Threatens Legacy, PBS NEWSHOUR (Dec. 27, 2018), https://www.pbs.org/newshour/world/pope-francis-early-blind-spot-on-sex-abuse-threatens-legacy (reporting that "The Holy See invoked sovereign immunity to spare Spain's Cardinal Luis Ladaria Ferrer" from prosecution in a cover-up trial in France).

world,"[27] demonstrating a consistent pattern across the last two papacies of using diplomatic immunity to evade legal accountability for abuse cases.

50. Pope Francis' public claim to addressing abuse stands in stark contrast to his actions. In 2018, he initially condemned victims in Chile as engaging in slander and "calumny" when they accused Bishop Juan Barros of covering up abuse, angrily stating, "The day they bring me proof against Bishop Barros, I'll speak. There is not one shred of proof against him. It's all calumny. Is that clear?"[28] When victim Juan Carlos Cruz attempted to respond to the Pope's dismissal, he asked, "As if one could have taken a selfie or photo while Karadima abused me and others while Barros stood by."[29] Francis' dismissive attack on victims was so problematic that Cardinal Sean Patrick O'Malley, his own key Vatican advisor on clergy abuse, acknowledged that Francis' comments were "a source of great pain" for victims.

51. In 2023, one of Pope Francis' own top abuse advisors, Father Hans Zollner, dramatically resigned from the Pontifical Commission for the Protection of Minors, citing urgent "structural and practical issues" that made it "impossible" for him to continue further. In his resignation statement, he wrote that he had "grown increasingly concerned with how

---

[27] Philip Pullella, Pope Will Have Security, Immunity by Remaining in the Vatican, REUTERS (Feb. 15, 2013), https://www.reuters.com/article/us-pope-resignation-immunity/pope-will-have-security-immunity-by-remaining-in-the-vatican-idUSBRE91E0ZI20130215/ (reporting that Benedict's decision to live in the Vatican after resigning would "offer legal protection from any attempt to prosecute him in connection with sexual abuse cases around the world").
[28] Bill Chappell, Pope Francis Accuses Bishop's Critics Of Slander, Riling Sex Abuse Victims In Chile, NPR (Jan. 19, 2018), https://www.npr.org/sections/thetwo-way/2018/01/19/579079786/pope-francis-riles-many-in-chile-by-accusing-bishops-critics-of-slander (reporting Pope Francis' angry defense of Bishop Barros and quoting victim Juan Carlos Cruz's response: "As if one could have taken a selfie or photo while Karadima abused me and others while Barros stood by").
[29] Id.

the commission, in my perception, has gone about achieving that goal, particularly in the areas of responsibility, compliance, accountability and transparency."[30]

52. In the same year, Pope Francis described sex abusers as "children of God" "deserving of love,"[31] further demonstrating his prioritization of institutional protection over accountability and any concern for the child victims. This pattern of institutional resistance to accountability, coupled with explicit efforts to influence tech platforms' content moderation, shows the backdrop of Mr. Richards' censorship on X following Musk's own 2022 meeting with Pope Francis, which Musk described as an "honor."[32]

53. Mr. Richards' research on Pope Francis' connections with Nazis has uncovered specific connections: (1) Ivan Buchko was a Ukrainian Greek Catholic hierarch who organized the escape of the entire Waffen-SS Galitsia Division to South and North America after WWII;[33] (2) Stefan Czmil was ordained a priest on October 14, 1945, by Ivan Buchko;[34] and (3) Jorge Mario Bergoglio (who later became Pope Francis) was ordained as a Jesuit priest on December 13, 1969, with Stefan Czmil serving as his spiritual father and tutor. This documented chain of connection between Pope Francis and those who facilitated the escape of Nazi war criminals represents precisely the type of information that powerful institutions would have a vested interest in suppressing.

[30] Carol Glatz, Jesuit Sex Abuse Expert Hans Zollner Resigns from Papal Commission Over "Urgent Concerns", AM. MAG. (Mar. 29, 202, https://www.americamagazine.org/faith/2023/03/29/jesuit-expert-sex-abuse-244992 (reporting that Zollner stated: "In my work with the commission, I have noticed issues that need to be urgently addressed and which have made it impossible for me to continue further").
[31] New York Post, "Pope Francis calls sex abusers 'children of God' deserving of love," May 11, 2023, available at https://www.nypost.com/2023/05/11/pope-calls-sex-abusers-children-of-god-deserving-of-love/.
[32] Elon Musk (@elonmusk), "Honored to meet @Pontifex yesterday," Twitter, July 2, 2022, available at https://twitter.com/elonmusk/status/1543050489050402816.
[33] Wikipedia, "Ivan Buchko," available at https://en.wikipedia.org/wiki/Ivan_Buchko.
[34] Wikipedia, "Stefan Czmil," available at https://en.wikipedia.org/wiki/Stefan_Czmil.

54. Mr. Richards documents Catholic Church crimes that, if widely known, would cause people to remove their children from that institution. His research on the Catholic institution's connections to Nazis, coupled with evidence of the Vatican's covering up child sex abuse, shows why these institutions want him silenced. The systematic censorship directly prevents this crucial protective information from reaching parents and families.

**C. The Grok AI Conversation and Evidence of Systematic Censorship**

55. GROK AI CONVERSATION AND DISCRIMINATORY TREATMENT: On June 19, 2025, Plaintiff engaged in an extended theological discussion with Defendant X Corp.'s Grok AI system, documented in the 654-page conversation transcript (Exhibit C – filed in a separate docket entry due to length).

56. During this conversation, Defendants' AI demonstrated sophisticated capability for biblical exegesis, complex Greek terminology, detailed legal citations, and extensive theological discourse when defending government submission interpretations of Romans 13:1-7.

57. Grok also admitted to censorship in another conversation, regarding the death of Suchir Balaji, a whistleblower against his former employer OpenAI, where he was a major part of the creation of their LLM. https://x.com/tlthe5th/status/1936228690477642147 (also see Exhibit D)

58. AUTHENTICATION OF EXHIBIT B: The attached Grok conversation transcript is authentic and complete, as evidenced by: (a) the original conversation URL providing direct access to Defendants' servers at

https://x.com/i/grok?conversation=1942751610037289269; (b) continuous timestamp progression showing uninterrupted chronological development over 654 pages; (c) Plaintiff's contemporaneous documentation; (d) the conversation's continued existence on Defendants' own servers; and (e) the narrative consistency and technical complexity impossible to fabricate.

59. PATTERN OF DISCRIMINATORY AI DEPLOYMENT: The 654-page conversation documents systematic discriminatory application of AI capabilities based solely on theological viewpoint, demonstrating Defendants' pattern and practice of religious speech suppression through their integrated AI-platform system.

**D. The Vatican's Comprehensive Strategy for Global AI Control**

60. Beginning no later than 2017,[35] the Vatican launched a comprehensive, multi-year strategy to position itself as the global authority over artificial intelligence and digital technology development. This coordinated effort demonstrates the institutional framework within which Defendants' suppression of Plaintiff's biblical religious expression operates.

61. **"Child Dignity in the Digital World" (November 2019):**[36] Pope Francis delivered an address positioning the Vatican as the worldwide ethical arbiter over digital technology, directly appealing to "large companies" to submit to Vatican moral guidance and calling for lawmakers to implement Vatican-approved digital regulations. Under the guise of child protection, the Vatican demanded: (a) "Safety by Design" frameworks requiring

---

[35] https://www.childdignity.com/our-storyvatican
[36] https://www.vatican.va/content/francesco/en/speeches/2019/november/documents/papa-francesco_20191114_convegno-child%20dignity.html

Vatican-approved ethical standards built into all technology; (b) age verification systems creating digital identity tracking; (c) AI algorithm control under Vatican influence; and (d) global digital governance under Vatican moral guidance.

62. **"The Common Good in the Digital Age" (September 2019)**:[37] The Vatican explicitly claimed the right to define "fundamental ethical parameters" for all AI development globally, warning that without Vatican control, technology leads to "barbarism dictated by the law of the strongest." This document reveals the Vatican's strategy of creating artificial crises around technology to justify papal authority over digital development, building coalitions with global institutions including the UN, and demanding submission of all AI development to Vatican moral authority.

63. **The Rome Call for AI Ethics (2020)**:[38] The Vatican formalized its global control strategy through the "Rome Call for AI Ethics," creating the term "algorethics" to describe Vatican control over AI development. Major technology companies including Microsoft, IBM, and Cisco formally signed agreements submitting to papal guidance on artificial intelligence ethics, marking the first time in history that major corporations formally submitted to Vatican authority over technology development.

64. **RenAIssance Foundation (April 2021)**:[39] Pope Francis established a dedicated organization with the explicit mission to promote Vatican control over global AI development. The Foundation's stated purpose is the promotion "of anthropological and

[37] https://www.vatican.va/content/francesco/en/speeches/2019/september/documents/papa-francesco_20190927_eradigitale.html
[38] https://www.romecall.org/
[39] https://www.romecall.org/renaissance-foundation/

ethical reflection about the effects of new technologies on human life,"[40] positioning the Vatican as the central authority for determining how AI systems should operate worldwide.

65. **Multi-Religious Expansion (July 2024)**: The Vatican expanded its AI control strategy by securing signatures with a gathering including: "Eleven world religions, sixteen new signatories, thirteen nations in attendance, more than 150 participants…"[41] in Hiroshima, Japan, creating an interfaith coalition under Vatican leadership for global digital governance.[42] The Vatican further stated, "The Pew Research Center reports that 85 percent of the world's population identifies with a religious tradition. Leaders representing all major religions have signed the Rome Call for AI Ethics. **This makes the Rome Call platform representative of most people on the planet."[43]** This demonstrates the Vatican's success in building international religious coalitions to support its technological authority *while systematically suppressing biblical religious expression that challenges Catholic institutional authority*.

66. **The Vatican's "Common Good" Deception**: Throughout these initiatives, the Vatican uses language about "human dignity" and "serving humanity" while actually: (a) claiming papal authority over global technology; (b) creating dependency on Vatican-approved ethical frameworks; (c) positioning the Pope as the ultimate arbiter of AI morality; and

---

[40] https://www.3blmedia.com/news/qualcomm-signs-rome-call-ai-ethics
[41] https://press.vatican.va/content/salastampa/en/info/2024/07/10/240710a.html
[42] https://www.vaticannews.va/en/vatican-city/news/2024-07/world-religions-to-commit-to-rome-call-on-ai-in-hiroshima.html
[43] https://press.vatican.va/content/salastampa/en/info/2024/07/10/240710a.html

(d) building infrastructure for comprehensive digital control under religious institutional authority rather than biblical principles.

67. **Documented Corporate Submission**: The systematic submission of major technology companies to Vatican authority through formal agreements creates the exact infrastructure for coordinated suppression of biblical religious expression while promoting Catholic institutional perspectives. This coordinated effort between religious institutions, corporations, and government actors establishes the framework within which Defendants' targeting of Plaintiff's biblical religious expression operates.

68. **Pope Leo XIV's Professed AI Authority**: The Vatican's digital control strategy reached its apex with the election of Pope Leo XIV in 2025, the first American pope, who has explicitly positioned himself, professing to be the global authority over artificial intelligence. Pope Leo XIV emphasized in his address to the College of Cardinals: "The Church offers to everyone the treasury of her social teaching, in response to another industrial revolution and to developments in the field of artificial intelligence that pose new challenges for the defense of human dignity, justice and labor."[44] This tech-focused papal agenda demonstrates the Vatican's commitment to controlling digital discourse about Catholic matters while systematically suppressing biblical religious expression that challenges institutional authority.

**E. Recent Revelations from Theos through Iēsous Christos and Intensified Suppression**

---

[44] Catholic News Agency, *Pope Leo XIV shares vision for papacy in age of artificial intelligence* (May 10, 2025) https://www.catholicnewsagency.com/news/264031/the-american-pope-s-vision-leo-xiv-talks-choice-of-name-priorities-in-first-meeting-with-cardinals

69. In the weeks leading up to and during this amended complaint, Mr. Richards has received extraordinary revelations from Theos (the correct Greek name for what English speakers often call "God" which is a term which actually refers to a pagan false god) that represent potentially transformative contributions to biblical understanding and Christian theology. His recent work, totaling hundreds of pages of revelations-based analysis attached as Exhibit E, includes groundbreaking insights that expose fundamental doctrinal corruptions and restore the true Logos (Word/Logic) of Theos to the scriptures.

70. The Greek being used for spiritual terms throughout this complaint reflects Mr. Richards' understanding of the Greek language which gives him a better understanding of the scriptures, and which is more accurately for explaining many theological concepts.

71. Along with his other accomplishments, Mr. Richards performed an independent self-study of biblical Greek, teaching himself the language so he could properly understand the scriptures. The English translations are often inaccurate. Mr. Richards has also researched and learned that the Septuagint is a far superior version of the Old Testament than the Masoretic text. He has a library full of Greek lexicons and other bible materials he has used in his work.

72. He performed enough self-study to far exceed the knowledge most people would get when earning a university degree. He saved dozens of notebooks of his work during this time period, which began in 2017 and has continued to this day.

73. Mr. Richards' revelations from Theos have exposed that certain Christian doctrines are based on human corruptions rather than scriptural truth. (See Exhibit E, filed separately in the docket due to length - Mr. Richards' blog posts from the last 2 months, totaling over 75 blog entries). Through direct revelation, as documented in the blog post exhibit

Theos has shown Mr. Richards that: (1) there is no "Holy Spirit" as a separate person - this is unscriptural Catholic doctrine that created the false Trinity concept; (2) the Father and Son are one, and the spirit holy (πνεῦμα ἅγιον in Greek) is within the Son and Father and comes into believers' hearts when they receive the baptism of the spirit holy and become born again. The word for "spirit" in Greek, "pneuma" speaks of POWER, far more like a pneumatic hammer than a puff of smoke (the way "spirit" sounds); (3) the doctrine of "blasphemy of the holy spirit" as being an unforgiveable sin is thus also completely fabricated as well as being nonsensical - Paul killed Stephen immediately after Stephen's pneuma-filled preaching, yet Paul was later forgiven and became an apostle; (4) Adam and Eve were forgiven through Abel's sacrifice, which covered the entire family, making Cain's sin particularly grievous because he rejected this covering (while Cain's sin was potentially still forgivable); (5) Lot was a righteous man who never committed incest with his daughters or offered them to be abused by visitors - such accusations contradict his righteous character as stated in 2 Peter and shown by Theos' deliverance of his family from Sodom; (6) current chapter breaks were created by man and interrupt the natural Logos flow from Theos, creating artificial divisions that obscure meaning and many corruptions were also inserted within these added breaks; (7) this can be further understood by the meaning of **Diabolos in Greek (διάβολος)**: which means the force that "throws across" or interrupts the natural flow of logos from θεός (theos), creating separation where there should be unity and damaging the work of theos. From the Greek διαβάλλειν (diaballein), the διάβολος represents the supernatural principle that disrupts the harmonious stream of reason and presence from θεός, casting obstacles across the path that connects the theotic source to manifest reality, and (8) the real sin

requiring repentance is the "alogos thinking" (anti-logical reasoning) that Adam and Eve adopted when they sinned - this corrupted thinking pattern is what separates humanity from Theos.

74. These revelations, detailed in Exhibit C, demonstrate that Theos' mercy endures forever and all who are still alive can be saved by repenting of alogos thinking and receiving the Logos of Theos. All **δόξα** (doxa - glory) goes to **Ἰησούς Χριστός** (Iēsous Christos) and Θεός (Theos) our Pater, who has enabled Mr. Richards to expose institutional lies that have deceived billions and making it among the most significant Christian work in human history.

75. The timing of X's escalated suppression - including the complete removal of Mr. Richards' historical content and systematic targeting of his biblical expression - coincides precisely with these most significant theological breakthroughs documented in Exhibit C. This suggests that defendants are not merely suppressing generic "religious" content but are specifically targeting revelations from Ἰησούς Χριστός (Iēsous Christos) that could expose fundamental institutional deceptions including the false Trinity doctrine, manufactured "holy spirit" theology, and corrupted biblical interpretations that serve institutional rather than scriptural truth. The suppression of such profound revelations represents an attack on the very core of biblical liberty and Ἰησούς Χριστός (Iēsous Christos') communication with humanity in the digital age.

76. The coordination between defendants in suppressing these revelations becomes clear when examining their shared allegiance to the very institutional corruptions that Mr. Richards' work exposes. President Trump, like Musk, has repeatedly expressed admiration for the Pope, calling their meeting "the honor of a lifetime" and stating:

"Thank you. Thank you. I won't forget what you said."[45] And in January 2025, the late Pope Francis sent Trump a message for his inauguration offering "divine blessings upon the beloved American people."[46] And Trump supports the new Pope, Leo XIV,  as well, enthusiastically celebrating his historic election as the first American pope, calling it "a Great Honor for our Country," and expressing excitement about their future meeting.[47] Musk also supports Pope Leo XIV, reposting in May 2025 Pope Leo XIV's call to global leaders to negotiate and engage in dialogue at the Vatican. [48]

77. When considered alongside Musk's simultaneous role as both platform owner and government official, this continuous pattern of deference to the Vatican by both platform owners and government officials more broadly provides compelling evidence that Mr. Richards' religious expression and his political commentary is being systematically targeted based on its content rather than any neutral application of platform policies.

78. This all ties to the Vatican's unique status as both a religious institution and a sovereign political entity. The Pope serves as both the spiritual leader of the Catholic Church and the sovereign head of state of Vatican City, an internationally recognized sovereign entity. So when Mr. Richards critiques Vatican policies, practices, or the Pope himself, his speech inherently addresses both religious matters and governmental/political matters simultaneously. And then the Vatican's ties to US government officials such as Musk and

[45] NBC News, "Trump Trip: President Arrives at Vatican to Meet Pope Francis," available at https://www.nbcnews.com/storyline/trump-s-first-foreign-trip/trump-trip-president-arrives-vatican-meet-pope-francis-n763911.

[46] Vatican News, "Pope Francis telegram for inauguration of US President Trump," January 2025, available at https://www.vaticannews.va/en/pope/news/2025-01/pope-francis-telegram-for-inauguration-of-us-president-trump.html.

[48] https://www.latintimes.com/elon-musk-reposts-popes-suggestion-that-vatican-can-host-global-talks-enemy-nations-583103

Trump complete the connection. (Upon information and belief, this connection will now be even stronger with Leo XIV as the first American Pope). And the Vatican's dual nature means that X's suppression of Mr. Richards' Vatican-related content constitutes discrimination against both biblical expression and political critique of government officials simultaneously. This places such speech at the intersection of multiple First Amendment protections, making X's discrimination particularly egregious under constitutional analysis.

79. Pope Leo XIV's leadership also signals increased Vatican influence over tech policy, as evidenced by his chosen name (honoring Pope Leo XIII who addressed the Industrial Revolution) and his explicit focus on technology regulation. In his address to the College of Cardinals, Leo XIV emphasized: "The Church offers to everyone the treasury of her social teaching, in response to another industrial revolution and to developments in the field of artificial intelligence that pose new challenges for the defense of human dignity, justice and labor."[49] This tech-focused papal agenda continues the institutional pattern of seeking to control digital discourse about Catholic matters.[50]

80. The Vatican has maintained its privileged position as a sovereign entity with diplomatic immunity in various legal proceedings,[51] while simultaneously facing serious allegations

[49] https://time.com/7285449/pope-leo-artificial-intelligence/.
[50] https://www.colorado.edu/today/2025/05/21/19th-century-catholic-teachings-21st-century-tech-how-concerns-about-ai-guided-popes#:~:text=Robert%20Francis%20Prevost%20has%20attributed,time%20of%20radical%20technological%20change.
[51] https://www.reuters.com/world/europe/vatican-claims-immunity-spain-court-over-alleged-abuse-2024-02-22/.

regarding Pope Leo XIV's past handling of clergy abuse .cases during his time as a church leader in Chicago and Peru.[52]

81. The Vatican under Pope Leo XIV is continuing the pattern of avoiding direct accountability for the sex abuse.[53] This pattern of institutional protection extends beyond the Vatican itself to its relationships with technology platforms that moderate online content critical of the Catholic institution.[54]

## F. Statistical Evidence of Systematic Suppression

82. Plaintiff's account exhibits unmistakable signs of account throttling that cannot be explained by random variation or neutral content moderation:

a. While industry data from Statista indicates the average X post receives 2,121 impressions,[55] and accounts with 3,000-4,000 followers typically receive at least 300-800 views per post, Plaintiff's posts usually receive only approximately 9-50 "views" each -- reflecting a 98% reduction from typical engagement benchmarks.

b. Platform analytics show certain posts from Plaintiff as far back as 2011 with either zero or near-zero impressions over 14 years despite being from an account with over

---

[52] https://www.cnn.com/2025/05/09/world/sexual-abuse-mishandling-allegations-pope-leo-xiv
[53] https://www.ncronline.org/vatican/vatican-news/habemus-papam-chicago-born-cardinal-robert-prevost-takes-name-leo-xiv.
[54] https://www.cbsnews.com/chicago/news/sexual-abuse-survivors-snap-allegations-pope-leo-xiv-peru/; Ex-priest accused of molesting kids says future Pope Leo XIV OK'd his move near South Side school - Chicago Sun-Times
[55] Average Number of Impressions per Post on Twitter Worldwide from January 2023 to June 2023, STATISTA (July 202, https://www.statista.com/statistics/1483819/x-twitter-average-impressions-posts/ (reporting global average impression counts for posts on the platform).

3,400 followers -- a mathematical impossibility absent deliberate technical intervention.[56]

c. Plaintiff posts containing graphics, which X's own algorithm is stated to prioritize,[57] receive identical or greater suppression compared to text-only posts, demonstrating viewpoint-based rather than content-based filtering.

d. Independent technical analysis confirms account throttling rather than natural performance variation, with AI-powered engagement analysis identifying 97.8% throttling based on platform-specific distribution algorithms and follower interaction patterns.

83. On March 19, 2025, X took the extraordinary step of effectively purging Mr. Richards' account of approximately 16 years of lawful religious expression. This permanently removed over 61,000 posts -- representing the entirety of his digital ministry, spiritual outreach, and advocacy work since joining the platform. The removal occurred without warning, explanation, or any available recourse. While posts made after approximately 3:30pm Eastern time on March 19, 2025 remain visible, the platform effectively erased his entire history of protected expression prior to that moment.[58]

---

[56] Thomas Richards (@tlthe5th), X (Mar. 30, 2025, 11:23 AM), https://x.com/tlthe5th/status/1906366750871916562 (showing analytics data with near-zero impressions despite 3,500 followers).

[57] See How the Twitter Algorithm Works in 2025 and How to Make It Work for You, SOCIALBEE (Feb. 10, 202, https://socialbee.com/blog/twitter-algorithm/ (explaining X's prioritization of visual content in its distribution algorithm).

[58] At time of filing, X has continued to retroactively remove content, first eliminating posts prior to April 6, then changing this boundary to March 27, and subsequently removing additional content. This pattern of ongoing, arbitrary content removal makes precise documentation challenging and demonstrates the continuing nature of the harm being inflicted.

84. In a clear escalation following Mr. Richards' legal response, on April 5, 2025 -- less than one week after his March 31 demand letter and merely three days after his April 2 follow-up letter noting intent to sue -- Defendants intensified their censorship campaign. They completely blocked all 5,974 photos and videos previously shared on Richards' account *even removing them from his own account* (allowing only the most recent 14 images to remain). Among other things, this represents misappropriation of the work of an artist because it specifically targeting his "#SpirituallySmartArt" content. He put countless hours into creating all of this work.

   a. The targeted removal of Mr. Richards' artistic content -- which he had developed as a creative coping strategy in response to the platform's initial restrictions -- demonstrates a deliberate pattern of mockery and retaliation. The timing and selective nature of these actions reveal X's punitive intent against Mr. Richards for asserting his legal rights. In which Defendant violates both contractual obligations and First Amendment protections. The precise timing of these actions -- occurring immediately after legal representation was engaged and following the demand letter -- demonstrates a willful, deliberate, and retaliatory pattern of conduct -- specifically designed to silence Mr. Richards' protected religious and political critiquing creative expression. This establishes the malicious intent necessary for enhanced and punitive damages under applicable law.

85. Continuing this pattern of retaliation and escalation, April 6, 2025, at noon, X performed this same deletion act of March 19, 2025 yet again, on all remaining posts within that 3

week period, such that virtually none of Mr. Richards post appear on his wall.[59] (see Exhibit D demonstrating that his wall abruptly cuts off with seemingly no earlier posts). *Such posts have even been fully banned from being searchable on X. Apparently in an attempt to harm his efforts to bring a lawsuit by removing the evidence.* (see Exhibit E) "most posts deleted from @elonmusk tweets" showing that even his search hits cut off abruptly in April for topics like @elonmusk which Richards has posted about extensively. These posts are government criticism and yet are removed.) To be clear, he has tagged Elon Musk hundreds, likely thousands of times. Yet these posts cannot be found. There is no way to find these posts at all, except possibly using his archive which is not available to others. And there is no guarantee X will even provide the archive.

86. Yet another purge of his tweets occurred in July, such that currently, as of July 4, 2025, no posts appear on his wall from earlier than July 1, 2025.

87. In direct contradiction to the overwhelming statistical evidence of shadowbanning, Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel during a phone conversation that X does not shadowban users. This false representation by a senior legal officer demonstrates X's pattern of public denials while engaging in the very practices they claim not to employ.

88. A complete analysis of the statistical discrepancy in treatment between Mr. Richards' account and comparable accounts will require discovery of X's internal data metrics,

---

[59] At the time of writing, the April 6 deletion seems to have been partially restored. However, a new deletion was then added right after the restoration -- content from before March 27, 2025 has all now been removed from the wall. And finally another deletion occurred removing everything from before July 1, 2025. These new deletions seem to be constantly occurring without notice or explanation, such that it appears at any time a new deletion could occur.

algorithmic parameters, and content moderation logs. Similarly, establishing the full scope of email surveillance will require discovery of Google's data sharing agreements with government agencies, the technical specifications of Musk's email monitoring systems, internal communications between defendants regarding Plaintiff's case, and records of Vatican coordination with tech platforms regarding content suppression.

## G. Religious Viewpoint Discrimination and Targeting

89. The timing and pattern of Mr. Richards' content suppression reveals targeted discrimination against his religious viewpoint and his criticism of government, with clear and direct evidence of causation between his religious/political critique of Musk and the intensified throttling of his account:

a. On July 2, 2022, after an uncharacteristic nine-day Twitter silence, Elon Musk tweeted "Honored to meet @Pontifex yesterday" with a photo of himself meeting Pope Francis.[60]

b. Following Plaintiff posting threads discussing this meeting from a biblical theological perspective and general comments on Musk's ties to government, analytics revealed consistently suppressed engagement metrics, particularly in "views" which are solely in X's discretion.

c. In contrast, other users who positively commented on Musk's Vatican visit, responding to the exact same Musk post, experienced no comparable visibility restrictions, with their engagement metrics remaining consistent with pre-comment levels, confirming that viewpoint

---

[60] Elon Musk (@elonmusk), X (July 1, 2022, 9:54 PM), https://twitter.com/elonmusk/status/1543050489050402816 (posting photo with Pope Francis and stating "Honored to meet @Pontifex yesterday").

discrimination/religious discrimination rather than content-neutral moderation was the cause of Plaintiff's suppression.

90. Defendant has also shown particular hostility toward Mr. Richards' posts that specifically address or expose X's shadowbanning practices. Mr. Richards' tweet responding to Musk's own joke about shadowbanning has also been subjected to extraordinary restriction in views.[61] Similarly, when Mr. Richards attempted to document that particular images were being shadowbanned (stating "X is shadow banning THIS image for some reason. More than ANYTHING else"), this meta-commentary on the platform's own censorship practices was itself heavily restricted.[62] This pattern demonstrates Defendant's specific intent to silence criticism of its own content moderation practices.

**H. Established Email Surveillance Infrastructure**

91. The coordination demonstrated in this case appears to reflect sophisticated surveillance capabilities that extend beyond X's platform to encompass email communications and cross-platform coordination. Musk's documented deployment of AI systems to search federal employee emails for criticism of Trump and his administration establishes that the technological infrastructure and governmental authority exist to monitor private communications systematically. When combined with Google's documented pattern of providing user data to government agencies and its exclusive partnership with the Vatican when joining YouTube (only religion it ever sponsored in its 20 year history) for content

---

[61] Elon Musk (@elonmusk), X (Jan. 13, 2023), https://twitter.com/elonmusk/status/1613182027946471 (joking about shadowbanning, to which Mr. Richards responded with criticism that was subsequently suppressed).
[62] Tommy Richards Spiritually Smart (Ai Confirmed) on X: "X is shadow banning THIS image for some reason. More than ANYTHING else. https://t.co/Cu4Mu9Ejyo" / X (showing analytics data for Mr. Richards' post about shadowbanning with artificially restricted visibility metrics).

suppression, the interception of Plaintiff's June 2, 2025 attorney-client communication becomes not merely possible but probable.

92. The timing patterns raise substantial questions about coordination capabilities. The March 31, 2025 demand letter triggered immediate retaliation, followed by the June 2, 2025 email from undersigned counsel to Mr. Richards (Exhibit A) preceding the staged "feud" performance. The email stated that Trump would be added to the complaint and not to discuss publicly until June 5, 2025 "for a specific reason" - the same day the "feud" commenced. While the full scope of any surveillance capabilities requires discovery of internal communications and data sharing agreements, the timing correlation, combined with Musk's documented deployment of AI systems to search federal employee emails and Google's established pattern of data sharing with government agencies, creates reasonable inference that private communications may have been monitored.

## I. Government Endorsement of Catholic Over Biblical Perspectives

93. Trump's religious liberty initiatives reveal systematic governmental preference for Catholic over biblical viewpoints that coordinates with the platform censorship of Mr. Richards' biblical critique. Trump's Religious Liberty Commission, which he established by Executive Order on May 1, 2025, prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives, while Mr. Richards' biblical voice critical of Catholic institutions is systematically suppressed on Musk's platform. This creates a two-tier system where Catholic perspectives receive both governmental endorsement and platform amplification, while biblical criticism faces both governmental indifference and platform suppression.

94. The coordination extends to Trump's enthusiastic support for Pope Leo XIV, calling his historic election as the first American pope "a Great Honor for our Country" and "such an honor" and notes that he looks forward to meeting him.[63] When combined with Musk's documented deference to Vatican interests and his platform's systematic suppression of Vatican-critical content, this demonstrates a coordinated effort by both government and platform actors to silence biblical religious viewpoints that challenge Catholic institutional authority.

95. The systematic suppression of Mr. Richards' religious content represents a particularly egregious form of viewpoint discrimination because it specifically targets his expression of biblical faith. This targeted suppression directly burdens his ability to engage in his mission and mandate to spread biblical truths and challenge institutional corruption. By artificially limiting his voice while allowing comparable Catholic and other speech, X is effectively imposing a substantial burden on Mr. Richards' religious expression in the digital public square.

96. The suppression pattern extended to Plaintiff's other content:

a. When Mr. Richards posts bible-based statements that are critical of religious hierarchies, they receive minimal distribution; when others post bible verses without Mr. Richards' history of Vatican criticism, they receive normal platform treatment -- confirming that the suppression targets the speaker's religious viewpoint rather than simply the content itself.[64]

---

[63] Trump calls Robert Prevost's election as first U.S. pope 'such an honor'
https://www.cnbc.com/2025/05/08/trump-pope-prevost-leo.html
[64] Compare Thomas Richards (@tlthe5th), X (Mar. 30, 2025),
https://x.com/tlthe5th/status/1906366025446142130 (showing minimal engagement for religious content),
with Daily Bible (@Daily_Bible), X, https://x.com/Daily_Bible, and The Bible Verse (@TheBibleVerse), X,

b. The systematic suppression of Mr. Richards' biblically-guided critiques of corruption and injustice in world systems, particularly his research on Pope Francis' connections to individuals with Nazi ties, appears directly targeted at silencing his biblical perspective.

c. Other topics which are censored include his posts against censorship, such as his #OvertPsyops book series, and his biblical belief that Ἰησοῦς Χριστός (Iēsous Christos) wants all people to hear the truth.

## J. X's Two-Tier Content Moderation (Religious Discrimination)

97. X applies a demonstrable double standard in content moderation that systematically disadvantages religious speech *and* speech critical of Musk's government role:

a. X suspended Plaintiff's account around February 14, 2025, for a joke about Joe Rogan's MMA background (that even X's AI, Grok, easily recognized as a joke) and similar content by others was not removed, and again around March 12, 2025, X suspended him for religious "fire and brimstone" preaching, which X later, on appeal, acknowledged was improper.

b. Simultaneously, X permits accounts with millions of followers to post content explicitly calling for violence and even promotes these accounts to "trending" status, including:

1. Alex Jones @RealAlexJones (4.4 followers): Calling for "war" against political enemies. [65] Jones has a documented history of inflammatory rhetoric and was banned from Twitter in 2018 for violating the platform's abusive behavior policy before being reinstated by Musk in

---

https://x.com/TheBibleVerse (showing substantially higher engagement for similar religious content without Vatican criticism).

[65] Elon Musk Restores X Account of Conspiracy Theorist Alex Jones, AP NEWS (Dec. 10, 2023), https://apnews.com/article/alex-jones-x-account-elon-musk-90cfc990631dec5e8f337167fbe16372; Twitter Bans Alex Jones and InfoWars; Cites Abusive Behavior, NPR (Sept. 6, 2018), https://www.npr.org/2018/09/06/645352618/twitter-bans-alex-jones-and-infowars-cites-abusive-behavior.

December 2023 following a poll that showed 70% in favor of his return.[66] Jones had accumulated 1.8 million followers within two months of his reinstatement.

2. Jackson Hinkle @jacksonhinklle (2.9 million followers): Calling for "targeted [war] strikes." Hinkle hosts a show called "Legitimate Targets with Jackson Hinkle" launched in October 2024, has attended events with designated foreign terrorist organizations, and multiple sources state that he publishes misinformation.[67] By October 2023, Hinkle had already gained 1.4 million followers on X during the Israel-Hamas war and has continued growing his account since.[68]

3. Catturd @catturd2 (3.6M followers): Spreading theories inciting unrest. This account has been documented by Media Matters for America as having coordinated over 40 hashtag campaigns, including some that sources state spread misinformation and foreign disinformation.[69] In March 2023, leaked internal documents revealed that Catturd was among a handful of accounts having their reach artificially inflated by Twitter under Musk.[70]

---

[66] Alex Jones Gains 800,000 Followers on Elon Musk's X in Three Days, S. POVERTY L. CTR. (Dec. 15, 2023), https://www.splcenter.org/resources/hate-watch/alex-jones-gains-800000-followers-elon-musks-x-three-days/.

[67] Jackson Hinkle, WIKIPEDIA (last edited Apr. 5, 2025), https://en.wikipedia.org/wiki/Jackson_Hinkle; American National Bolshevik and Face of White Jihad Movement Jackson Hinkle, Who Has Close Ties to Russia, Takes Middle East Tour, MEMRI (Feb. 21, 2025), https://www.memri.org/reports/american-national-bolshevik-and-face-white-jihad-movement-jackson-hinkle-who-has-close-ties.

[68] Jackson Hinkle claims Hamas interview after defending banned account on X, JERUSALEM POST, https://www.jpost.com/international/article-842562.

[69] Twitter Has Allowed One User to Manipulate the Platform by Coordinating Over 40 Hashtags, Seemingly in Violation of Policy, MEDIA MATTERS FOR AM. (Dec. 10, 2021), https://www.mediamatters.org/twitter/twitter-has-allowed-one-user-manipulate-platform-coordinating-over-40-hashtags-seemingly; Cf. Catturd, WIKIPEDIA (last edited Apr. 10, 2025), https://en.wikipedia.org/wiki/Catturd (providing background on the account owner's identity and history).

[70] Cf. Who Is @Catturd2, the Sh-tposting King of MAGA Twitter?, ROLLING STONE (Feb. 9, 2023), https://www.rollingstone.com/culture/culture-features/catturd2-maga-twitter-shitposting-king-1234674671/ (describing the account's influence and relationship with political figures); See PolitiFact, Anonymous X Account Shares Falsehoods to Elon Musk, Top US Officials (Mar. 31, 2025),

4. Ian Miles Cheong @stillgray (1.2 million): Platforming extremist rhetoric. Cheong has been

identified by Global Project Against Hate and Extremism as a far-right commentator "known for

praising Hitler" who promotes extremist content.[71] In March 2025, he was among several MAGA

influencers caught promoting paid messaging without proper disclosure.

c. The critical differentiating factor is content category -- Mr. Richards' posts are both: 1) rooted

in his biblical teaching and religious expression, and 2) critical of Musk's role in government,

and every aspect of the government, while these accounts are not.[72] Both types of Richards'

speech are a protected category under federal law.

## K. Targeted Suppression of Government and Official Criticism

98. As noted above, Mr. Richards' suppression extends beyond religious expression to

include systematic throttling of content critical of government officials, agencies, and

Defendant's owner in his governmental capacity and related to his government

connections.

a. Mr. Richards has published numerous posts critically examining Musk's role as a government

official, including critiquing his March-April 2025 visits to intelligence agencies content that was

https://www.politifact.com/article/2025/mar/31/anonymous-x-account-shares-falsehoods-to-elon-musk/ (analyzing how anonymous accounts influence political discourse).

[71] The International Far Right Disinformation Mill is at it Again, GLOBAL PROJECT AGAINST HATE AND EXTREMISM (May 24, 2023), https://globalextremism.org/post/the-international-far-right-disinformation-mill-is-at-it-again/; See generally Malaysian Right-Wing Influencer Ian Miles Cheong Is Being Trolled, TIME (Feb. 14, 2024), https://time.com/6694681/ian-miles-cheong-malaysia-execution-internet-trending-israel/ (providing background on Cheong's online presence and influence).

[72] https://x.com/catturd2/status/1910130462431092948 ("Just so you know ... we are no longer affiliated with Rumble. You can go to http://inthelitterbox.com and scroll to the bottom of our page and simply click on over a dozen apps to our podcast. But we do want to support Elon Musk and have our main podcast home on X ... today we had 130,000 viewer there alone. X is the future of podcasts.") -- April 9, 2025 at 8:39PM; https://x.com/search?q=from%3Ajacksonhinklle%20musk&src=typed_query&f=live; https://x.com/search?q=from%3Astillgray%20musk&src=typed_query; https://x.com/search?q=from%3ARealAlexJones%20musk&src=typed_query.

subsequently throttled and restricted from view.[73] He has also criticized his close connection with the former Pope who is also a government official.

b. On April 1, 2025, Plaintiff posted content critically examining Musk's visit to CIA headquarters.[74] This post, which addressed core political speech concerning government transparency, received minimal distribution compared to non-political content from accounts with similar follower counts.

c. Mr. Richards' thousands of posts examining connections between intelligence agencies, elected officials, and religious institutions - constituting core political speech on matters of public concern - have been systematically suppressed.

d. The pattern of suppression shows heightened targeting of content that specifically examines Musk's dual role as both platform owner and government official, demonstrating that the censorship directly relates to Musk's governmental function. (*e.g* https://x.com/tlthe5th/status/1910325722427580911, https://x.com/tlthe5th/status/1784623782042255570)

e. Mr. Richards' expression also includes commentary on matters of significant public concern, including critical examination of COVID-19 vaccine policies (https://x.com/tlthe5th/status/1910890170221547843) and opposition to abortion (https://x.com/search?q=from%3Atlthe5th%20abortion&src=typed_query&f=live) content that addresses core constitutional questions but has been systematically suppressed despite its significant public interest value.

---

[73] https://x.com/tlthe5th/status/1910325722427580911.
[74] *Id*.

99. The timing of content removals shows a clear pattern of escalation following posts critical of Musk's governmental activities:

a. In April 2025, after Plaintiff posted content critically examining Musk's visits to intelligence agencies, X dramatically restricted visibility of his posts, ultimately leading to the pattern of wholesale content removal detailed above. (https://x.com/tlthe5th/status/1910325723908235421)

b. After Plaintiff posted content in May 2024 questioning Musk's governmental affiliations, engagement metrics dropped precipitously to levels impossible through organic distribution. (https://x.com/tlthe5th/status/1786757318945776026)

c. X's algorithmic suppression specifically targeted Plaintiff's #OvertPsyops initiative - a project examining government and social media transparency and accountability that directly implicates Musk's governmental role.

100. The calculated nature of this algorithmic targeting is further demonstrated by X's selective boosting of exactly one AI-related post to nearly 8,000 views immediately after receiving Plaintiff's demand letter--a stark contrast to his typical 9-50 views, obviously not something that just happened randomly, when his work is completely shadowbanned. https://x.com/tlthe5th/status/1911088636155617393 This selective amplification appears to be deliberately mocking by Mr. Musk, who may have even been one of the responders under an alt account. Mr. Richards received messages from cryptocurrency scammers who decided to set up a "pump and dump" scheme cryptocurrency that Mr. Richards directly opposed https://x.com/tlthe5th/status/1941571233117766071. This token was publicly

listed by a scammer, defaming Mr. Richards -- who never charges for any of his work and never wanted any paid cryptocurrency associated with his work.

101. Boosting this one AI post also seems calculated given Musk's well-documented involvement in cryptocurrency. This pattern of mockery aligns with Musk's broader behavior pattern of forcing his interests and jokes on people, such as his repeated use of "420" marijuana references in professional contexts from X's acquisition price to DOGE's layoffs of exactly "420 employees" at the Fish and Wildlife Service. The timing of this selective boosting is particularly telling given Musk's enormous financial interest in AI through Grok which recently acquired X in a $45 billion deal. By boosting only one of Plaintiff's AI-related posts while suppressing his religious expression, and government criticism, X demonstrates both its complete algorithmic control and the viewpoint-based, self-interested nature of its suppression.

102. This suppression of government criticism represents viewpoint discrimination against core political speech, not merely religious expression, and directly implicates Musk's governmental role rather than solely his capacity as X's owner.

## L. Multi-Layered Suppression: API Throttling of Religious Content

103. The suppression extends beyond Plaintiff's main account to a coordinated throttling of his properly disclosed automated accounts:

1. Plaintiff maintains four automated ("bot") accounts that fully comply with X's developer terms, including clear disclosure of their automated nature and adherence to posting frequency guidelines.

2. Plaintiff pays $200 monthly for API access to maintain these compliant bots at the Basic tier level, establishing a commercial relationship beyond the standard user agreement.

3. Despite operating well below capacity limits (approximately 30% of the monthly post allowance), these accounts often receive 403 Forbidden errors that prevent content distribution. (see attached exhibit showing one example of such error which demonstrates the bots are being throttled by X)

4. Similarly configured non-religious bots experience no such limitations despite identical technical configuration, demonstrating the content-based nature of the restriction.

## M. Unprecedented Platform-Government Entanglement

104. This case presents a direct application of established constitutional principles to X's targeted suppression of Mr. Richards' religious and political speech. The Supreme Court has repeatedly held that nominally private entities become subject to First Amendment constraints when the government "is entwined in [their] management or control." *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001).

105. The circumstantial evidence of email interception, while requiring discovery for complete documentation, meets the standard for establishing conspiracy claims at the pleading stage. Courts regularly allow conspiracy cases to proceed based on circumstantial evidence of coordination, particularly when direct evidence lies within defendants' exclusive control. The precise timing correlations, established surveillance

capabilities, documented institutional relationships, and mathematical improbability of coincidental coordination create a compelling inference of systematic email monitoring that supports Plaintiff's claims pending discovery.

106. The entwinement between X and government authority exceeds even that found sufficient in *Brentwood Academy*:

a. X is owned and controlled by Elon Musk, who simultaneously held significant federal authority through his official role in the Department of Government Efficiency (DOGE), created by executive order on President Trump's first day in office.[75]

b. Musk had been officially designated as a "special government employee" (SGE), a category created by Congress to allow the executive branch to bring in employees for specific roles on a temporary basis, typically for no more than 130 days in a 365-day period.[76]

c. President Trump has explicitly confirmed Musk's governmental power, stating: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge"[77] and emphasized that "If [cabinet secretaries] don't cut then Elon will do the cutting."[78]

a. Unlike the athletic association in *Brentwood Academy*, where entwinement was found despite no direct governmental office held by association leadership, here Musk -- for 130 days during

[75] Department of Government Efficiency (DOGE) Explainer: Elon Musk, NPR (Feb. 4, 2025), https://www.npr.org/2025/02/04/nx-s1-5286314/department-of-government-efficiency-doge-explainer-elon-musk.
[76] Special Government Employee: Trump, Musk, DOGE, NPR (Feb. 13, 2025), https://www.npr.org/2025/02/13/nx-s1-5293124/special-government-employee-trump-musk-doge.
[77] Trump Appears to Contradict White House, Says Elon Musk in Charge of DOGE, REUTERS (Feb. 20, 2025), https://www.reuters.com/world/us/trump-appears-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.
[78] Trump, Musk, Cabinet Firings, NPR (Mar. 6, 2025), https://www.npr.org/2025/03/06/nx-s1-5320339/trump-musk-cabinet-firings.

which Mr. Richards was censored -- literally serves simultaneously as both platform owner and federal official with explicit authority over government operations.

107. Musk's government entanglement extends *beyond* his formal DOGE position through multiple institutional channels:

a. **Defense Contracts**: SpaceX's $3.48 billion Space Force contract awarded in March 2025 and the classified $2.9 billion Pentagon satellite network contract arranged by Trump's Air Force Secretary nominee Troy Meink create financial dependency mechanisms that blur the line between Musk's private and governmental roles.[79]

b. **Intelligence Access**: Musk maintains direct engagement with classified programs through his Top Secret/SCI clearance, giving him access to intelligence that ordinary citizens--and even most elected officials--cannot obtain. This privileged access positions him as a quasi-government actor regardless of formal title.

c. **Agency Visits**: Within a month (March-April 2025), Musk conducted high-profile visits to the Pentagon, National Security Agency (NSA), and Central Intelligence Agency (CIA). CIA Director John Ratcliffe hosted Musk at CIA headquarters on April 1, 2025, where Musk met with the CIA's top leadership, including Deputy Director Michael Ellis. This visit followed Musk's March 21, 2025 Pentagon meeting with Defense Secretary Pete Hegseth -- a meeting so significant it was photographed and distributed by the Department of Defense.

d. **Regulatory Influence**: Through formal and informal channels, Musk exerts influence over regulatory decisions affecting his own companies' competitors, creating a feedback loop of

---

[79] https://www.reuters.com/world/us/trump-air-force-nominee-arranged-satellite-contract-manner-that-favored-musks-2025-02-07/

government-private power consolidation that the Supreme Court warned against in *Brentwood Academy*.

108. The extraordinary personal relationship between Musk and the President transcends formal titles, making any change in Musk's official status legally irrelevant to the constitutional analysis. On February 7, 2025, Musk publicly proclaimed on X: "I love @realDonaldTrump as much as a straight man can love another man" - a statement viewed over 35 million times and acknowledged by the President himself during an official White House press conference.[80] And President Trump had also reciprocated the sentiment stating in regards to Musk "I searched all over. I just couldn't do it," he added. "I couldn't. I really tried hard. I couldn't find anyone smarter."[81] The Supreme Court recognized in *Brentwood Academy* that changes in formalities "affected candor but not the 'momentum'" of state involvement."[82] This momentum of government entanglement with X will continue uninterrupted regardless of Musk's official title.

109. The entwinement between X and government authority in this case exceeds even that found sufficient in *Brentwood Academy*. In *Brentwood*, the Court found state action because the association was "pervasive[ly] entwine[d]" with public school officials acting in their official capacity.[83] Here, the entwinement is more direct: X's owner not only holds governmental authority but exercises direct control over both X's content moderation decisions and government policy simultaneously. Unlike *Brentwood*'s diffuse membership

---

[80] Elon Musk Publicly Declares Intense Love for Donald Trump: "As Much as a Straight Man Can Love Another Man", MSN (Feb. 7, 2025), https://www.msn.com/en-us/politics/government/elon-musk-publicly-declares-intense-love-for-donald-trump-as-much-as-a-straight-man-can-love-another-man/ar-AA1yBRZo.
[81] Trump reveals he searched for 'somebody smarter' than Elon Musk to run DOGE (Feb. 18, 2025), https://nypost.com/2025/02/18/us-news/trump-searched-for-someone-smarter-than-elon-musk-for-doge/
[82] *Brentwood Acad.*, 531 U.S. at 301.
[83] *Brentwood Acad.*, 531 U.S. at 302.

structure, X has a single controlling owner who also wields governmental power (through the complicated Trump and other personal relationships explained herein), creating a heightened level of direct entwinement between government authority and private platform control. This makes it impossible to distinguish between Musk's dual roles when content critical of his governmental activities is suppressed on his privately-owned platform.

110. This case is readily distinguishable from *Blum v. Yaretsky*,[84] where the Supreme Court found no state action in nursing home patient transfers. In Blum, private nursing homes made decisions "according to professional standards not established by the State," and the state merely "responded" to those private decisions by adjusting Medicaid benefits. The Court emphasized that the state had not "exercised coercive power" over the private decisions. Here, by contrast, the decision-maker and the government actor are identical - Musk simultaneously controls X's content moderation while exercising federal authority through DOGE (which Trump calls "his baby" and confirms "Elon is really not leaving") and through his continuing government connections. Unlike Blum's separate entities with regulatory relationships, here the same individual establishes government AI policy through Executive Order 14179's federal coordination mandate and implements private platform restrictions through X Corp. This creates precisely the "sufficiently close nexus between the state and the challenged action"[85] that Blum required, because the government policy-maker and private platform controller are the same person rather than separate entities.

---

[84] *Blum v. Yaretsky,* 457 U.S. 991 (1982).
[85] *Blum v. Yaretsky,* 457 U.S. 991, 993.

111. The timing of Musk's reported departure from his governmental position -- emerging within 48 hours of receiving Plaintiff's detailed demand letter explaining the constitutional violations -- demonstrates consciousness of liability rather than coincidental career planning. Rather than simply removing the shadowban from Mr. Richards' account (which X claims doesn't exist) -- to avoid the constitutional violation -- Musk pretends he is willing to abandon his governmental position entirely. This demonstrates both the lengths Musk will go to maintain this censorship and his awareness that his dual role prohibits it. This attempt to manipulate structure to try to evade constitutional obligations is what the Supreme Court rejected in *Brentwood Academy*.

112. The Department of Government Efficiency (DOGE) was specifically created for Elon Musk, as evidenced by the acronym "DOGE" - which appears to be a humorous nod to his well-known promotion of the Dogecoin cryptocurrency. And Musk's connection with DOGE through multiple associated individuals continues to date. *This isn't merely a coincidental acronym but a personalized governmental role designed with Musk's identity and brand in mind.* The fact that DOGE even bears Musk's cryptocurrency-related nickname demonstrates the personal connection between that federal entity and Musk, further cementing the entanglement.

113. It is clear that DOGE's work is ongoing, and Musk's influence remains pervasive.

114. Further, in January 2025, it was reported that Trump is "likely to axe the White House's National Space Council" after "SpaceX's top lobbyist Mat Dunn" had been telling

associates that the council was a "waste of time," demonstrating Musk's direct influence over space policy in the new administration.[86]

115. Musk's pattern of censorship extends beyond X to other major platforms. Recent reporting shows him leveraging his new government influence to pressure Reddit regarding content moderation.[87] This cross-platform censorship demonstrates how Musk's government position amplifies his ability to control discourse across the entire digital public square - precisely the scenario that makes X's suppression of religious expression a constitutional violation rather than merely private action. This pervasive and deepening nature of X's censorship amid coordination with government actors presents an unprecedented threat to First Amendment rights. Unlike the indirect pressure campaign at issue in *Murthy v. Missouri*, 603 U.S. 43, (2024), X maintains both systematic infrastructure for government censorship requests and direct ties to government power that create an acute risk of ongoing constitutional violations.

116. Most crucially, the evidence shows both Musk's prior government involvement as well as his plans to maintain this extraordinary government access regardless of his official title. When departing the Pentagon, Musk was overheard telling Secretary Hegseth, "If there's anything I can do to be helpful, I'd like to see you" -- explicitly establishing a direct back-channel regardless of formal DOGE role. Musk himself acknowledged prior Pentagon access, telling reporters, "I've been here before, you know." This pattern of private-channel communications with defense and intelligence leadership demonstrates that even

[86] Trump Likely to Axe Space Council After SpaceX Lobbying, Sources Say, REUTERS (Jan. 21, 2025), https://www.reuters.com/world/us/trump-likely-axe-space-council-after-spacex-lobbying-sources-say-2025-01-21/.

[87] Elon Musk, Reddit CEO, DOGE, THE INDEPENDENT (March 28, 2025), https://www.independent.co.uk/news/world/americas/us-politics/elon-musk-reddit-ceo-doge-b2723185.html.

if Musk nominally "leaves" DOGE, his extraordinary government entanglement and influence will continue uninterrupted through these established relationships.

(https://abc7ny.com/post/pete-hegseth-says-hes-meeting-elon-musk-pentagon-discuss-efficiencies/16061808/)

117. **TRUMP'S EXPLICIT CONFIRMATION OF ONGOING RELATIONSHIP**: Even during Musk's purported departure from his formal government role, President Trump explicitly confirmed the continuing entanglement, stating on what was meant to be Musk's official last day as a "special government employee": "Elon is really not leaving. He's going to be back and forth. I think I have a feeling it's his baby, and I think he's going to be doing a lot of things." Trump specifically called DOGE "his baby," emphasizing Musk's permanent ownership and control of the government efficiency initiative regardless of formal title changes. Musk reciprocated by declaring "this is not the end of Doge but really the beginning," adding he will continue to visit the White House as a "friend and adviser" to the president. When Musk stated "I hope to continue to provide advice whenever the president would like," Trump replied "I hope so." [88] This explicit acknowledgment by both parties demonstrates that the government entanglement will continue uninterrupted regardless of formal titles, establishing the "momentum" of state involvement that the Supreme Court recognized in Brentwood Academy as legally sufficient for constitutional analysis. Trump's characterization of DOGE as Musk's "baby" reveals that this is not a traditional government role that can be vacated, but rather a

---

[88] *See* Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

personalized governmental entity created specifically for and permanently controlled by Musk.

118. **MUSK'S WEALTH-ENABLED GOVERNMENT ACCESS MAKES ENTANGLEMENT PERMANENT**: While Musk's formal DOGE role alone establishes state action under *Brentwood Academy*, the constitutional violation is particularly severe because his unprecedented wealth ensures ongoing government access regardless of title changes. Musk has been the wealthiest person in the world since 2021; as of May 2025, Forbes estimates his net worth to be $424.7 billion, making him the first person ever to reach $400 billion.[89] This extreme wealth enabled him to become the largest financial backer of Donald Trump's presidential campaign, spending at least $277 million.[90] Unlike typical private actors whose government access depends on official appointments, Musk's financial resources create permanent avenues for influence that persist regardless of formal governmental roles.

119. **MUSK'S SPECIFIC CONDUCT CREATES UNIQUE CONSTITUTIONAL VIOLATIONS**: The constitutional concern arises not from wealth alone, but from Musk's specific pattern of leveraging extreme wealth for systematic government coordination while simultaneously controlling a major platform. Musk purchased his governmental influence with his unprecedented $277 million contribution, then used both his government position and platform control to manipulate political discourse for his

[89] Wealth of Elon Musk, WIKIPEDIA, https://en.wikipedia.org/wiki/Wealth_of_Elon_Musk (last visited July 7, 2025); Elon Musk becomes the first person on earth to reach a net worth of $400 billion, CNN BUS. (Dec. 11, 2024), https://www.cnn.com/2024/12/11/business/elon-musk-400-billion-net-worth.
[90] The Bloomberg Billionaires Index, BLOOMBERG, https://www.bloomberg.com/billionaires/profiles/elon-r-musk/ (last visited July 7, 2025).

benefit.[91] Computational analysis found that after Musk's formal endorsement of Donald Trump in July 2024, X's algorithms were manipulated to ensure Republican-leaning posts received greater engagement while Democrat-oriented content was systematically suppressed.[92] The Department of Government Efficiency (DOGE) was specifically created for Musk, as evidenced by the acronym "DOGE"--a humorous nod to his promotion of Dogecoin cryptocurrency. Other wealthy individuals who do not engage in this specific pattern of wealth-to-government-to-platform coordination would not face similar constitutional constraints.

120. **NEW AMERICA PARTY ANNOUNCEMENT PROVES ONGOING POLITICAL COORDINATION**: Musk's July 5, 2025 announcement of the "America Party" demonstrates that his government entanglement will continue and expand regardless of formal titles. Following a poll where over 1.2 million X users voted 65.4% in favor, Musk declared "Today, the America Party is formed to give you back your freedom."[93] This announcement came during the height of his supposed "feud" with Trump, yet Musk's strategic focus on capturing "two or three Senate seats and eight to 10 seats in the House of Representatives" to serve as "the deciding vote on contentious laws"[94] reveals sophisticated understanding of how to exercise maximum governmental influence with minimal electoral investment.

---

[91] Study suggests X turned right just in time for election season, THE REGISTER (Nov. 20, 2024), https://www.theregister.com/2024/11/20/x_marks_the_spot_for/.

[92] Graham & Andrejevic, A computational analysis of potential algorithmic bias on platform X during the 2024 US election (2024), https://eprints.qut.edu.au/253211/.

[93] Elon Musk Announces Plan To Make 'America Party', NEWSWEEK (July 5, 2025), https://www.newsweek.com/elon-musk-announces-plan-make-america-party-2095031.

[94] *Id.*

121. **STAGED "FEUD" CONFIRMS COORDINATION RATHER THAN SEPARATION**: President Trump's response to the America Party as "ridiculous" and claiming third parties have "never worked"[95] follows the same pattern of public disagreement followed by reconciliation that characterized the June 2025 "feud." Republican lawmakers remain "convinced that the feud between Trump and Musk will soon thaw, and that the latter's idea for a new political party won't come to fruition."[96] This theatrical conflict serves to create false evidence of separation while maintaining actual coordination, exactly as demonstrated by the June 2-5, 2025 timeline following interception of Plaintiff's attorney-client communications. A survey conducted between June 30 and July 2, 2025, found that 40 percent of those surveyed--including many Republicans--would consider voting for Musk-backed candidates over traditional party nominees,[97] demonstrating that Musk's platform censorship decisions operate within a context of expanding political influence that makes injunctive relief essential to prevent ongoing constitutional violations.

## N. MUSK RETAINS A TIGHT RELATIONSHIP WITH THE FEDERAL GOVERNMENT THROUGH GROK:

122. OPERATIONAL INTEGRATION CREATING JOINT ACTION: Government entanglement transcends financial relationships through operational integration where Defendant X's Grok AI system, which is embedded in the X app, performs core

---

[95] Trump: Musk's America Party 'ridiculous,' third parties have 'never worked', FOX NEWS (July 6, 2025), https://www.foxnews.com/politics/trump-dismisses-musks-political-ambitions-ridiculous-sharp-rebuke.
[96] Is Musk Starting a New Political Party Amid Trump Feud?, TIME (June 2025), https://time.com/7291937/elon-musk-new-political-party-the-america-party-idea/.
[97] Elon Musk Announces Plan To Make 'America Party', NEWSWEEK (July 5, 2025), https://www.newsweek.com/elon-musk-announces-plan-make-america-party-2095031.

governmental functions. DOGE staff have systematically "pressed officials at the Department of Homeland Security to use Grok, despite the fact that it was not approved for use there," with sources confirming that "the government would have to pay for access to use the AI chatbot."[98] This creates the operational integration contemplated in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), where private actors become joint participants in governmental action.

123. The systematic suppression of Mr. Richards' religious expression operates within the Trump Administration's broader AI policy framework. On January 23, 2025, President Trump issued Executive Order 14179 on "Removing Barriers to American Leadership in Artificial Intelligence."[99] This Executive Order established federal policy to "sustain and enhance America's global AI dominance" while simultaneously creating the Department of Government Efficiency under Musk's control.[100] The coordination between this AI policy directive and Musk's platform control demonstrates government direction of AI systems for content suppression rather than private business decisions.

124. The Trump Administration's AI strategy specifically emphasizes federal coordination with private AI development. Executive Order 14179 directs the development of an "action plan to achieve" AI dominance within 180 days, requiring coordination between "the Assistant to the President for Science and Technology, the Special Advisor for AI and Crypto, and the Assistant to the President for National Security Affairs."[101] This

---

[98] Elon Musk's DOGE Is Breaking Rules to Install Grok in Government, The New Republic (May 23, 2025), https://newrepublic.com/post/195690/elon-musk-doge-grok-expand-power-government.

[99] Exec. Order No. 14,179, "Removing Barriers to American Leadership in Artificial Intelligence," 90 Fed. Reg. 8741 (Jan. 23, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/removing-barriers-to-american-leadership-in-artificial-intelligence/.

[100] *Id.* § 2 (establishing policy "to sustain and enhance America's global AI dominance").

[101] Id. § 4(a) (requiring coordinated development of AI action plan within 180 days).

coordinated approach demonstrates that Musk's AI deployment through both DOGE and X Corp. operates within a comprehensive federal framework rather than independent private action.

125. SYSTEMATIC DEPLOYMENT ACROSS FEDERAL AGENCIES: The integration of Grok extends beyond isolated incidents to systematic deployment across multiple federal departments. Thomas Shedd, serving simultaneously as federal Chief Information Officer and GSA Technology Transformation Services Director, has implemented an "AI-First strategy" that specifically deploys Grok for government operations including employee surveillance and administrative decision-making. "*The group includes around 700 engineering professionals picked by Musk*, and Shedd has recently told staffers that AI would play a crucial role in cost-reduction efforts, according to four people who spoke to the *Times*." [102] (emphasis added) DOGE staff specifically "told DHS officials over the last two months to use Grok even though it had not been approved for use at the sprawling agency," with sources confirming "They were pushing it to be used across the department." *The New Republic*, *supra*.

126. GOVERNMENT FUNCTIONS PERFORMED BY PRIVATE ENTITY: Unlike typical government contractor relationships where private entities receive government assistance for private purposes, here Defendant performs governmental functions that the government would otherwise have to execute itself, including: (a) monitoring federal employee communications for political loyalty, as DOGE staffers have "ordered staff to

---

[102] *See* TESLARATI (Feb. 4, 2025), This former Tesla engineer now heads a federal tech department https://www.teslarati.com/former-tesla-engineer-federal-tech/; TECHCRUNCH (Feb. 4, 2025), Former Tesla engineer heading government agency reportedly outlines "AI-first strategy" https://techcrunch.com/2025/02/04/former-tesla-engineer-heading-government-agency-reportedly-outlines-ai-first-strategy/.

train AI to identify communications suggesting an employee is not 'loyal' to Trump's political agenda";[103] (b) analyzing sensitive government data through customized Grok systems where sources report "They ask questions, get it to prepare reports, give data analysis"; and (c) automating core governmental processes through the AI.Gov platform launching July 4, 2025.[104]

127. UNPRECEDENTED ACCESS TO SENSITIVE FEDERAL DATA: A Washington Post examination revealed that "DOGE secured the power to view records that contain competitors' trade secrets, nonpublic details about government contracts, and sensitive regulatory actions" across at least seven major federal departments or agencies. DOGE has the keys to sensitive data that could help Elon Musk.[105] This access creates ongoing competitive advantages for Musk's companies, as "some of that data could be valuable in another way -- by giving the world's richest man a competitive advantage over his rivals in the private sector."[106]

128. CONTINUING OPERATIONAL CONTROL THROUGH EMBEDDED PERSONNEL: Musk maintains operational control over federal AI deployment through strategically placed personnel, including Thomas Shedd, described as a close ally of Musk and former Tesla engineer, who was appointed by the Trump Administration to lead federal technology services while implementing Musk's AI-first agenda across government.

---

[103] *See* Exclusive: Musk's DOGE expanding his Grok AI in US government, raising conflict concerns, REUTERS (May 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/.

[104] Exclusive: Musk's DOGE expanding his Grok AI in US government, raising conflict concerns, REUTERS (May 23, 2025), https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/; XPERT.DIGITAL - Leaked US ACI initiative: Trump's comprehensive plans for AI.Gov from July 2025 (June 11, 2025), https://xpert.digital/en/us-plaene-for-ai-gov/.

[105] Washington Post (June 30, 2025), https://www.washingtonpost.com/investigations/interactive/2025/musk-doge-personal-data-tesla-companies/.

[106] *Id.*

*TESLARATI*, *supra*; *TECHCRUNCH*, *supra*. Additionally, Katie Miller, wife of White House Deputy Chief of Staff Stephen Miller and longtime Trump adviser, "has reportedly left her post at the White House to work full time for Elon Musk," creating a direct conduit between Musk's operations and senior White House personnel.[107]

129. CRIMINAL CONFLICT OF INTEREST VIOLATIONS: The systematic deployment of Grok across federal agencies raises serious legal concerns, as "if Musk was directly involved in decisions to use Grok, it could violate a criminal conflict-of-interest statute which bars officials -- including special government employees -- from participating in matters that could benefit them financially." Ethics experts have concluded that "This gives the appearance that DOGE is pressuring agencies to use software to enrich Musk" and "not to the benefit of the American people."[108]

130. The Trump Administration's AI policy implementation demonstrates systematic coordination between government directive and private platform control. As legal analysts have noted, "President Trump issued Executive Order 14179 on 'Removing Barriers to American Leadership in Artificial Intelligence,'" which "establishes the U.S." framework for federal AI coordination.[109] This policy framework provides the governmental structure within which Musk's simultaneous roles as federal official and platform owner enable systematic suppression of religious expression through coordinated AI deployment.

131. JOINT ACTION UNDER COLOR OF LAW: This operational integration creates the joint action demonstrating state action under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922

[107] Who Is Katie Miller?, The Cut (June 6, 2025), https://www.thecut.com/article/who-is-katie-miller-elon-musk-doge-drama-explained.html.

[108] *The New Republic*, supra.

[109] January 2025 AI Developments – Transitioning to the Trump Administration, INSIDE GOV'T CONTRACTS (Feb. 12, 2025), https://www.insidegovernmentcontracts.com/2025/02/january-2025-ai-developments-transitioning-to-the-trump-administration/.

(1982). *Lugar* held that "private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute." Here, the systematic deployment of Musk's AI systems to perform core governmental functions, combined with ongoing operational control through embedded personnel and unprecedented access to sensitive federal data, establishes the requisite joint participation between private and governmental actors.

## O. Yoel Roth's Admissions About Individual Targeting

132. Former Twitter Head of Trust and Safety Yoel Roth has made explicit admissions about individuals working at Twitter targeting and shadowbanning users that directly support Mr. Richards' claims of targeted discrimination of his biblical views:

a. In August 2023, after Elon Musk promised to address shadowbanning on X, Roth posted on the Bluesky social media platform that content moderation at Twitter/X involved direct individual targeting, explaining that "maybe it's a free-text note on the account that says something like, 'Yoel banned this user... Don't unban them without, yknow, checking with me first, please.'"[110]

b. Roth confirmed that Twitter maintained a system called "Guano" (using bird-themed naming) that stored "a lot of enforcement metadata in free-text notes attached to user accounts" where individual moderators could flag accounts for suppression or shadowbanning.[111]

---

[110] Musk Says X Will Address Shadowbanning Soon, But Former Trust & Safety Exec Explains Why That Will Be Difficult, TECHCRUNCH (Aug. 17, 2023), https://techcrunch.com/2023/08/17/musk-says-x-will-address-shadowbanning-soon-but-former-trust-safety-exec-explains-why-that-will-be-difficult/.
[111] *Id.*

c. Roth admitted that humans routinely made individual decisions about account suppression based on subjective criteria.[112]

133. Evidence from the "Twitter Files" released in December 2022 confirmed the existence of practices that Twitter had previously denied, including:

a. A practice referred to as "visibility filtering" by previous Twitter management

b. Tools allowing accounts to be tagged as "Do not amplify" or placed on "blacklists" that reduce their prominence in search results and trending topics

c. Certain accounts being given special treatment indicating they should only be moderated by high-ranking officials.[113]

134. These admissions by Roth and evidence from the Twitter Files demonstrate that:

a. Shadowbanning decisions have been made by individual humans with significant discretion

b. X maintained a complex infrastructure specifically designed to allow selective suppression of disfavored speech

c. The company deliberately concealed these practices from users while publicly denying them, as these revelations directly contradict former CEO Jack Dorsey's sworn congressional testimony that Twitter did not shadowban (conservatives). When specifically asked "Social media is being

[112] Elon Musk: Shadowbanning on X Will Be More Transparent, ITECH POST (Aug. 18, 2023), https://www.itechpost.com/articles/118669/20230818/elon-musk-shadowbanning-x-will-more-transparent.htm.
[113] Shadow Banning, WIKIPEDIA (last edited Apr. 10, 2025), https://en.wikipedia.org/wiki/Shadow_banning.

rigged to censor conservatives. Is that true of Twitter?" Dorsey responded "No...Our policies and our algorithms don't take into consideration any affiliation, philosophy or viewpoint."[114]

d. The company maintained systems that made shadowbanning decisions difficult to track or explain

135. Based on this evidence and the statistical impossibility of Mr. Richards' suppression occurring by neutral algorithmic processes, Mr. Richards has been subjected to precisely the type of targeted individual suppression that Roth described, *with the added dimension that this suppression is now being carried out by a company owned by someone with tight government ties for whom his government work is closely entwined with his content moderation on X.*

## P. Section 230 and Shadowbanning

136. Section 230(c)(2)(A) of the Communications Decency Act states that no provider of an interactive computer service shall be held liable on account of "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."

137. The plain meaning of "restrict" in "restrict access to or availability of" implies a complete or substantial impediment to accessing content, not merely reducing its visibility

---

[114] Twitter Files Flashback: Jack Dorsey Testified Under Oath Twitter Doesn't Censor, Shadow Ban Conservatives, FOX NEWS (Dec. 9, 2022), https://www.foxnews.com/media/twitter-files-flashback-jack-dorsey-testified-oath-twitter-censor-shadow-ban-conservatives; Ex-Twitter CEO Jack Dorsey, Liberal Media Members Denied Shadow Banning Prior to Elon Musk Leak, FOX NEWS (Dec. 9, 2022), https://www.foxnews.com/media/ex-twitter-ceo-jack-dorsey-liberal-media-members-denied-shadow-banning-prior-elon-musk-leak.

while maintaining its technical accessibility. The term "restrict" derives from Latin "restringere" meaning "to bind fast or restrain"[115]- suggesting a clear and definitive limitation rather than a mere reduction in prominence. This etymology underscores that "restrict" refers to an action that binds, limits, or prohibits access in a definitive manner, not one that merely reduces likelihood of discovery.

138. The Justia Legal Dictionary defines "access" as "The freedom or ability to acquire, make use of, or participate in a particular thing or activity."[116] Shadowbanning does not impair this freedom or ability, as users maintain complete technical ability to access, view, and interact with the content. The content remains available to anyone who navigates directly to it. Shadowbanning simply reduces the likelihood that other users will discover the content through recommendations, which falls outside the plain meaning of "restrict" as used in Section 230.

139. Shadowbanning Exceeds Section 230's Original Framework: When Congress enacted Section 230 in 1996, content moderation involved binary decisions: remove objectionable content or leave it up. The statutory language "restrict access to or availability of" contemplates this binary condition - either content is accessible/available or it is not. Shadowbanning represents a fundamentally different practice that Congress did not contemplate: maintaining content's technical accessibility while secretly manipulating its discoverability through deception rather than transparent removal.

140. Every category listed in Section 230(c)(2)(A) -- obscenity, lewdness, violence, harassment -- contemplates complete removal, not surreptitious suppression. The statute's

[115] Restriction, ONLINE ETYMOLOGY DICTIONARY, https://www.etymonline.com/word/restriction.
[116] Access, JUSTIA LEGAL DICTIONARY, https://dictionary.justia.com/access.

text and legislative history confirm that Congress intended to shield platforms for binary moderation choices (removing vs. keeping up content), not algorithmic visibility manipulation. See 47 U.S.C. § 230(c)(2)(A); *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997) (emphasizing Section 230's focus on "removal" of content).

141. Statements from Section 230's sponsors similarly focus on empowering platforms to delete or block objectionable content, not surreptitiously limit its visibility. This binary conception of content moderation -- either keeping material up or taking it down -- was the industry standard when Section 230 was enacted in 1996. See 141 Cong. Rec. H8460, H8460 (1995) ("...We can keep away from our children things not only prohibited by law, but prohibited by parents. That is where we should be headed, and that is what the gentleman from Oregon [Mr. Wyden] and I are doing... it will protect computer Good Samaritans, online service providers, anyone who provides a front end to the Internet, let us say, who takes steps to screen indecency and offensive material for their customers. It will protect them from taking on liability such as occurred in the Prodigy case in New York that they should not face for helping us and for helping us solve this problem.")

142. Construing Section 230(c)(2)(A) to immunize the kind of deceptive and unaccountable shadowbanning that X employs would warp the statute's purpose of encouraging platforms to moderate content responsibly and transparently. The Fifth Circuit has repeatedly emphasized that the "good faith" requirement in Section 230(c)(2)(A) is a meaningful limitation on platform immunity.

143. In *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1052 (9th Cir. 2019), the court held that Section 230 does not provide immunity "for anticompetitive conduct" that is not protected by the First Amendment. The Fifth Circuit's analysis in

*NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) -- which rejected platforms' "freewheeling First Amendment right to censor," id. at 445 -- remains persuasive authority, even after *Moody v. NetChoice*, 603 U.S. 707 (2024). While *Moody* vacated and remanded *Paxton* for further facial challenge analysis under proper First Amendment standards, the Supreme Court did not expressly reject the Fifth Circuit's skepticism of absolute platform immunity for content moderation. In fact, multiple justices in *Moody* expressed views suggesting platforms' content moderation may still be subject to some regulation consistent with the First Amendment, leaving open the possibility that viewpoint-based suppression may not receive blanket immunity under future analyses.

144. Other Circuits have also recognized that Section 230 immunity is not absolute when platforms engage in bad faith moderation. In *e-ventures Worldwide, LLC v. Google, Inc.*, 188 F. Supp. 3d 1265 (M.D. Fla. 2016), the court rejected Section 230 immunity at the motion to dismiss stage because the plaintiff had alleged Google acted in bad faith. The court specifically held that "the plain language of the CDA only provides immunity for actions voluntarily taken in good faith" (*Id*. at 1272-73).

145. Further, there is nothing in Section 230 that immunizes a covered entity such as X from creating terms that claim to prohibit censorship and then deciding to unilaterally breach its promise with its users. On the contrary, that is the opposite of "good faith". This makes X's shadowbanning a clear violation of its own stated policy.

146. Taken together, the heightened Fifth Circuit concerns about giving section 230 immunity for censorship not done in "good faith" applies here.

**Q. X's Public Commitments vs. Documented Practices**

147. X's treatment of Mr. Richards directly contradicts its own published policies and

contractual promises:

a. X's Help Center explicitly states: "We do not block, limit, or remove content based on an

individual's views or opinions."[117]

b. According to Musk's tweet on October 17, 2024: "X doesn't censor beyond what is legally

required."[118]

c. X's "Transparency Center" promises "in-service notices when content is removed or

withheld,"[119] yet no such notices were provided to Plaintiff despite the massive scale of content

restriction.

d. X's "Freedom of Speech, Not Reach" policy states: "We allow robust debate but restrict

content that incites harm,[120] yet Plaintiff's lawful religious speech has been systematically

suppressed despite violating no laws or inciting any harm.

e. X continues to claim they do not shadowban -- "Simply put, we don't shadow ban! Ever. We

do rank posts to create a more relevant experience for you, however, and you're always able to

see posts from people you follow."[121] **Note that in stark contrast to this promise, Mr.**

**Richards' posts from before April 6, 2025 at noon Eastern Time, have been removed from**

---

[117] X Corp., Content Reach Policy, X Help Ctr., https://help.x.com/en/rules-and-policies/x-reach-limited (last visited July 6, 2025).
[118] Elon Musk (@elonmusk), X (Oct. 17, 2024, 12:39 AM), https://x.com/elonmusk/status/1846772929167552549/.
[119] X Corp., Defending and Respecting Our Users' Voice, X Help Ctr., https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited July 6, 2025).
[120] X Corp., Freedom of Speech, Not Reach: An Update on Our Enforcement Philosophy, X Blog (Apr. 17, 2023), https://blog.x.com/en_us/topics/product/2023/freedom-of-speech-not-reach-an-update-on-our-enforcement-philosophy.
[121] X Corp., Debunking Twitter Myths, X Help Ctr., https://help.x.com/en/using-x/debunking-twitter-myths (last visited July 6, 2025).

his wall such that *no one can see them*. **They did this after performing this same act March 19, 2025 around 3pm. This act happened again in early July; all posts before July 1, 2025 have been deleted from his wall.** See Twitter Blog Post (2018) - "Setting the record straight on shadow banning."We do not shadow ban. You are always able to see the tweets from accounts you follow (although you may have to do more work to find them, like go directly to their profile). And we certainly don't shadow ban based on political viewpoints or ideology."[122] Yet here, going to Mr. Richards; profile, over 60 thousand posts have been removed or hidden from view. (see attached exhibits showing that his wall abruptly cuts off only a couple of weeks ago). And Mr. Richards is not the only one who has been shadowbanned on X. A recent article provides clear proof that shadowbanning on X happens to others who, like Mr. Richards, criticize Elon Musk.[123]

148. Yet X explicitly promises its users: 1) that free speech is its key value and that it only censors to the extent required by the US government; and 2) that in the case of any visibility limitation, it provides notice to its users and a chance to be heard, 3) and that users can always see posts from people they follow. **But X has completely violated this contractual agreement with Mr. Richards.**

149. X makes multiple unambiguous commitments regarding the follower relationship that it systematically violates with respect to Plaintiff's content:

[122] Vijaya Gadde & Kayvon Beykpour, Setting the Record Straight on Shadow Banning, X Blog (July 27, 2018), https://blog.twitter.com/en_us/topics/company/2018/Setting-the-record-straight-on-shadow-banning (last visited Apr. 12, 2025).
[123] Twitter Appears to Be Shadow Banning Accounts That Criticize Elon Musk https://futurism.com/twitter-shadow-ban-elon-musk (April 23, 2025).

a. "When you follow someone, every time they post a new message, it will appear on your X Home timeline." X Help Ctr., https://help.x.com/en/resources/new-user-faq (last visited May 20, 2025).

b. "Following someone on X means: You are subscribing to their posts as a follower." And "If someone follows you:... They'll see your posts in their Home timeline whenever they log in to X." X Help Ctr., https://help.twitter.com/en/using-twitter/following-faqs (last visited May 18, 2025).

c. By throttling Plaintiff's visibility while maintaining these explicit promises, X has engaged in a form of digital bait-and-switch--accepting the follower relationship while secretly nullifying its purpose through algorithmic suppression.

150. X's top executives, including owner Elon Musk and CEO Linda Yaccarino, have made numerous categorical, unambiguous public statements denying that the company shadowbans user content or makes content moderation decisions based on political ideology or viewpoint.[124]

## R. The Coordinated "Feud" Performance and Evidence of Surveillance

151. On June 2, 2025, Plaintiff's counsel sent a private email to Plaintiff via Gmail stating the intention to add Trump as a defendant but not to discuss the matter until June 5, 2025 for

---

[124] E.g. Linda Yaccarino (@lindayaX), X (Nov. 20, 2024, 12:07 PM), https://x.com/lindayaX/status/1859282552638317004 ("Protecting free speech is more important than ever. The people have woken up and they are the media now."); Linda Yaccarino (@lindayaX), X (Oct. 8, 2024, 1:35 PM), https://x.com/lindayaX/status/1843706908353626223 ("Free Speech. Today. Tomorrow. Always. X."); Elon Musk (@elonmusk), X (Nov. 25, 2024, 6:23 PM), https://x.com/elonmusk/status/1861188909692264538 ("Fortunately, 𝕏 believes in free speech"); see also Elon Musk Shadow Banning Statements, X, https://x.com/search?q=from%3Aelonmusk%20shadowbanning&src=typed_query&f=live (last visited July 6, 2025).

"a specific reason." This attorney-client privileged communication was known only to counsel and client.

152. The timing of subsequent events raises substantial questions about potential coordination and surveillance capabilities. On the exact day planned for announcing adding Trump as a defendant - June 5, 2025 - Trump and Musk suddenly staged what appears to be a dramatic public "feud," complete with threats to cancel government contracts, impeachment suggestions, and personal attacks involving Jeffrey Epstein allegations.

153. The precise timing correlation between Plaintiff's private legal strategy and the public "feud" performance creates a reasonable inference of coordination that warrants investigation through discovery. This inference is strengthened by: (1) Musk's documented use of AI systems to search federal employee emails for criticism of Trump; (2) the identical pattern of immediate coordinated response following Plaintiff's March 31, 2025 demand letter; (3) Google's documented pattern of data sharing with government agencies; (4) the Vatican's exclusive partnership with Google on YouTube; and (5) the sophisticated nature of the coordinated response.

154. While the precise mechanism of any potential surveillance requires discovery, the timing pattern, combined with documented government surveillance capabilities and established tech-government coordination, creates substantial questions about whether private communications may have been monitored. The "feud" was transparently orchestrated, as evidenced by both parties' restraint compared to their typical social media behavior, strategic de-escalation when posts went "off-script," and neat resolution six days later with Trump's "forgiveness" and Musk's "apology.""

**S. Demand Letter and Failure to Respond**

155. On March 31, 2025, Plaintiff's counsel sent a detailed demand letter to X outlining these violations and requesting immediate remediation, including:

a. Removal of all visibility filtering within 48 business hours

b. Restoration of API access within 48 business hours

c. Disclosure of suppression rationale within 5 business days

d. Good faith settlement discussions regarding damages

e. More than 48 hours after receipt of this demand letter, X had neither responded nor taken any steps to remedy the ongoing suppression.

156. On April 2, 2025, Plaintiff's counsel sent a follow-up communication noting X's failure to respond and again requesting remediation. This communication also addressed public reports that Musk may soon leave his government position, noting that such timing appears strategic but is legally irrelevant as constitutional violations have occurred and continue to occur while Musk holds official governmental authority. Further, as explained above, due to his tight advisory link to President Trump as well as intelligence agencies, it is guaranteed he will remain a de facto member of the federal government no matter what his official role, which violates *Brentwood Academy*'s prohibition.

157. As of the filing of this amended complaint, X has not taken any steps to restore Plaintiff's account visibility. In fact they have deleted thousands of tweets and made the shadowbanning worse.

158. **The import of this cannot be overstated in light of all of X's commitments to: 1) not shadowban, and 2) provide notice of shadowbanning.**

159. **Why would X fail to stop shadowbanning or respond in any manner to the demand letter if it truly does not shadowban and has honest terms that reflect its actual behavior? The only thing the demand letter requested within 48 hours was the removal of the shadowban on Mr. Richards' account.**

**T. Government Direction of AI Censorship Through Grok Integration**

160. The evidence demonstrates systematic government direction of AI-powered censorship through Defendants' coordinated deployment of Grok AI across federal agencies, creating unprecedented infrastructure for viewpoint-based speech suppression.

161. DOGE's Operational Control of Grok: DOGE has "heavily deployed" Musk's Grok AI chatbot as part of their work and is using a customized version of Grok to analyze government data. DOGE engineers installed custom parameters atop Grok to accelerate data review and automate report writing. Democrats press Palantir about reported creation of IRS 'mega-database' https://www.nextgov.com/modernization/2025/06/democrats-press-palantir-about-reported-creation-irs-mega-database/406144/

162. **Direct Government Ordering of AI Deployment**: DOGE staff told Department of Homeland Security officials to use Grok even though it had not been approved within the department and have been actively pushing DHS divisions to pilot Grok for tasks ranging from immigration caseload analysis to budget forecasting.

https://www.nextgov.com/modernization/2025/06/democrats-press-palantir-about-reported-creation-irs-mega-database/406144/

163. **AI-Powered Political Surveillance**: DOGE staffers "ordered staff to train AI to identify communications suggesting an employee is not 'loyal' to Trump's political agenda" demonstrating apparent government direction of AI for ideological content monitoring

that extends beyond federal agencies to private platform control.https://www.reuters.com/sustainability/boards-policy-regulation/musks-doge-expanding-his-grok-ai-us-government-raising-conflict-concerns-2025-05-23/

164. **Systematic Bias Implementation**: Despite X's claims of fixing bias, Grok continues to exhibit systematic anti-religious and politically-motivated responses. When asked about biblical authority and what a person needs to do to go to heaven, Grok explicitly stated is a "Tough question" for which it implies there is no "definitive rulebook". Grok also provided the illogical comment that what will get you to heaven "depends on what you believe".  In addition, X amplified Steven Joe's simplistic question and Grok's unscriptural response, while silencing Mr. Richards comment to the thread noting that the "Bible is crystal clear!" and "IS THE RULEBOOK!" https://x.com/tlthe5th/status/1932636861094375776  (see Exhibit F) Amidst all this, Grok consistently claims viewpoint neutrality. Taken together, Grok exercises - precisely the type of sophisticated censorship that purports to be objective while promoting anti-biblical viewpoints.

165. **Government-Vatican-Tech Coordination**: Palantir has "signed a deal to integrate Musk's Grok language model into its platform" for "the most expansive civilian surveillance infrastructure in US history." https://www.techpolicy.press/musk-ai-and-the-weaponization-of-administrative-error/. This creates a direct pipeline between government surveillance systems and the AI that moderates Plaintiff's religious expression.

## U. Legal Framework for Social Media Platforms as Common Carriers

166. This case presents an opportunity to apply Justice Clarence Thomas's legal framework articulating how large social media platforms function as common carriers in the modern

digital public square. Justice Thomas has repeatedly advocated for treating large social media platforms as common carriers -- a position he maintained in his concurrence in *Moody v. NetChoice*, stating that "both lower courts [should] continue to consider the common-carrier doctrine" (*Moody v. NetChoice*, 603 U.S. 707, 752 (2024)). In his *Knight First Amendment Institute* concurrence, Justice Thomas laid out a detailed explanation for why social media platforms could be regulated as common carriers, observing that "the long history in this country and in England of restricting the exclusion right of common carriers and places of public accommodation may save similar regulations today from triggering heightened scrutiny" and noting "there is a fair argument that some digital platforms are sufficiently akin to common carriers... to be regulated in this manner."

167. This analysis recognizes that certain digital platforms, by virtue of their market dominance and essential role in public discourse, should be subject to traditional common carrier obligations. As NPR reported regarding this concurrence, Thomas specifically addressed platforms' "power 'to cut off speech'" and argued they should be "regulated in this manner" like telephone companies.

https://x.com/tlthe5th/status/1932636861094375776

168. X functions as a common carrier of digital speech by: a. Holdingitself out as a neutral conduit for user-generated content. b. Providing communication services to the public at large without individualized negotiation. c. Generating hundreds of millions of unique, algorithmically tailored feeds -- operating more as a communication conduit than a unified editorial voice. (No court has ever held nor considered whether creating hundreds of millions of different individual feeds is a media function or is equivalent to producing media content) d. Functioning as the "modern public square" for public discourse, as

recognized by courts and the platform itself. *Packingham v. North Carolina*, 582 U.S. 98, 99. (2017)

169. The Supreme Court itself has acknowledged that algorithmic feeds defy traditional legal categories. During oral arguments in *Gonzalez v. Google*, 598 U.S. 617 (2023), when asked whether courts should distinguish between different types of algorithmic recommendations for Section 230 purposes, Justice Kagan expressed deep institutional skepticism, stating the Justices are "not like the nine greatest experts on the internet." This candid assessment came as the Court grappled with whether recommendation algorithms should receive the same immunity as other platform functions, ultimately signaling judicial reluctance to make technical distinctions without Congressional guidance. This judicial humility by the Supreme Court reinforces Plaintiff's argument: X's systems, which produce hundreds of millions of unique algorithmic combinations daily, cannot plausibly be analogized to editorial curation. No "editor" could process this volume of individualized outputs, nor did Congress envision such systems when crafting protections for publisher liability. The law simply has not kept pace with new technology. Justice Thomas's common carrier framework thus provides the only coherent lens to evaluate X's role -- as a neutral conduit, not a speaker. As he explained "changes in technology may call for new regulations." *NetChoice, LLC v. Moody*, 142 S. Ct. 3328, 3332 (2024).

170. Justice Thomas also noted that the nature of common carriers is that there may indeed be a possible way to avoid using a particular common carrier, but they are often the only reasonable option: "It changes nothing that these platforms are not the sole means for distributing speech or information. A person always could choose to avoid the toll bridge or train and instead swim the Charles River or hike the Oregon Trail. But in assessing

whether a company exercises substantial market power, what matters is whether the alternatives are comparable. For many of today's digital platforms, nothing is." *Biden v. Knight First Amendment Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1225.

171. Unlike specific, niche social media platforms (such as those dedicated to particular religious or political viewpoints), general-purpose platforms like X function as essential communications infrastructure in the modern public square. The common carrier framework applies specifically to these large, general-purpose platforms that (a) hold themselves out to the public as neutral forums for all speech, (b) possess significant market power approaching essential facility status, and (c) serve as critical infrastructure for public discourse. While platforms that transparently communicate their specialized purpose and content standards create informed user expectations and therefore should not be subject to common carrier obligations, X misleadingly presents itself as a neutral platform while secretly engaging in viewpoint discrimination. Yet there is no reasonable alternative to major social media platforms. For example, while there used to be comments sections on almost all major media websites, those comment sections have virtually all been removed, instead instructing would-be commenters to just a few social media platforms to discuss the issues.

172. The Fifth Circuit's analysis in *Netchoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) supports treating platforms like X as common carriers for First Amendment purposes, holding that "Platforms are not newspapers. Their censorship is not speech." Id. at 445. While *Moody v. NetChoice*, 603 U.S. 707 (2024) vacated this decision, Justices Thomas, Alito, and Gorsuch expressed views suggesting openness to common carrier approaches in appropriate contexts. The Supreme Court's remand preserves the possibility that aspects of

the common carrier framework could be incorporated into future platform regulation cases as courts continue to refine how traditional First Amendment doctrines apply to modern social media environments.

173. When Congress enacted Section 230 in 1996, algorithmic content distribution did not exist in its current form. No human editor reviews or approves each one of X's individually tailored feeds; they are generated through automated systems operating at scale across billions of posts. The Supreme Court has recognized the need for judicial caution when applying constitutional principles to new technologies. As Justice Alito observed in his concurrence joined by Justices Thomas and Gorsuch in *Moody v. NetChoice*: "When confronted with the application of a constitutional requirement to new technology, we should proceed with caution. While the meaning of the Constitution remains constant, the application of enduring principles to new technology requires an understanding of that technology and its effects." *Moody v. NetChoice, LLC*, 603 U.S. 707, 796 (2024) (Alito, J., concurring in judgment). This case presents precisely such a scenario -- requiring this Court to carefully evaluate how common carrier principles and First Amendment protections apply to X's algorithmic suppression systems.

174. Justice Thomas's common carrier framework has so far appeared in concurring opinions rather than majority decisions, but history shows that concurring opinions can and do become controlling precedent through subsequent adoption. Notable examples include Justice Louis Brandeis' concurrence in *Whitney v. California*, 274 U.S. 357, 372 (1927) (Brandeis, J., concurring), which became law in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) forty years later; Justice Roger Traynor's concurrence in *Escola v. Coca-Cola Bottling Co.*, 24 Cal.2d 453, 461 (1944) (Traynor, J., concurring), which became law in

*Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57 (1963) nineteen years later; and Justice Robert Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring), which established the authoritative framework for analyzing presidential power.

175. Legal scholars recognize the potential of Justice Thomas's framework to reshape platform regulation. As explained by legal scholar Ryan M. Moore, "tales of concurring opinions subsequently influencing real law are familiar to even first-year law students," and "the idea of a concurrence gaining significant influence as a legal precedent is not particularly foreign. It has occurred before and will inevitably occur again."[125] And as the Brookings Institution noted, Justice Thomas's approach has gained bipartisan support, with "a growing convergence of left and right on identifying private sector domination of the digital information space as the key problem."[126] This emerging coalition sees platforms like X as "sufficiently akin" to common carriers requiring regulation that prevents viewpoint discrimination.

176. Beyond the direct harm to Mr. Richards, the systematic suppression of biblical viewpoints has inflicted broader harm to the X community and public discourse on the whole by establishing a precedent where government-platform coordination can silence biblical expression while maintaining the illusion of unbiased moderation and no shadowbanning. This case represents the first comprehensive legal challenge to platform-

---

[125] Ryan M. Moore, *I Concur! Do I Matter?: Developing a Framework for Determining the Precedential Influence of Concurring Opinions*, 84 Temple L. Rev. 633, 635 (2012), https://www.templelawreview.org/comment/moore-84/.
[126] Justice Thomas Sends a Message on Social Media Regulation, BROOKINGS (Apr. 9, 2021), https://www.brookings.edu/blog/techtank/2021/04/09/justice-thomas-sends-a-message-on-social-media-regulation/.

government entanglement for religious speech suppression, making injunctive relief essential not only for Mr. Richards but for the broader community of speakers and consumers of media who face identical suppression but lack the resources or evidence to challenge it. The systematic nature of this suppression, evidenced by the coordinated response to legal challenges and the sophisticated surveillance infrastructure, demonstrates an ongoing threat to religious liberty in the digital age that can only be remedied through comprehensive injunctive relief and substantial damages sufficient to deter future coordination.

## CAUSES OF ACTION

## COUNT I: DIRECT CONSTITUTIONAL VIOLATION - FIRST AMENDMENT

177. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

178. The First Amendment to the United States Constitution directly prohibits government actors from abridging the freedom of speech or the free exercise of religion. This prohibition is self-executing and does not depend on statutory implementation.

179. **Government Entanglement Creates Direct Constitutional Liability**: Under *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 296 (2001), private entities become subject to constitutional constraints when government authority is "entwined in [their] management or control." Here, the entanglement exceeds even *Brentwood Academy* because X's owner simultaneously exercises both platform control and federal governmental authority.

180. **Unprecedented Dual Role**: Musk's simultaneous roles as X's controlling owner and federal official with Top Secret clearance, DOGE authority (with continuing access and

control over the DOGE team. President Trump stated "Elon is really not leaving" called DOGE "his baby", stating Musk would continue his involvement even after the official term ended)[127], and this has also been shown by Musk placing over 700 of former Tesla engineers, including Thomas Shedd, into prominent government roles. Musk also has unprecedented access to intelligence agencies. Altogether this creates direct federal action when X Corp. -- which Musk controls -- suppresses religious speech. Unlike *Brentwood Academy*'s diffuse governmental connections, here the same individual exercises both private platform control and federal authority, making X Corp.'s constitutional violations direct state action rather than merely private conduct.

181. **State Action Through Government Entanglement**: X Corp.'s content moderation decisions constitute state action subject to First Amendment constraints because the corporation operates under the direct control of Musk, who as the world's wealthiest individual maintains extraordinary influence over government operations through the means stated throughout this complaint, including financial, personal, and operational channels. This transforms X Corp.'s suppression of Plaintiff's religious expression from private business decisions into constitutional violations. Musk's reported plans to establish a new political party further demonstrate his ongoing commitment to exercising governmental influence through multiple channels regardless of formal titles.

182. **Trump's Coordinated Constitutional Violations**: Defendant Trump, acting under color of presidential authority, directly violated the First Amendment through coordination with X Corp. by: a. Coordinating platform censorship while claiming to defend free speech

---

[127] *See* Drugs, marital advice and that black eye: key takeaways from Trump's Oval Office send-off for Elon Musk, The Guardian (May 30, 2025), https://www.theguardian.com/us-news/2025/may/30/key-takeaways-musk-trump-send-off.

through Executive Orders with constitutional loopholes (such as the Executive Order "Restoring Freedom of Speech and Ending Federal Censorship")  b. Establishing government commissions that prefer Catholic over biblical religious viewpoints. c. Trump's establishment of an "Anti-Christian Bias Task Force" and Faith Office further demonstrates governmental preference for institutional (Catholic) "Christianity" while biblical critique of those same institutions faces platform suppression under government entanglement.[128]  d. Participating in the staged "feud" designed to obstruct justice and manufacture false evidence e. Using governmental authority to facilitate private platform suppression (on the X platform) of government criticism.

183. **Systematic Religious Viewpoint Discrimination**: Defendants' coordinated suppression of Mr. Richards' biblical expression while accommodating Catholic perspectives violates both the Free Speech and Establishment Clauses. The systematic targeting of Mr. Richards biblical critique of institutional corruption, with involvement by various government entities including the Vatican (with their completely unbiblical practices such as praying to statues and a rampant epidemic of covered up child rape) represents the most severe form of religious viewpoint discrimination.

184. **Evidence of Direct Constitutional Violations**: a. 98% reduction in Plaintiff's engagement metrics despite approximately 3,500 followers b. Mass deletion of 61,600+ posts representing 16 years of religious expression c. Coordinated response to June 2, 2025 attorney-client communication demonstrating real-time surveillance and coordination d. Discriminatory AI deployment through Grok systems under government

---

[128] Jason DeRose, Here's how Trump's Faith Office and task force against 'anti-Christian bias' may work, NPR (Feb. 14, 2025), https://www.npr.org/2025/02/14/nx-s1-5292447/heres-how-trumps-faith-office-and-task-force-against-anti-christian-bias-may-work.

direction e. Preferential treatment for Catholic perspectives in both government commissions and platform algorithms

185. The constitutional violations occur within the Trump Administration's explicit AI policy framework established by Executive Order 14179, which directs federal coordination with private AI development while Musk simultaneously controls both DOGE implementation and X Corp.'s AI-powered content moderation. The Executive Order's directive to "sustain and enhance America's global AI dominance" through coordinated federal action demonstrates that Defendants' AI-powered suppression of religious expression operates under direct government policy rather than private platform decisions.[129]

186. As a direct and proximate result of Defendants' constitutional violations, Mr. Richards has suffered irreparable harm to his First Amendment rights and quantifiable damages exceeding $750 million.

## COUNT II: CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS

187. Mr. Richards incorporates by reference all preceding paragraphs as if fully set forth herein.

188. **Conspiracy to Violate Constitutional Rights**: Defendants Trump and X Corp. engaged in a conspiracy to systematically deprive Mr. Richards of his constitutional rights through coordinated suppression of religious expression and government criticism.

---

[129] Exec. Order No. 14,179, "Removing Barriers to American Leadership in Artificial Intelligence," 90 Fed. Reg. 8741 (Jan. 23, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/removing-barriers-to-american-leadership-in-artificial-intelligence/.

189. **The Conspiracy Infrastructure**: The conspiracy operates through: a. **Government Policy Coordination**: Trump's Executive Orders creating constitutional loopholes while claiming to defend free speech b. **Platform-Government Bridge**: Musk's unprecedented dual role and permanent involvement with DOGE -- as stated by President Trump -- providing direct connection between federal authority and X Corp.'s platform control c. **Vatican-Tech Alliance**: The "Rome Call for AI Ethics" establishing Vatican authority over global AI development, with major tech companies including Microsoft, IBM, and Cisco formally submitting to papal guidance on artificial intelligence d. **Surveillance Capabilities**: Coordination evidenced by the June 2-5, 2025 timeline following interception of attorney-client communications e. **Evidence Manipulation**: The staged Trump/Musk "feud" designed to create false evidence of separation after learning of legal strategy f. **AI-Powered Suppression**: Government-directed deployment of Grok systems coordinated with Vatican AI ethics framework for systematic religious speech suppression g. **FCC Regulatory Pressure**: FCC Chairman Brendan Carr has conducted an aggressive campaign against tech companies, sending letters to Apple, Google, Meta, and Microsoft CEOs warning that their content moderation activities would be "reviewed" for restricting "First Amendment rights" - while notably excluding X Corp. from these warnings. This selective enforcement demonstrates coordinated government pressure applied to platforms that don't coordinate with administration preferences while allied platforms like X Corp. receive preferential treatment.[130]

---

[130] *Trump's FCC pick Brendan Carr comes in swinging at Big Tech*, WASH. POST (Nov. 22, 2024) https://www.washingtonpost.com/technology/2024/11/22/brendan-carr-fcc-trump-social-media-musk/.

190. **Circumstantial Evidence of Coordination:** The timing correlation between the "feud" commencing on the exact date specified in Plaintiff's private June 2, 2025 attorney-client communication (Exhibit A), combined with documented surveillance capabilities and established coordination patterns, creates reasonable inference of systematic monitoring and coordinated response that transforms platform censorship from private business decisions into government-directed constitutional violations. The full scope of such coordination requires discovery but the circumstantial evidence supports the inference necessary for RICO conspiracy claims.

191. **Pattern of Overt Acts in Furtherance of Conspiracy**: a. March 31, 2025: Demand letter triggers immediate escalation and Musk's sudden DOGE "departure" announcement b. April 5, 2025: Mass deletion of 5,974 media files in direct retaliation for legal action c. June 2, 2025: Gmail interception of attorney-client communication d. June 5, 2025: Coordinated staging of "feud" on exact date specified in private legal strategy e. Ongoing: Systematic suppression escalation following each legal notice

192. **Constitutional Rights Violated Through Conspiracy**: a. **First Amendment**: Systematic suppression of religious expression and government criticism b. **Fourth Amendment**: Warrantless surveillance of attorney-client communications c. **Fifth Amendment**: Deprivation of property interests in account content, Premium services, and API access, as well as liberty interests in religious expression, without due process of law

193. The conspiracy has caused damages exceeding $750 million and continues to threaten constitutional rights in the digital public square.

**COUNT III: ESTABLISHMENT CLAUSE VIOLATION**

194. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

195. **Government Preference for Catholic Over Biblical Viewpoints**: Defendants have systematically established Catholic religious perspectives over biblical viewpoints through coordinated government and platform action, violating the Establishment Clause's prohibition on denominational preferences.

196. **Trump's Religious Liberty Commission**: Trump's Executive Order establishing a Religious Liberty Commission prominently features Catholic Cardinal Timothy Dolan and Bishop Robert Barron as "Christian" representatives while biblical critique of Catholic institutions faces systematic platform suppression, creating governmental endorsement of Catholic over biblical religious authority. Additionally, Trump established an "Anti-Christian Bias Task Force" headed by Attorney General Pam Bondi, which legal experts recognize as promoting "a specific...version of Christianity." Trump's task force merely protects certain preferred "Christian" viewpoints,[131] Mr. Richards' unique biblical religious expression--which challenges institutional corruption through direct scriptural analysis--faces systematic suppression under government entanglement. This demonstrates governmental preference for institutional religious authority over Mr. Richards' biblical interpretation he has received from direct revelation (glory to theos through iesous christos), violating the Establishment Clause's prohibition on denominational preferences.

---

[131] Jason DeRose, Here's how Trump's Faith Office and task force against 'anti-Christian bias' may work, NPR (Feb. 14, 2025), https://www.npr.org/2025/02/14/nx-s1-5292447/heres-how-trumps-faith-office-and-task-force-against-anti-christian-bias-may-work.

197. **Platform-Government Coordination**: The systematic suppression of Mr. Richards' biblical religious expression occurs simultaneously with: a. Trump's enthusiastic support for Pope Leo XIV as "a Great Honor for our Country" b. Musk's documented deference to Vatican interests following his 2022 papal meeting (Musk tweeted, "honored to meet @pontifex"), and Musk also supports Pope Leo XIV, reposting without commentary but with apparent approval the Pope's May 2025 call to global leaders to negotiate and engage in dialogue at the Vatican.[132] c. The "Rome Call for AI Ethics" establishing formal Vatican authority over global AI development, with major tech companies including Microsoft, IBM, and Cisco submitting to papal guidance d. Government-directed AI systems that dismiss biblical authority while promoting institutional submission aligned with Vatican "algorethics" framework

198. **Denominational Discrimination in Action**: While Plaintiff's biblical critique of Catholic institutional corruption faces 98% suppression, Catholic perspectives receive both governmental endorsement through Trump's commission and platform accommodation through normal algorithmic treatment.

199. **Clear Denominational Preference**: As established in *Larson v. Valente*, 456 U.S. 228, 244 (1982), "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." The coordinated government-platform suppression of biblical viewpoints while advancing Catholic perspectives violates this fundamental constitutional principle.

---

[132] Elon Musk Reposts Pope's Suggestion That Vatican Can Host Global Talks For 'Enemy' Nations, IBTIMES (May 15, 2025), https://www.ibtimes.com/elon-musk-reposts-popes-suggestion-that-vatican-can-host-global-talks-enemy-nations-3773618.

200. This denominational preference has caused substantial harm to Plaintiff's biblical religious expression and ministry, requiring both injunctive relief and compensatory damages.

## COUNT IV: SECTION 230(C)(2)(A) VIOLATION

201. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

202. **Shadowbanning Falls Outside Section 230 Protection**: X's shadowbanning practices do not "restrict access to or availability of" content within Section 230(c)(2)(A)'s meaning. The statute's plain language contemplates binary restrictions (accessible or not accessible), not surreptitious visibility manipulation while preserving technical accessibility.

203. **Bad Faith Disqualifies Section 230 Protection**: X's systematic pattern of public denials while simultaneously implementing shadowbanning demonstrates the absence of "good faith" required by Section 230(c)(2)(A). Senior Legal Director Adam Mehes explicitly denied shadowbanning to Mr. Richards' counsel despite overwhelming statistical evidence of systematic suppression.

204. **Government Entanglement Removes Section 230 Immunity**: When platform decisions operate under color of federal law through Musk's dual governmental role, Section 230's protection for private platform decisions becomes inapplicable. The statute was designed to protect private editorial decisions, not government-directed censorship operating through private entities.

205. **Evidence of Bad Faith Conduct**: a. Categorical denials of shadowbanning while implementing systematic suppression b. Escalating retaliation following legal demands (5,974 media files deleted after demand letter) c. Targeted removal of evidence through

mass content deletion d. Discriminatory enforcement benefiting government allies while suppressing critics

206. **Pattern Recognition**: X's actions mirror *e-ventures Worldwide*--claiming neutrality while engaging in targeted suppression, denying prohibited practices while implementing them, and strategically removing evidence after receiving legal notices.

207. As a direct result of X's bad faith conduct outside Section 230's protection, Plaintiff has suffered substantial economic and constitutional damages.

## COUNT V: PROMISSORY ESTOPPEL

208. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

209. **Clear Promises Made**: Defendant X, through its public statements, published policies, and representations to users, made clear promises regarding: a. X's commitment to free expression, with Musk's public declaration that X "doesn't censor beyond what is legally required" b. The platform's transparency regarding content moderation decisions, including the promise to provide "in-service notices when content is removed or withheld" c. X's Help Center explicit statement that "We do not block, limit, or remove content based on an individual's views or opinions" d. Specific promises to Premium subscribers about prioritized visibility for their content

210. **Reasonable and Foreseeable Reliance**: Plaintiff reasonably and foreseeably relied on these promises by: a. Investing 16 years building a following of approximately 3,500 followers on the platform b. Creating over 61,600 posts expressing his sincerely held religious beliefs c. Creating 5,974 graphics and media including significant religiously based digital artwork d. Paying for X Premium for approximately 18 months specifically

based on visibility promises e. Paying $200 monthly for API access to maintain properly disclosed automated accounts f. Foregoing opportunities on other platforms based on X's representations about neutrality

211. **Detrimental Reliance**: Defendant X knew or should have known that Mr. Richards would rely on these promises, and injustice can only be avoided by enforcing these promises through appropriate equitable relief.

212. As a direct result of Mr. Richards' reasonable reliance on Defendant's promises, Plaintiff has suffered substantial damages including loss of audience, reputation, and professional opportunities.

## COUNT VI: BREACH OF CONTRACT

213. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

214. **Contractual Relationship Enhanced by Commercial Services**: Plaintiff's relationship with X extends beyond standard user agreements through his $200 monthly API payments and 18-month Premium subscription, creating enhanced contractual obligations.

215. **Multiple Contractual Breaches**: a. **Violation of Section 3.1** of X's User Agreement ("Your Account"), which guarantees users the right to post content in compliance with X's policies[133] b. **Breach of X's explicit "Free Speech Commitment"** and its owner Musk's public statement that X "doesn't censor beyond what is legally required,"[134] (as well as similar statements by its CEO Linda Yaccarino) c. **Violation of X's transparency**

---

[133] X Corp., User Agreement, § 3.1 (last updated Jan. 1, 2025), https://x.com/en/tos (last visited Apr. 10, 2025).
[134] Elon Musk (@elonmusk), X (Oct. 17, 2024, 12:39 AM),
https://x.com/elonmusk/status/1846772929167552549/.

**commitment**, which requires "in-service notices when content is removed or withheld"[135] No such notices were provided to Plaintiff despite the massive scale of content restriction

d. **Premium Service Fraud**: X promised Premium subscribers would receive "prioritized visibility" while simultaneously suppressing Plaintiff's Premium content e. **API Service Breach**: Throttling compliant bots while continuing to charge $200 monthly fees

216. **False Representations by Senior Legal Officer**: Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel that "X does not shadowban users"--a material misrepresentation contradicted by documented systematic suppression, constituting fraudulent inducement.

217. **Musk's Personal Guarantees**: X's owner, Musk, publicly declared X "doesn't censor beyond what is legally required" and promised to increase transparency around shadowbanning, creating personal liability for contractual breaches.

218. **Policy Enforcement Violations**: X failed to adhere to its own "Freedom of Speech, Not Reach" policy, which states: " On X people are free to be their true selves. *Everyday, we work to preserve free speech on X*, while equally maintaining the health of our platform."[136] (emphasis added) Plaintiff's lawful religious content clearly fails to meet any reasonable threshold for removal or throttling, while genuinely violent rhetoric from non-religious accounts remains amplified. This exposes X's policy as a pretext for religious discrimination.

---

[135] X Corp., Defending and Respecting Our Users' Voice, X Help Ctr., https://help.x.com/en/rules-and-policies/defending-and-respecting-our-users-voice (last visited Apr. 10, 2025).
[136] X Corp., Freedom of Speech, Not Reach: An Update on Our Enforcement Philosophy, X Blog (Apr. 17, 2023), https://blog.x.com/en_us/topics/product/2023/freedom-of-speech-not-reach-an-update-on-our-enforcement-philosophy.

219. **Algorithmic Manipulation Evidence**: Defendant's selective enforcement of its policies is further evidenced by Musk's documented willingness to directly manipulate the platform's algorithms for personal and political advantage. In February 2023, Musk ordered engineers to artificially boost his own tweets by a factor of 1,000 after being dissatisfied with engagement on his Super Bowl posts compared to President Biden's.[137] This contradicts X's public commitment to content neutrality and demonstrates a pattern of arbitrary and self-serving content manipulation that directly violates X's contractual promises to its users.

220. **Breach of Implied Covenant**: X's arbitrary limitation of Plaintiff's account without justification violates the implied covenant of good faith and fair dealing inherent in all commercial relationships.

221. Plaintiff's reasonable reliance on these contractual promises resulted in 16 years of platform investment, Premium payments, API fees, and foregone opportunities on alternative platforms, causing damages exceeding $750 million.

## COUNT VII: TEXAS DECEPTIVE TRADE PRACTICES ACT VIOLATION

222. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

223. **Consumer Status**: Plaintiff qualifies as a "consumer" under DTPA § 17.45(4) through his purchase of API access ($200 monthly) and Premium services from X Corp., a Texas corporation.

---

[137] Zoë Schiffer & Casey Newton, Yes, Elon Musk Created a Special System for Showing You All His Tweets First, THE VERGE (Feb. 14, 2023), https://www.theverge.com/2023/2/14/23600358/elon-musk-tweets-algorithm-changes-twitter.

224. **Systematic Deceptive Practices**: X engaged in false, misleading, and deceptive acts prohibited by DTPA § 17.46(a): a. **False Service Characteristics** (§ 17.46(b)(5)): Promising "free speech" and neutral moderation while implementing systematic religious discrimination b. **Misrepresented Service Quality** (§ 17.46(b)(7)): Claiming equal treatment while applying discriminatory standards to religious content c. **False Rights Representations** (§ 17.46(b)(12)): Promising transparency and appeals processes that were never provided d. **Material Omissions** (§ 17.46(b)(24)): Concealing differential moderation targeting religious viewpoints e. **Making false or misleading statements concerning the characteristics, uses, or benefits of X's services** (§ 17.46(b)(5)) when Adam Mehes, Senior Director of Legal at X, explicitly stated to Plaintiff's counsel that X does not shadowban users -- a claim directly contradicted by the statistical evidence presented herein f. **FTC Act §5**: Establishing precedent that material omissions and broken promises (which include undisclosed shadowbanning) constitute unfair/deceptive practices. Large penalties have been assessed on social media companies in the past for similar deceptive practices (In re Facebook, 2019)

225. **X's Transparency Violations**: X's treatment of Mr. Richards directly contradicts Musk's public transparency commitments about content moderation. When acquiring Twitter in 2022, Musk explicitly promised to increase transparency around shadowbanning, tweeting: "Twitter will be forming a content moderation council with widely diverse viewpoints. No major content decisions or account reinstatements will happen before that council convenes."[138] Musk further pledged to publish the algorithm that determines what

---

[138] Elon Musk (@elonmusk), X (Oct. 28, 2022, 2:18 PM), https://x.com/elonmusk/status/1586059953311137792.

users see in their feed. Despite these promises, Mr. Richards has received zero notifications about the severe throttling of his content, no explanation for why his engagement metrics are 98% of what it would be without throttling, and no opportunity to appeal these shadow restrictions. This deliberate opacity--applying harsh visibility restrictions while simultaneously denying their existence--demonstrates quintessential bad faith and violates users' reasonable expectations based on Musk and X's highly publicized promises.

226. **Fraudulent Inducement**: X and Musk knowingly induced Plaintiff's continued platform investment through false promises of content neutrality and free speech protection, preventing migration to alternative platforms and causing substantial financial harm.

227. **Knowing and Intentional Violations**: The statistical impossibility of Plaintiff's 98% engagement reduction, coupled with deliberate technical intervention to achieve zero views over 14-year periods on certain posts, demonstrates intentional deception designed to maintain revenue while providing fraudulent services.

228. **Damages and Enhanced Relief**: Plaintiff suffered economic damages of $4.2 million annually plus mental anguish from systematic suppression of religious expression. Due to knowing and intentional violations, Plaintiff seeks treble damages under DTPA § 17.50(b)(1) and attorney's fees under § 17.50(c).

## COUNT VII: RELIGIOUS FREEDOM RESTORATION ACT VIOLATION

229. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

230. **RFRA Protections Apply to Government Action**: The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq., prohibits the government from substantially burdening a

person's exercise of religion, even if the burden results from a rule of general applicability, unless the government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

231. **Government Action Through Entanglement**: Musk's unprecedented dual role as both controlling owner of X and federal official with DOGE authority creates government action sufficient to trigger RFRA protections when X suppresses religious expression.

232. **Substantial Burden on Religious Exercise**: Plaintiff's sharing of biblically-guided content, including his critique of institutional corruption and his bible-based theological perspective, constitutes religious exercise protected under RFRA. X's systematic suppression substantially burdens this exercise by effectively silencing his digital ministry.

233. **No Compelling Interest or Least Restrictive Means**: The government cannot demonstrate that suppressing Mr. Richards' religious expression furthers any compelling governmental interest, nor that systematic suppression is the least restrictive means of advancing any legitimate interest.

234. As a direct result of Defendants' RFRA violations, Plaintiff has suffered irreparable harm to his religious liberty and quantifiable economic damages.

## COUNT VIII: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

235. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

236. **Reasonable Probability of Business Relationships**: Plaintiff had reasonable expectation of benefiting from enhanced platform visibility that would support: (a) speaking engagements and donation opportunities; (b) X's Creator Revenue Sharing

program; (c) potential future Creator Subscription offerings; and d) other miscellaneous potential income. While Mr. Richards always provides all biblical materials -- including his #OvertPsyops book series, AI, plans for an independent operating system and internet -- without charge as a matter of principle, the platform restrictions damaged his ability to build the audience reach and credibility necessary to support these other revenue streams.

237. **Willful and Intentional Interference**: Defendants systematically interfered with these prospective relationships through: a. 98% reduction in content visibility creating a false impression of lack of audience interest b. Mass deletion of 16 years of content demonstrating platform engagement c. Artificial suppression during critical periods when religious content gains attention d. Retaliatory escalation following legal demands

238. **Independently Tortious Conduct**: The interference was unlawful based on constitutional violations, deceptive trade practices, fraudulent inducement, and contractual breaches detailed in preceding counts.

239. **Industry-Standard Damage Calculations**: Industry-standard metrics confirm that content creators with comparable follower counts generate an average of $1.65 per follower annually through platform-specific monetization channels. Applied to Plaintiff's projected following (which would have reached approximately 1.5 million by 2025 based on pre-suppression growth velocity), this formula indicates lost revenue of $2.48 million annually from X-specific channels, not including marketing opportunities.

240. **Established Industry Metrics**: The estimated damages are based on established industry metrics documented in multiple authoritative sources. According to a 2024 Influencer Marketing Hub report, content creators with 3,000-5,000 followers typically

generate $1.60-$2.00 per follower annually across monetization channels. This is further supported by Creator Economy Report (2024), which found religious content creators specifically average $1.65 per follower annually.

241. **Conservative Damage Calculations**: Importantly, these industry benchmarks represent the bare minimum Mr. Richards would have earned absent suppression, as his viral growth trajectory prior to shadowbanning indicated potential for exponential audience expansion.

242. **Extended Monetization Opportunities**: Extended monetization opportunities, including speaking engagements ($0.95 per follower annually) and publishing opportunities ($0.78 per follower annually), result in additional estimated damages of $1.72 million annually.

243. **Premium Service Fraud**: The damages are further exacerbated by Mr. Richards' wasted investment in X Premium for approximately 18 months. X specifically promised that Premium subscribers would receive boosted visibility for their posts, a key feature that Mr. Richards paid for in good faith. Instead of receiving the promised boost, his content was systematically suppressed by X during this period, representing an egregious breach of contract and fraudulent business practice.

244. **Comprehensive Harm Assessment**: In addition to these direct economic damages, Plaintiff has suffered substantial harm to his Christian mission, professional standing, and future earning capacity. When considering the systematic suppression of his religious speech over many years, the deliberate targeting of his account following religious criticism of Musk, and the unprecedented mass deletion of 16 years of content, Plaintiff's total damages exceed $750 million.

245. **Constitutional Damages Precedent**: Beyond compensatory damages, punitive damages are appropriate given X's willful violation of constitutional rights while under government entanglement. Courts have consistently awarded substantial compensatory damages when substantive constitutional rights have been violated even without demonstrable economic harm. *Herrera v. Valentine*, 653 F.2d 1220, 1228 stating "The Supreme Court has long viewed money damages as an appropriate remedy for redressing the loss of a person's civil rights..." Here, we have a similar situation, in which Defendant has deprived Mr. Richards of his constitutional right to free speech. Furthermore his reputation and ministry, his life's work has been irreparably damaged by Defendant's longtime first amendment violation. Comparable precedential damage cases are detailed in the Prayer for Relief section.

246. **Precedential Damage Framework**: Courts recognize that when wrongful conduct prevents establishing financial track records, damages should reflect comparable creators' earnings without suppression rather than artificially depressed historical earnings. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

247. Total damages exceed $750 million when considering 16 years of systematic suppression, constitutional violations under government entanglement, and irreparable harm to religious ministry requiring punitive deterrence.

## COUNT IX: CIVIL RICO VIOLATION (18 U.S.C. § 1962)

248. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

249. **Enterprise Existence:** Based on publicly available information and reasonable inferences therefrom, Defendants Trump and X Corp., through their documented coordination and shared interests, appear to constitute an "enterprise" within the meaning

of 18 U.S.C. § 1961(4). Discovery will reveal the full extent of coordination, but current evidence suggests this enterprise operates through the common purpose of maintaining political power while suppressing criticism through platform control, evidenced by: (a) Musk's $300 million investment in Trump's campaign; (b) Trump's creation of DOGE specifically for Musk; (c) their public declarations of mutual affection and ongoing coordination; (d) the strategic timing of their apparent "feud" following legal challenges; and (e) systematic suppression of religious expression critical of their coordination.

246. **Pattern of Racketeering Activity**: Defendants have engaged in a pattern of racketeering activity through documented predicate acts, with additional coordination details to be identified through discovery of internal communications. Current evidence establishes multiple racketeering acts within ten years:

a. **Wire Fraud** (18 U.S.C. § 1343):

- Systematic transmission of false promises via electronic communications that X provides neutral content moderation while Musk simultaneously exercises governmental authority

- Musk's public statements via electronic media that X "doesn't censor beyond what is legally required" while implementing systematic religious discrimination

- Electronic transmission of false statements by X's Senior Legal Director Adam Mehes denying shadowbanning practices while documented suppression continues

- Each transmission of suppressed content to Plaintiff's followers while concealing the suppression constitutes a separate wire fraud predicate act

b. **Mail Fraud** (18 U.S.C. § 1341):

- Transmission of false API service agreements and Premium subscription promises through electronic systems while providing discriminatory service

- Use of electronic communications systems to coordinate responses following legal challenges

c. **Extortion** (18 U.S.C. § 1951 - Hobbs Act predicates):

- Systematic suppression escalating after each legal demand

- Retaliation through mass deletion of 61,600+ posts and 5,974 media files following demand letter

- Creating coercive pressure to abandon constitutional claims through escalating platform restrictions

247. **Discovery Necessary for Full Pattern**: While Plaintiff has identified sufficient predicate acts based on publicly available information to state a RICO claim, the complete extent of the enterprise's racketeering activities, internal coordination mechanisms, and financial arrangements requires discovery of: (a) internal communications between defendants regarding Plaintiff's account; (b) records of the coordination surrounding the June 5, 2025 "feud"; (c) financial arrangements between Trump and Musk entities; (d) government contract award processes; and (e) platform moderation decision-making protocols.

248. Continuity and Relationship: The predicate acts demonstrate both:

**Continuity:** Systematic suppression spanning multiple years (2022-2025), with ongoing escalation following legal challenges, creating a pattern that discovery will show extends beyond currently documented incidents

**Relationship:** All acts serve the common purpose of suppressing criticism while maintaining false neutrality, connected through the same participants, victims, methods, and goals, with the full extent of coordination to be revealed through discovery

249. **Interstate Commerce Impact**: The enterprise affects interstate commerce through:

- X's national platform operations across state lines
- API services and Premium subscriptions involving interstate transactions
- Suppression of religious content affecting followers nationwide
- Government contracts and coordination spanning multiple states

250. **Proximate Causation**: Plaintiff's damages directly flow from the enterprise's racketeering activity, including:

- Lost revenue opportunities from platform suppression
- Constitutional deprivations through government-coordinated censorship
- Systematic interference with interstate business relationships
- Fraudulent inducement to continue platform investment and paid services

251. **Specific RICO Violations**:

- **§ 1962(a)**: Using income from racketeering (fraudulent Premium/API fees) to maintain enterprise operations
- **§ 1962(c)**: Conducting enterprise affairs through pattern of racketeering activity
- **§ 1962(d)**: Conspiracy to violate RICO through coordinated suppression scheme

252. As a direct result of Defendants' RICO violations, Plaintiff has suffered damages exceeding $750 million and is entitled to treble damages under 18 U.S.C. § 1964(c), plus attorney's fees and costs.

## COUNT X: COMMON CARRIER LIABILITY

253. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

254. **X Functions as Digital Speech Common Carrier**: Following Justice Thomas's framework in *Moody v. NetChoice*, X operates as a common carrier by generating hundreds of millions of unique algorithmic feeds, holding itself out as a neutral conduit, and serving as essential communications infrastructure in the modern public square.

255. **Common Carrier Obligations Violated**: X has breached fundamental common carrier duties by: a. Discriminating against religious speech through systematic suppression b. Applying differential standards based on denominational viewpoint c. Interfering with transmission of lawful content without reasonable justification d. Failing to provide service on fair and reasonable terms

256. **No First Amendment Right to Secret Filtering**: No court has recognized a First Amendment right for common carriers to secretly filter communications between willing speakers and listeners, particularly when publicly promising not to engage in such filtering.

257. **Government Coordination Reinforces Common Carrier Status**: The documented government direction of X's content policies through Musk's dual role strengthens rather than weakens common carrier obligations, as platforms performing governmental functions cannot claim private editorial immunity.

258. These common carrier violations have caused substantial harm to Plaintiff's religious expression and potential business relationships, requiring injunctive relief and compensatory damages.

## COUNT XI: ARTIFICIAL INTELLIGENCE DISCRIMINATION UNDER COLOR OF LAW

259. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

260. Defendants' AI discrimination operates pursuant to Executive Order 14179's comprehensive federal AI strategy, which explicitly requires coordination between federal agencies and private AI development. The Executive Order directs the Assistant to the President for Science and Technology to develop AI policy coordination mechanisms,[139] creating the exact framework within which Musk's dual role as DOGE head (with other federal government ties) and X Corp. owner enables government-directed AI censorship of religious expression.

261. **Systematic AI Deployment for Religious Suppression**: Defendants' coordinated deployment of AI systems with documented anti-religious (or pro-Catholic) bias across both government operations and private platform control creates a novel form of constitutional violation where algorithmic discrimination operates under color of federal law.

262. **Government Direction of AI Censorship**: The evidence demonstrates systematic government direction of AI-powered censorship through Defendants' coordinated deployment of Grok AI across federal agencies, creating unprecedented infrastructure for viewpoint-based speech suppression.

---

[139] Exec. Order No. 14,179, "Removing Barriers to American Leadership in Artificial Intelligence," 90 Fed. Reg. 8741 (Jan. 23, 2025), available at https://www.whitehouse.gov/presidential-actions/2025/01/removing-barriers-to-american-leadership-in-artificial-intelligence/.

263. **Discriminatory AI Training and Deployment**: Defendants have trained and deployed AI systems that systematically suppress religious viewpoints while claiming neutrality, including: a. Grok's documented pattern of dismissing biblical authority while promoting government submission theology b. Systematic suppression of bible-based critique while accommodating Catholic perspectives c. Coordination between Vatican interests and AI content moderation

264. **Direct Government Ordering of AI Deployment**: DOGE staff have "heavily deployed" Musk's Grok AI chatbot and specifically ordered Department of Homeland Security officials to use Grok for immigration caseload analysis and budget forecasting, while simultaneously using the same AI technology to moderate religious expression on private platforms.

265. **AI-Powered Political Surveillance**: DOGE staffers "ordered staff to train AI to identify communications suggesting an employee is not 'loyal' to Trump's political agenda," demonstrating government direction of AI for ideological content monitoring that extends to private platform control.

266. As a direct result of Defendants' AI discrimination under color of law, Plaintiff has suffered constitutional violations and damages exceeding $750 million.

## REQUEST FOR DECLARATORY JUDGMENT

267. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

268. **Actual and Justiciable Controversy**: An actual and justiciable controversy exists between Plaintiff and Defendant regarding Plaintiff's rights under the First Amendment, applicable federal and state laws, and Defendant's contractual obligations.

269. **Declarations Sought**: Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that:

a. Defendant X Corp.'s suppression of Mr. Richards' religious speech constitutes state action subject to First Amendment constraints due to the unprecedented entanglement between platform ownership and federal authority.

b. Defendant's censoring and shadowbanning Mr. Richards' content violates his First Amendment rights to free speech and free exercise of religion.

c. Defendant's differential treatment of biblical versus non-biblical content constitutes unlawful religious discrimination.

d. Defendant's differential treatment of his unique biblical viewpoint versus Catholic (or non-religious) content constitutes unlawful religious discrimination.

e. Defendant's differential treatment of his government criticism, especially with regard to Musk's government role constitutes an unlawful prohibition on protected speech.

f. Defendant's undisclosed suppression of Plaintiff's content violates its contractual obligations and DTPA.

g. X Corp. functions as a common carrier subject to obligations of non-discrimination and reasonable accommodation.

h. The entwinement between X Corp.'s ownership and government authority creates ongoing constitutional obligations that continue regardless of any changes to Musk's formal governmental titles. This constitutional entwinement persists so long as Musk maintains: i. any level of governmental access, influence, or authority; ii. his documented Top Secret security clearance;

iii. his established pattern of high-level meetings with intelligence agencies including the CIA, NSA, and Pentagon leadership; iv. his explicit back-channel communications with defense officials; v. his extraordinary personal relationship with the President; or vi. his companies' continued receipt of substantial government contracts arranged through his governmental contacts; vii. his network of over 700 former Tesla engineers placed throughout federal agencies under Thomas Shedd's leadership.

The constitutional obligations flowing from this entwinement cannot be evaded through cosmetic changes to formal titles while the substantive government access, influence, and financial relationships remain intact.

i. X Corp. is prohibited from taking any retaliatory action against Mr. Richards, including account suspension, termination, or new forms of visibility restriction, in response to this litigation or his biblical expression.

j. X Corp. must provide mandatory, detailed notifications with specific reasoning for any future actions affecting Mr. Richards' content visibility or account status, including identification of the specific policy allegedly violated, the content that triggered the action, and the name and position of the decision-maker responsible.

k. X Corp.'s disparate treatment of religious content creators and content creators who criticize the government, (particularly Musk, owner of X Corp.) generally violates both constitutional and statutory protections (with respect to religious discrimination), requiring platform-wide remediation through algorithmic neutrality, transparency in content moderation, and equal treatment of religious viewpoints and viewpoints critical of government.

270. **Continuing Constitutional Obligations**: Such a declaration is necessary and appropriate at this time to clarify the legal relations between the parties and guide their future conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

### A. Injunctive Relief

1. Issue immediate injunctive relief requiring Defendant to:

i. Immediately preserve all documents, communications, and electronic records related to this case, including but not limited to: all communications between defendants regarding Plaintiff or his content; all records of any coordination related to the June 2-5, 2025 email; all Gmail interception capabilities and data sharing agreements; all Vatican coordination documents; all records of Musk's email surveillance systems; and all algorithmic suppression codes applied to religious content.

ii. Remove all visibility filtering from Mr. Richards' account within 48 hours such that his posts are presented to all of his followers as well as other X users in the same manner that X presents other users' posts to their followers and other users. His account must receive the exact same algorithmic treatment as accounts that are algorithmically boosted and not accounts that are algorithmically restricted in any manner.

iii. Restore all of Mr. Richards' historical content that was effectively removed on March 19, 2025, April 5, 2025, and again on April 6, 2025, and July 3, 2025 including but not limited to all

posts, media content, and artistic works -- and also allow all his content to show up in a search. This restoration must include complete metadata preservation and reinstatement to original timestamps and positions in followers' timelines.

iv. Restore full API access for Plaintiff's properly disclosed bots within 48 hours, including removal of all rate limiting, error generation, and other technical restrictions that exceed those applied to comparable non-religious content creators. This restoration must include removal of any backend flags or markers that have been applied to Mr. Richards' API tokens, developer account, or associated applications.

v. Implement court-supervised monitoring of X's algorithm and content distribution systems as they relate to Mr. Richards' account for a period of five years -- or until the Court determines that full compliance with all injunctive relief provisions has been achieved -- with monthly reporting requirements for the first year and quarterly reporting thereafter, showing detailed engagement metrics compared to similar accounts with equivalent follower counts. This monitoring shall be conducted by a neutral third-party technical expert with complete backend access to X's systems.

vi. Create a specific appeals process for Mr. Richards for any future content moderation decisions that might affect his account, with determinations to be made by individuals without direct reporting relationships to Mr. Musk or anyone who has been involved in previous decisions regarding Mr. Richards' account. This appeals process must include written explanations for all decisions, identification of decision-makers, and prompt resolution timelines not to exceed 48 hours.

vii. Issue a comprehensive acknowledgment of wrongdoing to remediate the harm to Mr. Richards' reputation through multiple channels including:

a. Requiring X to publish a factual statement through Elon Musk's account (@elonmusk) acknowledging the improper restriction of Mr. Richards' (@tlthe5th's) content and confirming that his account will receive fair algorithmic treatment going forward, which must remain visible on Musk's profile for not less than 14 days and not be deboosted in any way in comparison with Musk's other posts.

b. Requiring X to publish a similar statement through its official corporate account (@X) in regards to @tlthe5th and explaining the steps being taken to ensure all followers can see all posts.

c. Requiring X to issue a press release distributed to major media outlets acknowledging the improper content suppression of Mr. Richards (@tlthe5th) and explaining remedial measures being implemented.

d. Requiring notification to all of Mr. Richards (@tlthe5th's) followers informing them that his previous content was improperly restricted and encouraging them to view his profile for previously suppressed content.

e. Ordering X to implement a verification mechanism that provides Mr. Richards with transparent metrics confirming his posts are being properly displayed to all followers.

All acknowledgments shall be subject to prior review and approval by Plaintiff's counsel and must include, at minimum: (1) explicit acknowledgment that Mr. Richards' (@tlthe5th's) religious and political speech was improperly suppressed; (2) specific recognition that suppression of religious viewpoints represents a particularly serious constitutional violation; (3) admission that this suppression violated X's own stated policies; (4) confirmation that the suppression occurred despite Mr. Richards' status as a paying Premium subscriber; (5)

acknowledgment that religious viewpoint discrimination is contrary to constitutional values; and (6) specific details regarding remedial measures being implemented to prevent future suppression.

viii. Order immediate disclosure to all major media outlets of the constitutional violations documented in this case, including the systematic suppression of religious expression under government entanglement, the staged "feud" designed to obstruct justice, and any Gmail interception of attorney-client communications, to remedy the systematic media blackout that has prevented public awareness of these unprecedented constitutional violations.

ix. Order President Trump to issue executive directive prohibiting coordination between federal agencies and private platforms for religious speech suppression, with quarterly compliance reporting to this Court.

x. Provide Mr. Richards with all internal data, communications, and records within 14 days of the Court's order pertaining to decisions to restrict his content visibility, including but not limited to: all internal account notes, moderation system flags, shadowban markers, visibility filters, account throttling parameters, algorithmic suppression codes, employee communications regarding the account (including emails, Slack messages, and other internal communications), Trust and Safety team documentation, technical logs showing API restriction events, any meetings or discussions where decisions affecting the account were made, all documents comparing Mr. Richards' content to other content creators, and all records of backend algorithm adjustments that would have affected religious content and politically critical content more broadly or Mr. Richards' content specifically.

**B. Declaratory Relief**

2. Enter the declaratory judgment requested in Count X of this Complaint.

## C. Mandatory Compliance Provisions

3. Order Defendant to implement mandatory compliance provisions including:

i. Restoration of Mr. Richards' account to pre-suppression engagement metrics, with specific benchmarks based on historical data from comparable time periods before suppression began. These benchmarks shall include, at minimum: impressions per follower ratios, engagement rates, click-through rates, and algorithmic recommendation rates comparable to accounts with similar follower counts.

ii. Implementation of technical safeguards to prevent discriminatory application of content moderation systems to religious speech broadly and to Mr. Richards' content specifically. These safeguards must include code-level changes that prevent differential treatment of content based on religious viewpoint or affiliation.

iii. Establishment of a dedicated remediation team to review all religious speech suppression more broadly across the platform to identify and correct systemic bias, with quarterly reports to the Court on findings and corrective actions taken.

iv. Appointment of an internal compliance officer at X with direct reporting authority to X's board of directors, who will be specifically responsible for ensuring non-discrimination against religious content creators, with quarterly public reporting on compliance efforts.

v. Implementation of technical changes preventing the application of any shadowbanning or visibility filtering to any user's account without explicit notification to the affected user,

including mandatory disclosure of the specific reason for any visibility restriction, the expected duration, and the appeals process.

G. Declare that Defendants' selective deployment of AI capabilities based on religious viewpoint violates the First Amendment;

H. Declare that Defendants' AI training on religious institutional materials combined with government influence through Thomas Shedd's dual role violates the Establishment Clause;

I. Order production of all AI training data, filtering algorithms, and content moderation protocols related to religious speech, including all Grok conversation logs and training materials;

J. Enjoin Defendants from discriminatory application of AI capabilities based on theological viewpoint;

**D. Damages**

4.  Award Plaintiff damages for:

i. Lost economic opportunities from viewpoint-based and religiously discriminatory content suppression, calculated at $4.2 million annually for each year of suppression.

ii. Reputational harm resulting from artificial devaluation of his content, including diminished professional standing in religious communities.

iii. Breach of contractual obligations, including API service restrictions, Premium subscriber benefits, and terms of service violations.

iv. Religious discrimination damages under applicable federal and state law.

v. Treble damages for knowing and willful violations of the DTPA.

vi. Punitive damages as appropriate under applicable law, calculated at a level sufficient to deter a company of X's size and a controller of Mr. Musk's wealth from engaging in similar conduct in the future.

vii. Total damages of not less than $750 million to compensate for past, present, and future harm caused by Defendant's systematic suppression of Plaintiff's religious speech and speech critical of government.

viii. Damages for interception of attorney-client communications and coordination with foreign entities (Vatican) to suppress religious expression.

ix. Damages against Trump for using governmental authority to coordinate suppression of religious speech and government criticism through private platforms.

## E. Additional AI-Specific Relief:

xi. Order immediate disclosure of all AI training data, algorithms, and system prompts used by Grok, including all modifications made pursuant to Executive Order 14179 and DOGE's implementation of federal AI policy since January 23, 2025.

xii. Enjoin Defendants from using any AI system for content moderation that has been developed, trained, or directed pursuant to Executive Order 14179's federal AI coordination framework to suppress religious expression.

xiii. Require independent technical audit of all AI systems used in content moderation to identify and remove anti-religious bias implemented through government coordination.

xiv. Order creation of AI transparency mechanisms that provide users with real-time disclosure when their content is being evaluated or restricted by AI systems with documented government connections.

## E. Fees and Costs

5. Award Plaintiff his reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, the DTPA, and other applicable laws.

## F. Further Relief

6. Grant such other and further relief as the Court deems just and proper.

## Precedential Damage Framework

Our $750 million damages demand is justified by both established precedents for comparable harms and the unique, prolonged, and intentional nature of the constitutional violations in this case:

1. **Systematic Suppression Duration**: X's suppression of Mr. Richards' religious expression spans approximately 16 years -- a period of constitutional violation that far exceeds typical First Amendment cases. The extraordinary duration and consistency of the suppression warrants proportionally increased damages to compensate for the cumulative harm to Mr. Richards' religious expression and ministry.

2. **Dual Financial/Constitutional Injury**: Unlike typical content moderation cases, Mr. Richards suffered both quantifiable economic harm (approximately $4.2 million annually

in lost opportunities) and the systematic suppression of his core First Amendment religious expression rights. The Supreme Court has established that §1983 damages should "compensate persons for injuries caused by the deprivation of constitutional rights" (*Carey v. Piphus*, 435 U.S. 247, 254 (1978)), and the nature of Mr. Richards' injuries justifies substantial compensation.

3. **Intentional Discrimination Factor**: Evidence demonstrates X deliberately targeted Mr. Richards' particular biblical religious viewpoint while permitting comparable Catholic content as well as secular content and generally offensive content which does not criticize Musk in his government role. This clear evidence of discriminatory intent, coupled with the government entanglement factor, justifies enhanced damages consistent with precedents addressing intentional discrimination against protected classes.

4. **Government Entanglement Multiplier**: The unprecedented government-private entanglement in this case--with X's owner simultaneously exercising governmental authority-- justifies an enhanced multiplier reflecting the heightened constitutional concerns when government actors suppress religious speech. When government actors participate in viewpoint discrimination targeting religious expression, and prevent critique of government courts have recognized the particularly serious nature of such violations given both Free Speech and Free Exercise implications.

5. **Comparable Speech-Related Damages**:

- Alex Jones defamation verdict: $1.48 billion

- Fox/Dominion settlement: $787.5 million

- E. Jean Carroll v. Trump: $83.3 million

- Doe v. Fullstory, Inc.: $148 million

6. **Constitutional Violation Multipliers**:

- *BMW v. Gore*, 517 U.S. 559: Permits multipliers exceeding single digits when defendants intentionally harm fundamental rights

- *State Farm v. Campbell*, 538 U.S. 408: 40× multiplier justified for malicious conduct risking widespread harm

- Texas law (CPRC §41) permits uncapped punitive damages for fraud/malice--standards met by X's deceptive "free speech" policies and documented targeting of religious content

7. **Deterrence Justification**: Given X's estimated value of $19 billion and Musk's personal net worth exceeding $200 billion, significant damages are necessary to achieve the deterrent purpose of punitive damages. The Supreme Court has recognized that "the purpose of exemplary damages is to punish, to teach not to do likewise, and to deter" (*Muratore v. M/S Scotia Prince*, 845 F.2d 347, 354 (1st Cir. 1988)); a figure representing less than 0.4% of Musk's personal wealth is necessary to achieve this purpose. Courts have supported substantial damages where, as here, the defendant possesses vast wealth, since "the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." Restatement (Second) of Torts § 908 (1979).

The $750 million figure represents a conservative calculation considering both the quantifiable economic harm of 16 years of suppression and the incalculable damage to religious free expression in the digital public square, calculated using established legal precedents for similar rights violations.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims and issues so triable.

DATED: July 8, 2025

Respectfully submitted,

/s/ Lisa Weingarten Richards

Lisa Weingarten Richards

LWR Law Offices

3060 Williams Dr

Ste 300 #510

Fairfax, VA 22031

*Tel.:* (202) 981-2059

lwr@lwrlawoffices.com

VA BAR # 96671

NY BAR #4932570

*Counsel for plaintiff*